## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

Geraud Darnis, David Hess, Michael Maurer, Richard Sanfrey, Dino DePellegrini, Bradley Hardesty, Roy Dion, Alan Machuga, Theresa MacKinnon, Christopher Doot, David Carter and Costas Loukellis, on behalf of themselves and all others similarly situated,

    Plaintiffs,

  vs.

Raytheon Technologies Corporation, Carrier Global Corporation, Otis Worldwide Corporation, United Technologies Corporation Long-Term Incentive Plan, United Technologies Corporation 2018 Long-Term Incentive Compensation Plan, Carrier Global Corporation 2020 Long-Term Incentive Plan, Otis Worldwide Corporation 2020 Long-Term Incentive Plan, United Technologies Corporation Savings Restoration Plan, Carrier Global Corporation Savings Restoration Plan, Otis Worldwide Savings Restoration Plan, United Technologies Company Performance Share Unit Deferral Plan, Carrier Global Corporation LTIP Performance Share Unit Deferral Plan, Otis Worldwide Corporation LTIP Performance Share Unit Deferral Plan, United Technologies Company Deferred Compensation Plan**,** Carrier Global Corporation Deferred Compensation Plan, Otis Worldwide Corporation Deferred Compensation Plan, UTC Company Automatic Contribution Excess Plan, Carrier Global Corporation Company Automatic Contribution Excess Plan, Otis Worldwide Corporation Company Automatic Contribution Excess Plan, Lloyd J. Austin, III, Diane M. Bryant, John V. Faraci, Jean-Pierre Garnier, Gregory J. Hayes, Christopher J. Kearney, Ellen J. Kullman, Marshall O. Larsen, Harold McGraw, III, Robert K. Ortberg, Margaret L. O'Sullivan, Denise L. Ramos, Frederic G. Reynolds, Brian C. Rogers, David Gitlin, John J. Greisch, Charles M. Holley, Jr., Michael M. McNamara, Michael A. Todman, Virginia M. Wilson, Jeffrey H. Black, Kathy Hopinkah, Shailesh G. Jejurikar, Judith F. Marks, Margaret M. Preston, Shelley Stewart, Jr., and John H. Walker.

    Defendants.

Civil Action No.: 3:20-cv-1171

**CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

JURISDICTION AND VENUE ........................................................................... 3

PARTIES ............................................................................................................ 4

SUBSTANTIVE ALLEGATIONS .................................................................... 12

    A.    The UTC Plans Before the Transaction ............................................ 12

        1.    The UTC LTIP ........................................................................ 12

        2.    The UTC 2018 LTIP ............................................................... 16

        3.    The UTC Savings Restoration Plan ...................................... 17

        4.    The UTC PSU Deferral Plan................................................. 17

        5.    UTC DC Plan .......................................................................... 18

        6.    The UTC CACEP ................................................................... 19

    B.    UTC's Businesses Before the Transaction .................................... 20

    C.    Defendants Affirmed Their Obligations To Treat The Participants Fairly Before the Transaction.................................................................... 22

    D.    UTC's Board Announces the Terms of the Spin-Offs.................... 23

    E.    The Transaction's Effect on the UTC Plans ................................... 24

        1.    Awards under the UTC LTIP and the UTC 2018 LTIP........... 25

            a.    Vested Stock Options and SARs................................... 25

            b.    Unvested Stock Options and SARs............................... 25

            c.    Unvested RSUs .............................................................. 26

            d.    PSUs............................................................................... 26

        2.    UTC Stock Units in the UTC ERISA Plans ........................... 26

    F.    Defendants' Formulae Harmed Plaintiffs ....................................... 27

        1.    Vested Stock Options and SARs............................................ 27

       2.      Unvested Stock Options, SARs, PSUs and RSUs .................................. 30

       3.      The UTC ERISA Plans ....................................................................... 31

  G.    Participants in the UTC 401(k) Plan Were Treated Fairly in the Transaction...... 32

  H.    RTX Admitted the Formulae in the EMA Were Unfair and Inequitable to
      Participants................................................................................................... 33

CLASS ACTION ALLEGATIONS ................................................................................ 34

CLAIMS FOR RELIEF .................................................................................................. 37

FIRST CAUSE OF ACTION AGAINST RTX, THE UTC LTIP, THE UTC 2018 LTIP,
    CARRIER, OTIS AND THE CARRIER AND OTIS LTIPs
    (Breach of Contract) ....................................................................................... 37

SECOND CAUSE OF ACTION AGAINST RTX, THE UTC LTIP, THE UTC 2018 LTIP,
    CARRIER, OTIS AND THE CARRIER AND OTIS LTIPs
    (Breach of Implied Covenant of Good Faith and Fair Dealing) ....................... 38

THIRD CAUSE OF ACTION AGAINST RTX, THE UTC DIRECTOR DEFENDANTS
    AND THE COMMITTEE DEFENDANTS
    (Breach of Fiduciary Duty Concerning the UTC LTIP and the UTC 2018 LTIP)........... 40

FOURTH CAUSE OF ACTION AGAINST THE UTC ERISA PLANS,
    THE CARRIER ERISA PLANS AND THE OTIS ERISA PLANS
    (Claim to Enforce Rights and Recover Benefits under ERISA § 502(a)(1)(B),
    29 U.S.C. § 1132(a)(1)(B)) ............................................................................. 42

FIFTH CAUSE OF ACTION AGAINST RTX, THE COMMITTEE DEFENDANTS,
    AND THE UTC DIRECTOR DEFENDANTS
    (Declaratory and Equitable Relief under ERISA § 404(a)(1),
    29 U.S.C. § 1104(a)(1) and § 502(a)(3), 29 U.S.C. § 1132(a)(3)).................................... 44

SIXTH CAUSE OF ACTION AGAINST THE CARRIER DIRECTOR DEFENDANTS
    AND OTIS DIRECTOR DEFENDANTS
    (Breach of Fiduciary Duty)............................................................................. 48

PRAYER FOR RELIEF .................................................................................................. 50

JURY DEMAND ............................................................................................................. 50

Plaintiffs Geraud Darnis, David Hess, Michael Maurer, Richard Sanfrey, Dino DePellegrini, Bradley Hardesty, David Carter, Roy Dion, Alan Machuga, Theresa MacKinnon, Christopher Doot and Costas Loukellis, on behalf of themselves and all others similarly situated, based on their personal knowledge regarding their own circumstances and based on information and belief as to all other allegations, allege the following.

## INTRODUCTION

1.     This is a class action stemming from Defendants substantial mistreatment of participants in certain of United Technologies Corporation's ("UTC") compensation plans when UTC spun-off Carrier Global Corporation ("Carrier") and Otis Worldwide Corporation ("Otis") into separate companies and merged with Raytheon Corporation ("Old Raytheon") to form Raytheon Technologies Corporation ("RTX").  The spin-offs and merger are collectively referred to as the "Transaction."

2.     UTC's compensation plans at issue provided participants with compensation in the form of Stock Options, Stock Appreciation Rights ("SARs"), and other rights in UTC common stock.  UTC offered and encouraged participation in the compensation plans and assured participants that it would make "equitable adjustments" to preserve the value of participants' compensation if UTC spun-off a subsidiary or merged with another company.  UTC furthered assured participants that the value preservation would be measured in relation to the treatment of common stock and option investors and the value of UTC's share price on the New York Stock Exchange.

3.     In breach of these obligations, when Defendants converted Plaintiffs' and Class Members' stock-based compensation into interests in RTX, Carrier and Otis, they used formulae that treated compensation plan participants in a manner that was significantly inferior and inequitable as compared to how UTC common stock and option owners were treated in the

1

Transaction.  While common stock owners received 1 share of RTX, 1 share of Carrier and .5 shares in Otis in the Transaction for each share of UTC stock they owned; Plaintiffs and Class Members only received .851 shares in RTX and Carrier and only .425 shares in Otis.  To make matters worse, Defendants' formulae increased the exercise price (also known as "Strike Price" or grant price) at which Plaintiffs and Class Members could exercise their Stock Options and SARs, which further diminished Plaintiffs' and Class Members' interests and deprived them of the benefits realized by UTC's common stock and option owners.

4.     Defendants' formulae directly contradicted the plans' purpose to "align executive and shareowner interests."  In contrast to other UTC equity investors, the increases in RTX, Carrier and Otis's share prices in the days following the Transaction *significantly harmed* Plaintiffs and the Class.  Plaintiffs received fewer shares in the new companies, the Strike Prices for their options and SARs increased and the values of their interests were diminished.  Defendants' wrongful conduct harmed Plaintiffs and Class Members in excess of $100,000,000.

5.     Importantly, RTX already has recognized publicly in a Form 8-K securities filing the impropriety of using the conversion formulae that it and the other Defendants employed.  In order to correct the substantial financial harm to those with *unvested* equity benefits, RTX changed the formulae that were used to convert some of its employees' UTC-equity-based compensation after the Transaction to "treat employees and retirees *fairly* in the conversion process."

6.     RTX also attempted to change the formulae for Plaintiffs and Class Members with *vested* benefits so that they too would be treated "fairly," but such a change required the agreement of Carrier and Otis.  According to RTX's 8-K, Carrier and Otis refused to agree, thereby perpetuating the harm to Plaintiffs and the Class.

2

7.      Plaintiffs bring this case on behalf of themselves and the thousands of participants in UTC's compensation plans who had their plan benefits substantially diminished in the Transaction.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq*. ("ERISA").

9.      This Court also has subject matter jurisdiction over Plaintiffs' Delaware state law claims pursuant to 28 U.S.C. § 1332(d)(2), because is a class action, the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest or costs, and there is diversity of citizenship between some Class Members and some Defendants.

10.     This Court has personal jurisdiction over each of the Defendants because at the relevant times they are or were headquartered and transacted business in, or resided in, and still have significant contacts with, this District, and because ERISA provides for nationwide service of process.

11.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the alleged ERISA violations occurred in this District and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because each of the Defendants does business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within in Farmington, Connecticut, which is in this District.

## PARTIES

### Plaintiffs

12.      Plaintiff Geraud Darnis is an individual residing of the State of Florida.  Darnis was a participant in the United Technologies Corporation Long-Term Incentive Plan ("UTC LTIP") and the United Technologies Corporation Savings Restoration Plan ("UTC SRP") before the Transaction and pursuant to the Transaction remained in the UTC LTIP (now under the name RTX) and is now a participant in the Carrier Global Corporation 2020 Long Term-Term Incentive Plan ("Carrier LTIP"), the Carrier Global Corporation Savings Restoration Plan ("Carrier SRP") and the Otis Worldwide Long-Term Incentive Plan ("Otis LTIP").

13.      Plaintiff David Hess is an individual residing in the State of Connecticut.  Hess was a participant in the UTC LTIP and the UTC SRP before the Transaction and has remained a participant in those plans (now under the name RTX) and now is a participant in the Carrier LTIP and Otis LTIP after the Transaction.

14.      Plaintiff Michael Maurer is an individual residing in the State of Florida.  Maurer was a participant in the UTC LTIP and the UTC SRP before the Transaction and has remained a participant in the UTC LTIP (now under the name RTX) and now is a participant in the Carrier LTIP, the Otis LTIP and the Otis Worldwide Corporation Savings Restoration Plan ("Otis SRP") after the Transaction.

15.      Plaintiff Richard Sanfrey is an individual residing in the State of Florida.  Sanfrey was a participant in the UTC LTIP and the UTC Savings Restoration Plan before the Transaction and remained a participant in the UTC LTIP (now under the name RTX) and now is is a participant in the Carrier LTIP, the Otis LTIP and the Carrier SRP after the Transaction.

4

16.     Plaintiff Dino DePellegrini is an individual residing in the State of Connecticut. DePellegrini was a participant in the UTC LTIP and the UTC SRP before the Transaction and has remained a participant in the UTC LTIP (now under the name RTX) and now is a participant in the Carrier LTIP, the Otis LTIP and the Otis SRP after the Transaction.

17.     Plaintiff Bradley Hardesty is an individual residing in the State of Indiana. Hardesty was a participant in the UTC LTIP before the Transaction and has remained a participant in that plan (now under the name RTX) and now is a participant in the Carrier LTIP, Otis LTIP, Carrier Global Corporation LTIP Performance Share Unit Deferral Plan ("Carrier PSU Deferral Plan"), Carrier Global Corporation Deferred Compensation Plan ("Carrier DC Plan") and Carrier SRP after the Transaction.

18.     Plaintiff Christopher Doot is an individual residing in the State of Maryland.  Doot was a participant in the UTC LTIP before the Transaction and has remained a participant in the UTC LTIP (now under the name RTX) and now is a participant in the Carrier LTIP and the Otis LTIP after the Transaction.

19.     Plaintiff David Carter is an individual residing in the Commonwealth of Massachusetts.  Carter was a participant in the UTC LTIP, the United Technologies Corporation Performance Share Unit Deferral Plan ("UTC PSU Deferral Plan") and the UTC SRP before the Transaction and has remained a participant in those plans (now under the name RTX) after the Transaction and now is a participant in the Carrier LTIP and the Otis LTIP after the Transaction.

20.     Plaintiff Roy Dion is an individual residing in the State of Florida.  Dion was a participant in the UTC LTIP before the transaction and has remained a participant in the UTC LTIP (now under the name RTX) and now is a participant in the Carrier LTIP and the Otis LTIP after the Transaction.

21.     Plaintiff Alan Machuga is an individual residing in the State of Florida.  Machuga was a participant in the UTC LTIP, the United Technologies Corporation 2018 Long-Term Incentive Plan (the "UTC 2018 LTIP"), the UTC Deferred Compensation Plan (the "UTC DC Plan"), the UTC PSU Deferral Plan and the UTC SRP before the Transaction and now is a participant in the UTC LTIP (now under the name RTX), Carrier LTIP, Otis LTIP, the Carrier DC Plan, the Carrier PSU Deferral Plan and the Carrier SRP after the Transaction.

22.     Plaintiff Theresa MacKinnon is an individual residing in the State of Connecticut. MacKinnon was a participant in the UTC LTIP before the Transaction and has remained a participant in the UTC LTIP (now under the name RTX) and now is a participant in the Carrier LTIP and the Otis LTIP after the Transaction.

23.     Plaintiff Costas Loukellis is an individual residing in the State of Connecticut. Loukellis was a participant in the UTC LTIP and the UTC SRP before the Transaction and has remained a participant in those plans (now under the name RTX) and now is a participant in the Carrier LTIP and the Otis LTIP after the Transaction.

**<u>Defendants</u>**

24.     Defendant RTX is a Delaware corporation with its principal place of business is in Waltham, Massachusetts. RTX was formerly named UTC, a Delaware corporation with a principal place of business in Farmington, Connecticut, before the Transaction.

25.     Defendant Otis is a Delaware corporation with its principal place of business in Farmington, Connecticut.

26.     Defendant Carrier is a Delaware corporation with its principal place of business in Palm Beach Gardens, Florida.

27.     Defendant UTC LTIP is a non-qualified, non-ERISA plan of incentive compensation sponsored by RTX.

28.     Defendant UTC 2018 LTIP is a non-qualified, non-ERISA plan of incentive compensation sponsored by RTX.

29.     Defendant UTC SRP is a plan of deferred compensation under ERISA sponsored by RTX.

30.     Defendant UTC PSU Deferral Plan is a plan of deferred compensation under ERISA sponsored by RTX.

31.     Defendant United Technologies Corporation Deferred Compensation Plan ("UTC DC Plan") is plan of deferred compensation under ERISA sponsored by RTX.

32.     Defendant United Technologies Corporation Company Automatic Excess Contribution Plan ("UTC CACEP") is a plan of deferred compensation under ERISA sponsored by RTX.

33.     The UTC LTIP, the UTC 2018 LTIP, the UTC SRP, the UTC PSU Deferral Plan, the UTC DC Plan and the UTC CACEP are referred to as the "UTC Plans."

34.     The UTC SRP, the UTC PSU Deferral Plan, the UTC DC Plan and the UTC CACEP are referred to as the "UTC ERISA Plans."

35.     Defendant Carrier LTIP is a non-qualified, non-ERISA plan of incentive compensation sponsored by Carrier.

36.     Defendant Carrier SRP is a plan of deferred compensation under ERISA sponsored by Carrier.

37.     Defendant Carrier PSU Deferral Plan is a plan of deferred compensation under ERISA sponsored by Carrier.

38.     Defendant Carrier DC Plan is a plan of deferred compensation under ERISA sponsored by Carrier.

39.     Defendant Carrier Global Corporation Company Automatic Excess Contribution Plan ("Carrier CACEP") is a plan of deferred compensation under ERISA sponsored by Carrier.

40.     The Carrier LTIP, the Carrier SRP, the Carrier DC Plan, the Carrier PSU Deferral Plan and the Carrier CACEP are referred to as the "Carrier Plans."

41.     The Carrier SRP, the Carrier DC Plan, the Carrier PSU Deferral Plan and the Carrier CACEP are referred to as the "Carrier ERISA Plans."

42.     Defendant Otis LTIP is a non-qualified, non-ERISA plan of incentive compensation sponsored by Otis.

43.     Defendant Otis SRP is a plan of deferred compensation under ERISA sponsored by Otis.

44.     Defendant Otis LTIP Performance Share Unit Deferral Plan ("Otis PSU Deferral Plan") is a plan of deferred compensation under ERISA sponsored by Otis.

45.     Defendant Otis Deferred Compensation Plan ("Otis DC Plan") is a plan of deferred compensation under ERISA sponsored by Otis.

46.     Defendant Otis Worldwide Corporation Company Automatic Excess Contribution Plan ("Otis CACEP") is a plan of deferred compensation under ERISA sponsored by Otis.

47.     The Otis LTIP, the Otis SRP the Otis DC Plan, the Otis PSU Deferral Plan and the Otis CACEP are referred to as the "Otis Plans."

48.     The Otis SRP, the Otis DC Plan, the Otis PSU Deferral Plan, and the Otis CAECP are referred to as the "Otis ERISA Plans."

49.    The United Technologies Corporation Compensation Committee is an unincorporated association under Connecticut law that administered the UTC Plans, the Carrier Plans and the Otis Plans before the Transaction.

### UTC Directors

50.    Defendant Lloyd J. Austin III ("Austin") was a director of UTC at all material times before the Transaction.

51.    Defendant Diane M. Bryant ("Bryant") was a director of UTC at all material times before the Transaction.

52.    Defendant John V. Faraci ("Faraci") was a director of UTC and a Member of Compensation Committee at all material times before the Transaction.

53.    Defendant Jean-Pierre Garnier ("Garnier") was a director of UTC and the Chair of Compensation Committee at all material times before the Transaction.

54.    Defendant Gregory J. Hayes ("Hayes") was the CEO and a director of UTC at all material times before the Transaction.

55.    Defendant Christopher J. Kearney ("Kearney") was a director of UTC at all material times before the Transaction.

56.    Defendant Ellen J. Kullman ("Kullman") was a director of UTC and a Member of Compensation Committee at all material times before the Transaction.

57.    Defendant Marshall O. Larsen ("Larsen") was a director of UTC at all material times before the Transaction.

58.    Defendant Harold McGraw III ("McGraw") was a director of UTC and a Member of Compensation Committee at all material times before the Transaction.

59.     Defendant Robert K. Ortberg ("Ortberg") was a director of UTC at all material times before the Transaction.

60.     Defendant Margaret L. O'Sullivan ("O'Sullivan") was a director of UTC at all material times before the Transaction.

61.     Defendant Denise L. Ramos ("Ramos") was a director of UTC and a Member of Compensation Committee at all material times before the Transaction.

62.     Defendant Fredric G. Reynolds ("Reynolds") was a director of UTC at all material times before the Transaction.

63.     Defendant Brian C. Rogers ("Rogers") was a director of UTC and a Member of Compensation Committee at all material times before the Transaction.

64.     Austin, Bryant, Faraci, Garnier, Hayes, Kearney, Kullman, Larsen, McGraw, Ortberg, O'Sullivan, Ramos, Reynolds, and Rogers are collectively referred to as the "UTC Director Defendants."

65.     Faraci, Garnier, Kullman, McGraw, Ramos, and Rogers are collectively referred to as the "Committee Defendants."

***Carrier Directors***

66.     Faraci has been a director of Carrier at all material times after the Transaction.

67.     Garnier has been a director of Carrier at all material times after the Transaction.

68.     Defendant David Gitlin ("Gitlin") has been a director of Carrier at all material times after the Transaction.

69.     Defendant John J. Greisch ("Greisch") has been a director of Carrier at all material times after the Transaction.

10

70.     Defendant Charles M. Holley, Jr. ("Holley") has been a director of Carrier at all material times after the Transaction.

71.     Defendant Michael M. McNamara ("McNamara") has been a director of Carrier at all material times after the Transaction.

72.     Defendant Michael A. Todman ("Todman") has been a director of Carrier at all material times after the Transaction.

73.     Defendant Virginia M. Wilson ("Wilson") has been a director of Carrier at all material times after the Transaction.

74.     Faraci, Garnier, Gitlin, Greisch, Holley, McNamara, Todman and Wilson are collectively referred to as the "Carrier Director Defendants."

*Otis Directors*

75.     Defendant Jeffrey H. Black ("Black") has been a director of Otis at all material times after the Transaction.

76.     Defendant Kathy Hopinkah ("Hopinkah") has been a director of Otis at all material times after the Transaction.

77.     Defendant Shailesh G. Jejurikar ("Jejurikar") has been a director of Otis at all material times after the Transaction.

78.     Kearney has been a director of Otis at all material times after the Transaction.

79.     Defendant Judith F. Marks ("Marks") has been a director of Otis at all material times after the Transaction.

80.     Defendant McGraw has been a director of Otis at all material times after the Transaction.

81.     Defendant Margaret M. Preston ("Preston") has been a director of Otis at all material times after the Transaction.

82.     Defendant Shelley Stewart Jr. ("Stewart") has been a director of Otis at all material times after the Transaction.

83.     Defendant John H. Walker ("Walker") has been a director of Otis at all material times after the Transaction.

84.     Black, Hopkinah, Jejurikar, Kearney, Marks, McGraw, Preston, Stewart and Walker are collectively referred to as the "Otis Director Defendants."

## SUBSTANTIVE ALLEGATIONS

A.     **The UTC Plans Before the Transaction**

85.     UTC sponsored the UTC Plans for its executives, management and other key employees before the Transaction "to give UTC a competitive advantage in attracting and retaining" these employees.  *See, e.g.*, UTC LTIP at § 1; *see also* UTC's Notice of 2019 Annual Meeting of Shareowners and Proxy Statement at 54 ("Retirement and deferred compensation plans help UTC attract and retain talented executives.").  UTC told its equity holders that the UTC Plans "align[ed] executive and shareowner interests."   UTC's Notice of 2019 Annual Meeting of Shareowners and Proxy Statement at 21.

1.     **The UTC LTIP**

86.     The UTC LTIP provided participants with "Awards" of incentive compensation in the form of Stock Options and Stock Appreciation Rights (SARs) for UTC common stock, performance share units ("PSUs") based on UTC's attainment of performance goals, and restricted stock units ("RSUs") of UTC common stock.  The UTC LTIP's purpose was to "align shareholder

and management interests through stock and performance-based awards ***linked to shareowner value . . . .***" *See* UTC LTIP at § 1 (emphasis added).

87.     UTC described the "material features" of each type of Award in a "Schedule of Terms" that UTC sent to participants each year and attached as an exhibit to its annual report filed with the SEC on Form 10-K.

88.     Stock Options entitled participants to buy shares of UTC common stock at a Strike Price at any time between the award's vesting date ("Vesting Date") and a future date (the "Exercise Date"). UTC LTIP at § 5(a); Stock Options Schedule of Terms at 2. The Strike Price was the closing price for UTC common stock on the New York Stock Exchange on the date the options were awarded (the "Grant Date"). If the price of UTC common stock exceeded the Strike Price between the Vesting Date and the Exercise Date, participants could purchase UTC common stock at a discount as compared to its price on the New York Stock Exchange.

89.     "A Stock Appreciation Right (a 'SAR') provides the recipient with the right to the appreciation in the Common Stock of [UTC] measured from the date of grant to the date of exercise." Participants holding SARs have the right to the appreciated value between the Strike Price and the stock's price on the New York Stock Exchange in "shares of Common Stock" or as a "cash payment" from UTC. UTC LTIP at § 5(b); SAR Schedule of Terms at 2.

90.     Participants who held PSUs received shares of UTC common stock if UTC met certain performance goals, such as a specified earnings per share or revenue growth. UTC LTIP at §§ 7(a), 2(v); PSU Schedule of Terms at 2, 3. Each PSU was "equal in value to one share of common stock of [UTC]." PSU Schedule of Terms at 1.

91.     Participants who held RSUs owned shares of UTC common stock subject to a specified vesting period and UTC's attainment of performance targets. UTC LTIP at §§ 6(a), 8.

13

Each RSU was "equal in value to one share of common stock of [UTC]."  RSU Schedule of Terms at 1.  While participants could not sell, assign, transfer or pledge their RSUs before they vested, participants otherwise had "all of the rights of a shareowner of [UTC]," including "the right to receive cash dividends at the same time as the dividends are paid to [UTC's] other shareowners." UTC LTIP at § 6(b)(ii).

92.     The value of all Awards under the UTC LTIP were measured by the "Fair Market Value" of UTC common stock, a term defined as:

> in reference to the grant of an Award, means the closing price for [UTC] Common Stock on the Exchange on the Grant Date. In reference to the exercise, vesting, settlement or payout of an Award, Fair Market Value may mean the average of the high and low per share trading prices, or the closing price, or the real time trading price, for [UTC] Common Stock on the Exchange during regular session trading on the relevant date, as specified in the Award Agreement. If there is no reported price on the relevant date, Fair Market Value will be determined for the next following day for which there is a reported price for [UTC] Common Stock.[1]

UTC LTIP at § 2(r); *see also* SAR Schedule of Terms at 2.

93.     The Compensation Committee administered the UTC LTIP.  UTC LTIP at § 2(i).

94.     If UTC entered into a "stock split, reverse stock split, share combination, recapitalization, sale of assets, stock dividend, extraordinary dividend or similar event affecting the value of" UTC stock, the UTC LTIP provided that the Compensation Committee or UTC would adjust the number of participants' Awards and the applicable Strike Price "***to preserve the value of Awards***." UTC LTIP at § 10(a) (emphasis added).

95.     If UTC entered into "Corporate Transaction," including a "merger, consolidation, [or] spin-off," the Compensation Committee or UTC's Board could make "***appropriate and equitable***" adjustments to the number of participants' Awards and the applicable Strike Prices of

---

[1]     The term "Exchange" means the New York Stock Exchange.  UTC LTIP at § 2(p).

those Awards.  UTC LTIP at § 10(b).   "Adjustments may include, without limitation, the cancellation of outstanding Awards in exchange for payments of cash, property or a combination thereof having an aggregate value equal to the value of such Awards, as determined by the [Compensation] Committee or the Board in its sole discretion ***to be necessary or appropriate to protect the value of Participants' interests in their Awards***."  *Id*. (emphasis added).

96.    Each Schedule of Terms that UTC issued stated that if UTC spun-off a subsidiary, "***equitable adjustments shall be made*** . . . ***to prevent an increase or decrease in the value of [Awards] relative to [UTC] Common Stock or the dilution or enlargement of rights of recipients***."  *See* SAR Schedule of Terms at 4 (emphasis added); *see also RSU Schedule of Terms at 3-4*.

97.    Section 12(d) of the UTC LTIP, titled "Amendment of Awards," provides:

> Subject to Section 10, the [Compensation] Committee may unilaterally amend the terms of any Award theretofore granted, prospectively or retroactively, ***but no such amendment shall be made without the Participant's consent if such amendment materially impairs the rights of any Participant with respect to an Award***, except amendments made to cause the Plan or Award to comply with applicable law, stock exchange rules, tax rules or accounting rules. No amendment to any Award shall reduce the exercise price of any Option or Stock Appreciation Right except to the extent necessary to preserve the value of the Award in the event of a stock split or other "Share Change" as defined in Section 10(a) or a "Corporate Transaction" as described in Section 10(b).

UTC LTIP at § 12(d).

98.    Section 3(c) of the UTC LTIP provides that the Compensation Committee had discretion to make determinations "with respect to any Award. . . . ***unless in contravention of any express term of the [UTC LTIP]***."  (emphasis added).  Likewise, UTC's Board could "amend, alter or discontinue the [UTC LTIP], ***but no amendment, alteration or discontinuation shall be***

*made which would materially impair the rights of a Participant with respect to a previously granted Award without such Participant's consent . . . .*"  UTC LTIP at § 12(c).

### 2.      The UTC 2018 LTIP

99.      UTC established the UTC 2018 LTIP to provide participants with Stock Options, SARs, PSUs and RSUs between April 30, 2018 and April 30, 2028 that in previous years were awarded under the UTC LTIP.  *See* UTC's Notice of 2018 Annual Meeting of Shareowners and Proxy Statement ("2018 Proxy Statement") at 68.  Awards issued under the UTC LTIP "remained in full force and effect under the [UTC LTIP] according to their respective terms" when the UTC 2018 LTIP was established.  UTC 2018 LTIP at § 3(b).

100.      The UTC 2018 LTIP's purpose was "to implement a compensation program that correlates compensation opportunities with shareowner value . . . ."  UTC 2018 LTIP at § 1; *see also* 2018 Proxy Statement at 68 ("The Board believes that the [UTC 2018 LTIP] will serve its intended purpose of: *Aligning shareowner and management interests* . . . ." (emphasis in original).

101.      The Compensation Committee administered the UTC 2018 LTIP.  UTC 2018 LTIP at § 2(a).  If UTC spun-off a subsidiary, the Compensation Committee could "make such substitutions or adjustments as it deems appropriate *and equitable* to" the number of participants' Awards and the Strike Prices for those Awards.  UTC 2018 LTIP at § 3(e). (emphasis added)

102.      Under the UTC 2018 LTIP, the Compensation Committee could "unilaterally amend the terms of any Award theretofore granted, *but no such amendment shall, without the Participant's consent, materially impair the rights of any Participant with respect to an Award. . . .*"  UTC 2018 LTIP at § 12(c). (emphasis added)

### 3.    The UTC Savings Restoration Plan

103.    The UTC SRP allowed participants to defer up to 6% of their compensation above the income limit that applied to the UTC 401(k) Plan (*e.g.*, $280,000 in 2019).  UTC SRP at Article 1.  Participants could invest their deferred compensation in various investment funds in their individual plan accounts, including a UTC Stock Fund.  UTC SRP at § 4.5.  UTC matched 60% of participants' deferrals, making its contributions to the plan's UTC Stock Fund for the participant's account.

104.    Each share of UTC stock in the UTC Stock Fund was called a "UTC Deferred Stock Unit," with each unit's value "equal to the closing price of one share of UTC Common Stock as reported on the composite tape of the New York Stock Exchange."  UTC SRP at § 6.3.

105.    Participants immediately vested in their own deferrals and vested in UTC's matching contributions upon the earlier of three years of service or two years of participation in the plan.  UTC SRP at § 5.5.

106.    The Compensation Committee was "solely responsible for the administration and operation of the [UTC SRP]," and had the "full and exclusive authority and discretion to . . . carry out the purposes of the [UTC SRP]."  UTC SRP at § 10.1.  UTC could amend the UTC Savings Restoration Plan "in whole or in part, provided that ***no amendment may decrease the value*** of any Plan Accounts as of the date of such amendment."  UTC SRP at § 8.1 (emphasis added).

### 4.    The UTC PSU Deferral Plan

107.    The UTC PSU Deferral Plan allowed participants to defer receiving the PSUs that were scheduled to be paid as shares of UTC common stock under the UTC LTIP.  UTC PSU Deferral Plan at Article I.

108.    Each participant had a "Performance Cycle Account" that represented the value of the PSUs that the participant deferred.  PSU Deferral Plan Document at Article 2(n).  The deferred PSUs were called "Deferred Share Units," and each unit was equal to one share of UTC common stock. PSU Deferral Plan Document at § 7.1.  The value of each Deferred Share Unit was "based on the closing price" of UTC common stock on the New York Stock Exchange as of any given day or, "if the [UTC stock] is not traded on the day, on the next trading day."  UTC PSU Deferral Plan at Section 5.1.

109.    The Compensation Committee administered the UTC PSU Deferral Plan and had the "full and exclusive authority and discretion . . . to carry out the purposes of the [UTC PSU Deferral Plan]."  UTC PSU Deferral Plan at § 9.1. UTC could amend the UTC PSU Deferral Plan, "provided that *no amendment may decrease the value* of any Plan Accounts as of the date of such amendment."  UTC PSU Deferral Plan at § 6.1.  (emphasis added)

110.    The UTC PSU Deferral Plan provides that if there is "any change" in the shares of UTC stock because of a merger, spin-off, exchange of shares of other corporate change, "the number of Deferred Share Units may be *adjusted appropriately* by the Committee . . . ."  UTC PSU Deferral Plan at § 7.3 (emphasis added).

**5.    UTC DC Plan**

111.    The UTC DC Plan permitted participants to defer up to 50% of their annual salary and 70% of their incentive compensation until: (a) their retirement from UTC; or (b) a fixed period of at least five years.  UTC DC Plan at § 4.4.

112.    Participants could invest their deferred compensation in several investment funds, including one comprised entirely of UTC common stock called the "UTC Stock Fund." Investments in the UTC Stock Fund was expressed as "UTC Stock Units," with each unit "equal

to the closing price of one share of UTC Common Stock" as reported on the New York Stock Exchange." UTC DC Plan at § 5.3.

113.    The Compensation Committee administered the UTC DC Plan and had the "full and exclusive authority and discretion . . . to carry out the purposes of the [UTC Deferred Compensation Plan]." UTC Deferred Compensation Plan at § 9.1.  UTC could amend the plan so long as "*no amendment may decrease the value* of any Plan Accounts as of the date of such amendment." UTC DC Plan at § 7.1.  (emphasis added)

### 6.    The UTC CACEP

114.    The UTC CACEP was for executives and key employees hired on or after January 1, 2010 who were not eligible to participate in UTC's defined benefit pension plan.  UTC CACEP at Article 10.  UTC automatically contributed between 3% and 5.5% of the participant's income that exceeded the income limits that applied to UTC's 401(k) plan (*e.g*., $280,000 in 2018) to participants' plan accounts.  UTC CACEP at § 5.1.

115.    Participants could invest UTC's contributions in the plan's investment funds, including one comprised of UTC common stock.  UTC CACEP at §§ 2, 4.3.  The value of each participant's account was based on the "closing share price" of the funds in which they invested, including a UTC Stock Fund.  UTC CACEP at § 6.3.  Participants were fully vested in the value of their plan accounts after the earlier of: (a) two years of participation in the UTC CACEP; or (b) three years of continuous service for UTC.  UTC CACEP at § 5.4.

116.    The Compensation Committee administered the UTC CACEP and had the "full and exclusive authority and discretion . . . to carry out the purposes of the [UTC CACEP]." UTC CACEP § 10.1.  UTC had the authority to amend the UTC CACEP, "provided that *no amendment*

*may decrease the value* of any Plan Accounts as of the date of such amendment."  UTC CACEP at § 8.1.  (emphasis added)

**B.      UTC's Businesses Before the Transaction**

117.    Before the Transaction, UTC provided technology products and services to the building systems and aerospace industries. Its operations were classified into four business segments: Otis, Carrier, Pratt & Whitney, and Collins Aerospace Systems. Each segment was comprised of groups of similar operating companies. Otis was the world's largest elevator and escalator manufacturing, installation and service company. Carrier was a leading global provider of heating, ventilating, air conditioning (HVAC), refrigeration, fire and security solutions for residential, commercial and industrial and applications. Pratt & Whitney was a leading supplier of aircraft engines for the commercial, military, business jet and general aviation markets. Collins Aerospace Systems was a leading provider of technologically advanced aerospace products and aftermarket service solutions for aircraft manufacturers, airlines, regional, business and general aviation markets, and military and space operations.

118.    On June 9, 2019, UTC entered into a merger agreement with Old Raytheon providing for an all-stock merger of equals transaction, with UTC being the surviving entity. Under the terms of the merger, each share of Old Raytheon common stock was converted into the right to receive 2.3348 shares of UTC common stock. Upon the closing, UTC changed its name to "Raytheon Technologies Corporation."

119.    In conjunction with the merger, and as disclosed in November 2018, UTC would separate into three independent companies.  The Collins Aerospace Systems and Pratt & Whitney business segments would remain part of UTC (and thus merge into the Old Raytheon). The Otis

and Carrier business segments would be spun-off into separate, independent companies and not be part of the new merged company.

120.   UTC expected that spin-offs and merger would increase shareholder value. In November, 2018, UTC Chairman and CEO Gregory Hayes stated about the spin-off of Carrier and Otis: "Our decision to separate United Technologies is a pivotal moment in our history and will best position each independent company to drive sustained growth, lead its industry in innovation and customer focus, and *maximize value creation*." (emphasis added) https://www.floridatrend.com/article/25917/united-technologies-announces-intention-to-separate-into-three-independent-companies; *see also* UTC's Notice of 2019 Annual Meeting of Shareowners and Proxy Statement at 35.

121.   Hayes further stated about UTC's merger with Old Raytheon and spin-off of Otis and Carrier: "I'm confident that each company will continue our proud history of performance, excellence and innovation while building an even brighter future." https://www.cnn.com/2018/11/27/business/united-technologies-breakup-conglomerate/index.html

122.   "Besides hopes of unlocking value, splitting up a conglomerate is also sold as a way to improve the management of each business unit." During the firm's second-quarter earnings conference call, for example, CEO Greg Hayes told analysts, "What we have heard is that people prefer focus. Breaking up United Technologies is management's attempt to give investors what they want on the theory that separately run companies will be more focused and thus effective at driving long-term revenue and cash flow growth."

123.   Hayes described the Transaction as an "important step in the transformation of UTC and the establishment of two independent companies that are leaders in their respective industries

with attractive investment profiles.  As standalone public companies, Carrier and Otis are each well-positioned to drive sustained growth and innovation, with more focused business strategies that will enable them to ***maximize value*** for their customers and shareowners."

https://www.prnewswire.com/news-releases/united-technologies-board-of-directors-approves-separation-of-carrier-and-otis-and-declares-spin-off-distribution-of-carrier-and-otis-shares-301021893.html (emphasis added)

124.    UTC shareholders and market investors agreed.  Activist investors Dan Loeb of Third Point and William Ackman of Pershing Square Capital Management had been pushing for United Technologies to break up into three companies. "The company has been more hampered by its model than it's been helped," said Jim Corridore, an analyst at CFRA Research, told CNN. "It makes a lot of sense for United Technologies to break itself up."  https://www.cfo.com/strategy-budgeting-planning/2018/11/united-technologies-ditches-conglomerate-model

## C.    Defendants Affirmed Their Obligations To Treat The Participants Fairly Before the Transaction

125.    In the months before the Transaction, UTC, Carrier, Otis and the Compensation Committee affirmed their obligation to treat participants in the plans fairly in the Transaction.  In a 2019 Power Point entitled "Stock Conversion," UTC advised Plaintiffs and Class Members that the "[g]oal of the valuation method is to best approximate the ***'true value'*** of each company's stock post-spin." (emphasis added)

126.    In a document entitled "How the Spinoffs and Merger Affect My LTIP Awards," UTC and the Compensation Committee stated that the LTIP Conversion would "have a ***neutral financial impact*** on employees—meaning that the Intrinsic Value of outstanding equity awards before and after the Spinoffs will be equivalent." (emphasis in original)

127.     Similarly, in a document entitled "How the Spinoffs and Merger Affect the UTC Savings Restoration Plan," Defendants affirmed that "the value of your [SRP] account balance *will be preserved*."  (emphasis added)

128.     Another document entitled "How the Spinoffs and Merger Affect the UTC Company Automatic Contribution Excess Plan" stated, "We have designed this transition so that the new Carrier and Otis CACEPs will be the *same* as the UTC CACEP *in all material respects*, and the value of your account balance will be preserved." (emphasis in original).

**D.     UTC's Board Announces the Terms of the Spin-Offs**

129.     To carry out these spin-offs, on March 11, 2020, UTC's Board declared a *pro rata* dividend for UTC shareowners in the form of Carrier common stock and Otis common stock.  Each UTC shareowner of record as of March 19, 2020 at 5:00 p.m. EDT would receive one share of Carrier common stock and one-half share of Otis common stock for each share of UTC common stock they owned, with the distribution occurring when the Transaction closed on April 3, 2020 at 12:01 a.m. EDT.  No fractional shares of Carrier or Otis were issued in the distribution, and instead UTC shareowners received cash in lieu of any fractional shares. UTC shareowners retained their shares of UTC common stock.

130.     Publicly traded options of UTC stock were similarly converted in the spin-off. Each UTC option holder received one Carrier option and one-half of an Otis option.  Each option holder also retained the UTC option.

131.     On March 19, 2020, the common stocks of Carrier and Otis began trading on the New York Stock Exchange on a "when issued" basis, allowing the market to value the post-Transaction prices of Carrier and Otis and the company that would become RTX.

**E.      The Transaction's Effect on the UTC Plans**

132.     As part of the Transaction, UTC, Carrier and Otis entered into a Employee Matters Agreement (the "EMA") on April 2, 2020 to, among other things, allocate the liabilities among RTX, Carrier and Otis after the Transaction.  Under Section 2.01(a) of the EMA, Carrier and its related entities such as the Carrier Plans accepted and assumed the liabilities for, among other things, incentive compensation, equity compensation and any other compensation or benefits payable to current and former employees in the Carrier business segment (the "Carrier Group") that was spun-off.  Under Section 2.01(b) of the EMA, Otis and its related entities like the Otis Plans accepted and assumed the liabilities for, among other things, incentive compensation, equity compensation and any other compensation or benefits payable to current employees and former employees in the Otis business segment (the "Otis Group") that was spun-off.  UTC and its related entities such as the UTC Plans retained the liabilities, for, among other things, incentive compensation, equity compensation and any other compensation or benefits payable to current and former employees in the Pratt & Whitney and Collins Aerospace business segments (the "UTC Group").

133.     Accordingly, Carrier established the Carrier Plans for the members of the Carrier Group and Otis established the Otis Plans for the members of Otis Group to mirror the UTC Plans.

134.     The EMA set forth the multiple formulae that would be used to convert participants' interests in UTC common stock in the UTC Plans in the Transaction.

1.      **Awards under the UTC LTIP and the UTC 2018 LTIP**

     a.      **Vested Stock Options and SARs.**

135.    Vested Stock Options and SARs were converted to options and SARs for RTX, Carrier and Otis under the EMA.  The conversion changed the number of Stock Options/SARs that participants held and the applicable Strike Prices.

136.    Defendants did not use the conversion formula by which publicly-traded shares of UTC common stock and options were converted in the Transaction: one share of UTC stock became one share of RTX, one share of Carrier and one-half of a share of Otis.  Instead, Defendants developed a flawed formula that did ***not*** preserve the value of participants' Stock Options and SARs.

137.    Defendants' formula calculated the number of Stock Options and SARs that participants would have in RTX, Carrier and Otis by dividing the closing price of UTC's stock on the day before the Transaction, *i.e.*, April 2, 2020, by the sum of volume-weighted average prices on the fourth and fifth trading days after the Transaction ("4/5 VWAP") of the common stocks of RTX and Carrier and Otis, with Otis's figure multiplied by .5 to reflect Otis's reverse share split.

138.    Moreover, Defendants further diluted the value of the Stock Options and SARs by calculating a new Strike Price for Plaintiffs' Stock Options and SARs by dividing the company's 4/5 WVAP by UTC's share price on April 2 multiplied by the Strike Price that applied to UTC's Stock Options and SARs before the Transaction.  EMA at § 4.02(c).

     b.      **Unvested Stock Options and SARs.**

139.    Defendants used a different formula for participants' unvested Stock Options and SARs.  Under the EMA, unvested Stock Options and SARs were converted entirely into options and SARs for the stock of the company "group" that the participants were in: members of the UTC

Group only received options or SARs for RTX, members of the Carrier Group only received options or SARs for Carrier, and members of the Otis Group only received options or SARS for Otis.  EMA at §§ 4.02(b) and (d).

140.    Defendants again calculated the number of Stock Options/SARs that participants would receive by dividing the UTC's share price on April 2, 2020 by the applicable 4/5 VWAP. To calculate the new Strike Prices, Defendants divided the company's 4/5 VWAP by UTC's share price on April 2, 2020, and then multiplied that number by the original Strike Price for UTC common stock.

### c.    Unvested RSUs

141.    Participants' unvested RSUs were converted into RSUs of either RTX, Carrier or Otis based the participant's company group. EMA at § 4.02(e).  To determine the number of RSUs, Defendants divided UTC's stock price on April 2, 2020 by the company's 4/5 VWAP.

### d.    PSUs

142.    Under the UTC LTIP PSUs, participants received shares of UTC stock if UTC met specified performance goals over several years.  After adjusting the number of PSUs to account for UTC's achievement of those goals before the Transaction, Defendants converted participants' PSUs into PSUs of either RTX, Carrier or Otis using the same method as they used to convert participants' unvested RSUs.

### 2.    UTC Stock Units in the UTC ERISA Plans

143.    The UTC stock units in participants' accounts in the UTC ERISA Plans were converted to units (which were equivalent to shares) of RTX, Carrier or Otis based the participant's company group.  EMA at § 6.02(c).  Defendants calculated the number of units that participants

would have in their accounts by dividing the closing price for UTC's common stock on April 2, 2020 by the company's 4/5 VWAP.  EMA at § 6.02(c).

**F.   Defendants' Formulae Harmed Plaintiffs**

**1.   Vested Stock Options and SARs**

144.   Defendants did not act equitably or preserve the value of participants' vested Stock Options and SARs in the Transaction.  Defendants' formula compared the value of participants' options on April 2, 2020 to their values days later, on April 8 and 9, 2020, using the 4/5 VWAP method.

145.   The closing price of UTC common stock on the last trading day before the Transaction, April 2, 2020, was $86.01, a price which consisted of the "when issued" price per share of RTX ($50.73), Carrier ($13.28) and Otis ($44.00).  Each company's opening prices per share on April 3, 2020, the first day of trading after the transaction closed at 12:01 a.m., were consistent with their closing prices the previous day.  Shares of RTX opened on April 3, 2020, hours after the Transaction closed, at $51.00 a share, Carrier opened at $13.75 and Otis opened at $43.75.

146.   In the days following the Transaction, the share prices of RTX, Carrier and Otis increased substantially.  Raytheon's share price increased to a 4/5 VWAP of $63.90, Carrier's share price increased to a 4/5 VWAP of $14.38 and Otis's share price increased to a 4/5 WVAP of $22.76 ($45.52 x .5), for a total of $101.04, an increase of $15.03 per share or 17.04%, from UTC's closing price on April 2, 2020, as shown in the chart below:

| Company | Closing Price on April 2, 2020 | 4/5 WVAP | Percent Increase |
|---------|-------------------------------|----------|------------------|
| RTX | $50.73 | $63.90 | 24.4% |
| Carrier | $13.28 | $14.38 | 8.3% |
| Otis | $44.00 | $45.52 | 3.5% |
| **Total** | **$86.01** | **$101.04** | |

147.    Using the companies' 4/5 WVAP materially reduced the value of participants' Stock Options and SARs in two ways.  First, it decreased the number of options and SARs that participants received.  Because Defendants' formula calculated the new number of options and SARs by dividing UTC's Pre-Separation stock price by the companies' combined 4/5 WVAP, under Defendants' flawed formula, *an increase* in the aggregate share prices of Raytheon, Carrier and Otis in the days following the Transaction reduced the number of Stock Options or SARs that participants would hold after the Transaction.  Accordingly, participants with 1,000 vested Stock Options or SARs before the Transaction only received 851 Stock Options or SARs for RTX, 851 Stock Options or SARs for Carrier and 425 Stock Options or SARs for Otis.  If Defendants had used the same formula for participants as UTC's common stockowners, participants with 1,000 Stock Options or SARs before the Transaction in UTC would have received 1,000 Stock Options or SARs in RTX, 1,000 Stock Options or SARs in Carrier and 500 Stock Options or SARs in Otis.

148.    Second, Defendants' formula increased the Strike Prices for the Stock Options and SARs.  Stock Options and SARs are only valuable if the stock's price is higher than the Strike Price at the time of exercise.  All other things being equal, the value of a Stock Options or SAR declines when a higher Strike Price is used because the difference between the Strike Price and the stock price is reduced.

149.    By measuring the value of participants' Stock Options and SARs days after the Transaction closed when the share prices of RTX, Carrier and Otis had substantially increased, Defendants caused the Strike Prices to increase and thereby substantially deprived Plaintiffs and Class Members of the appreciation value of those benefits.  Defendants' 4/5 WVAP methodology caused Strike Prices to increase by 17.5% in each year, as shown below, causing participants to lose appreciation value for each option they received since 2011:

| Award Year | Pre-Transaction Strike Price | Combined Post-Transaction Strike Prices | Percent Increase | Value Lost Per Option |
|---|---|---|---|---|
| 2011 | $78.99 | $92.79 | 17.5% | $13.80 |
| 2012 | $74.66 | $87.72 | 17.5% | $13.06 |
| 2013 | $84.00 | $98.68 | 17.5% | $14.68 |
| 2014 | $112.49 | $132.16 | 17.5% | $19.67 |
| 2015 | $115.04 | $135.15 | 17.5% | $20.11 |
| 2016 | $95.57 | $112.28 | 17.5% | $16.71 |
| 2017 | $110.83 | $130.21 | 17.5% | $19.38 |
| 2018 | $128.16 | $150.57 | 17.5% | $22.41 |
| 2019 | $120.77 | $141.87 | 17.5% | $21.10 |
| 2020 | $149.95 | $179.16 | 17.5% | $29.21 |

150.    Darnis' harm is illustrative.  Darnis held 54,500 SARs with a Strike Price of $74.66 from the year 2012.  At a share price of $86.01, Darnis' SARs had a value of $618,575 (($86.01 – $74.66) x 54,500).  Under Defendants' formula, Darnis' SARs were converted to 46,394 options for RTX with a Strike Price of $55.47, 46,394 options for Carrier with a Strike Price of $12.48 and

23,197 options for Otis with a Strike Price of $39.51.  At a combined share price of $86.01 – the price used to value participants' options before the Transaction, the value of Darnis' options is $141,244, a *decrease of $477,331*.

151.    In short, participants with vested Stock Options and SARs experienced two forms of harm: they got substantially fewer Stock Options and SARs with a substantially higher Strike Price compared to those who purchased options in the market. There was no equitable justification for short-changing UTC LTIP participants, especially when the UTC LTIP's stated purpose was to "align shareowner and management interests . . . ."  UTC LTIP at §1.  Through its formula, Defendants *un*aligned participants' interests from UTC's shareowners' interests:  participants did much worse when the share prices of RTX, Carrier and Otis increased.

152.    In substance, Defendants caused participants to sell their Stock Options and SARs when UTC's share price was $86.01 and then re-purchase those Stock Options and SARs days later, when the share prices of the companies that comprised UTC days earlier was $101.04.  This methodology was inequitable and did *not* preserve the value of participants' Stock Options and SARs as the UTC LTIP required.

### 2.    Unvested Stock Options, SARs, PSUs and RSUs

153.    The formula that Defendants applied to unvested Stock Options, SARs, PSUs and RSUs in the Transaction also harmed participants in two significant ways.  First, Defendants determined the number of options or units that participants would have by dividing UTC's Pre-Transaction share price of $86.01 by the company's 4/5 WVAP, the result of which is called a "Post-Transaction Multiplier."

154.    The consequence of Defendants' formula was that participants' interests were not aligned with the interests of public stock and options owners.  An increase in the company's 4/5

WVAP caused the Post-Transaction Multiplier to decline, meaning that the ***participant received fewer options when the company's stock price increased*** and "maximize[d] value creation" like UTC's CEO predicted before the Transaction.

155.     Because the share prices of RTX, Carrier and Otis each increased after the Transaction, participants received fewer Stock Options, SARs, PSUs and RSUs compared to what they would have received if Defendants had treated them like public option holders and a lower amount of dividends on their RSUs because they owned fewer shares than they should have.

|  | Pre-Transaction Multiplier | Post-Transaction Multiplier | Percent Decrease |
|---|---|---|---|
| **Raytheon Group** | 1.695 | 1.346 | 20.6% |
| **Carrier Group** | 6.476 | 5.982 | 7.6% |
| **Otis Group** | 1.954 | 1.889 | 3.3% |

156.     Defendants exacerbated the harm by increasing the Strike Prices for the Options and SARs since the new Strike Price was based on the company's 4/5 WVAP.  Accordingly, any increase in the company's share price between April 2, 2020 and April 8 and 9, 2020, increased the new Strike Price.

**3.     The UTC ERISA Plans**

157.     Defendants' formula to calculate the number of "units" of RTX, Carrier or Otis that participants received also substantially harmed participants in the UTC SRP, the UTC PSU Deferral Plan, the UTC DC Plan and the UTC CACEP.

158.     For instance, Darnis had 2,101.791 units of UTC common stock in his UTC SRP account at the time of the Transaction, which were converted to units of Carrier common stock in

the Carrier SRP because of the Transaction.  Darnis' holdings were converted to 12,573.118 units of Carrier (2,101.791 x 5.98) in the Carrier SRP under the EMA.  If Defendants had used formula applied to common stockholders, Darnis would have received 13,612.579 units of Carrier - 1,039.461 more than he received.  Based on Carrier's share price on July 31, 2020, this shortfall cost Darnis over $28,000.

159.    Defendants' inequitable and improper formula similarly harmed participants in the UTC SRP who were part of the Otis Group like DePellegrini.  DePellegrini held 723 units of UTC stock at the time of the Transaction.  Under Defendants' formula, DePellegrini's UTC holdings were converted to 1,325 units of Otis (723 x 1.89) in the Otis SRP.  If Defendants had used formula applied to common stockholders, DePellegirni would have received 1,410 units of Otis, 85 more than he received under Defendants' formula.  Based on Otis's share price on July 31, 2020, the shortfall cost DePellegrini over $5,300.

**G.    Participants in the UTC 401(k) Plan Were Treated Fairly in the Transaction.**

160.    Unlike the participants in the UTC Plans, Defendants treated fairly the participants in the UTC 401(k) plan for its employees, the "UTC Savings Plan," to which participants and UTC contributed.  Participants could invest their contributions in UTC common stock and UTC made its matching contributions in UTC stock.  As of December 31, 2018, the UTC Savings Plan held more than 24 million shares of UTC stock worth over $2.4 billion.

161.    Unlike the flawed formula based on volume-weighted average stock prices days later that Defendants used for participants in the UTC Plans, participants in the UTC Savings Plan were treated "[j]ust like any other shareholder of UTC stock . . . ."  *See* UTC Savings Plan ESOP and UTC Common Stock Fund Treatment at 1.  Shares of UTC stock in participants' 401(k) accounts were converted to one share of Raytheon stock, one share of Carrier stock, and 1/2 share

of Otis stock.  The 401(k) plan participants could then sell the shares of RTX, Carrier and Otis in their account ***three days*** after the Transaction.

## H.    RTX Admitted the Formulae in the EMA Were Unfair and Inequitable to Participants

162.    RTX acknowledged after the Transaction that the formulae in the EMA did ***not*** treat participants in the UTC Plans fairly in the Transaction.  In a Form 8-K filed on May 29, 2020, RTX (*i.e.*, the new UTC) informed shareholders that it had amended the Employee Matters Agreement to change the formulae used to convert unvested equity awards and that it had eliminated use of the 4/5 WVAP.  RTX's amendment provided that "the post-Separation Company stock price used in the applicable conversion ratio for [unvested equity awards] held by employees and former employees shall be the ***opening price*** on the date of the Separation, instead of the [4/5 WVAP]." (emphasis added).

163.    RTX stated that the reason for the amendment was that "the increase in the [RTX] stock price in the week following the Separation caused ***material discontinuity*** between the pre-Separation UTC stock price and the post-Separation [RTX] stock price originally chosen in the Agreement." (emphasis added). In other words, the holders of unvested Stock Options and SARs, unvested PSUs, unvested RSUs and members of the UTC Group that participated in the UTC SRP, the UTC PSU Deferral Plan, the UTC DC Plan and the UTC CACEP, were denied the value appreciation enjoyed by owners of UTC's common stock.

164.    RTX further stated in its 8-K that the amendment to the EMA "preserves the Company's ability to continue to treat employees and retirees ***fairly in the conversion process*** . . . ." In other words, absent this change, RTX treated employees and retirees ***unfairly*** in the conversion process.  Necessarily, RTX admitted that it acted unfairly and, therefore, inequitably,

towards participants with vested benefits in the UTC Plans when it ***did not*** similarly revise the conversion formula to eliminate the 4/5 WVAP for those participants.

166. Indeed, RTX stated that it believed it should "choose a different post-Separation stock price" for any other "legacy UTC equity awards" and asked Carrier and Otis for their required consent to make such a fair and equitable adjustment, but both companies refused.

166. All Defendants knew or should have known that the benefit conversion formulae were inconsistent with the terms of the benefit plans and the treatment of common stock and option holders, particularly at the time they were employed and afterward, and that those formulae would likely result is substantial financial harm to Plaintiffs and Class Members and unalign Plaintiff and Class Members' interests from those of common stock and public option holders

## **CLASS ACTION ALLEGATIONS**

167. Plaintiffs bring this case as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the class (the "Class") defined below:

> All participants in UTC Plans whose compensation benefits were converted in the Transaction using the formulae in the Employee Matters Agreement. Excluded from the Class are the Defendants and any individuals who are subsequently determined to have been fiduciaries to participants in the UTC Plans at the time of the Transaction.

168. The members of the Class are so numerous that joinder of all members is impractical. Upon information and belief, the Class includes thousands of people. The members of the Class are all former employees of UTC, many of whom are now current employees of RTX, Carrier or Otis. Members of the Class live in, among other states, Connecticut, Florida, Indiana, and Massachusetts, the states where UTC formerly operated and the states where Raytheon, Carrier and Otis now operate.

169.    Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs' claims, and those of all Class members, arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class are similarly affected by Defendants' wrongful conduct.

170.    There are common questions of law and fact common to the Class and these questions predominate over questions affectingly only individual Class members.  Common legal and factual questions include, but are not limited to:

> A.    Whether Defendants breached the UTC LTIP, the Carrier LTIP and the Otis LTIP in the Transaction;
>
> B.    Whether Defendants preserved the value of participants' Stock Options, SARs, PSUs, RSUs and UTC Stock Units in the Transaction
>
> B.    Whether Defendants impaired the rights of participants who held Stock Options, SARs, PSUs and RSUs in the Transaction;
>
> C.    Whether Defendants caused participants to forfeit vested benefits under the UTC ERISA Plans, the Carrier ERISA Plans and the Otis ERISA Plans;
>
> D.    Whether Defendants violated the fiduciary duties they owed to participants in the UTC Plans, the Carrier Plans and the Otis Plans; and
>
> E.    Whether Plaintiffs and Class members should receive additional benefits under the UTC Plans, the Carrier Plans or the Otis Plans.

171.    Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of class actions involving breach of contract, employee benefits and fiduciary duty litigation.  Plaintiffs have no interests antagonistic to those

of other members of the Class.  Plaintiffs are committed to the vigorous prosecution of this action, and do not anticipate any difficulty in the management of this case as a class action.

172.    This action may be properly certified under either subsection of Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendant. Class action status also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

173.    In the alternative, certification under Rule 23(b)(2) is warranted because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

174.    In the alternative, certification under Rule 23(b)(3) is also appropriate. A class action is superior to other available methods for the fair and efficient adjudication of the controversy within the meaning of Rule 23(b) and in consideration of the matters set forth in Rule 23(b)(3)(A)-(D). Because of the amount of the individual Class members' claims relative to the complexity of the litigation and the financial resources of the Defendants, few, if any, members of the Class would seek legal redress individually for the wrongs complained of herein. The maintenance of separate actions would place a substantial and unnecessary burden on the courts, and could result in inconsistent adjudications, while a single class action can determine, with

judicial economy, the rights of all Class members. Absent a class action, Class members will continue to suffer damages, and Defendants' misconduct will proceed without remedy.

**CLAIMS FOR RELIEF**

**FIRST CAUSE OF ACTION AGAINST RTX, THE UTC LTIP, THE UTC 2018 LTIP, CARRIER, OTIS AND THE CARRIER AND OTIS LTIPs**
**(Breach of Contract)**

175.     Plaintiffs repeat the allegations in paragraphs 1 through 174 above.

176.     The UTC LTIP and the UTC 2018 LTIP are contracts that provided Plaintiffs with compensation in exchange for the work they performed for UTC.

177.     Plaintiffs performed all their obligations under the UTC LTIP and the UTC 2018 LTIP.

178.     Under the UTC LTIP and 2018 UTC LTIP, the the plans and UTC were required to protect the value of participants' Awards if UTC spun-off a subsidiary or merged, making "equitable adjustments. . . .to prevent an increase or decrease in the value of [Awards] relative to [UTC] Common Stock . . . ." UTC LTIP Schedule of Terms at 4; UTC 2018 LTIP at § 3(e) (stating that adjustments to Awards must be "appropriate and equitable"). The UTC LTIP and the UTC 2018 LTIP also prohibited the Compensation Committee from materially impairing participants' rights in their Awards.

179.     The UTC LTIP, the UTC 2018 LTIP and UTC breached contractual obligations by ***not*** protecting the value of participants' Awards, ***not*** making "equitable adjustments" to participants' Awards relative to UTC's common stock and impairing participants' rights to their Awards as alleged above. In particular, UTC LTIP and UTC 2018 LTIP Participants were deprived of substantial value because the EMA valued their Awards in the Transaction on terms

that were significantly less favorable than those that applied to UTC's shareowners and option holders.

180.    Carrier and the Carrier LTIP, having accepted and assumed the liabilities for the compensation and employee benefits owed to members of the Carrier Group, including the compensation owed under the UTC LTIP and 2018 UTC LTIP, is liable for the UTC LTIP and UTC's breach of contract.

181.    Otis and the Otis LTIP, having accepted and assumed the liabilities the compensation and employee benefits owed to members of the Otis Group, including the compensation owed under the UTC LTIP and 2018 LTIP, is liable for the UTC LTIP and UTC's breach of contract.

182.    Plaintiffs and the Class suffered damages because of contractual breaches.  They received fewer Stock Options, SARs, PSUs and RSUs and their Stock Options and SARs had higher Strike Prices than they should have based on the formula applied to UTC share and option owners.  Plaintiffs' rights in their Awards was materially impaired because they received fewer Stock Options and SARs that had higher Strike Prices.

**SECOND CAUSE OF ACTION AGAINST RTX, THE UTC LTIP, THE UTC 2018 LTIP, CARRIER, OTIS AND THE CARRIER AND OTIS LTIPs**
**(Breach of Implied Covenant of Good Faith and Fair Dealing)**

183.    Plaintiffs repeat the allegations in paragraphs 1 through 182 above.

184.    Under the UTC LTIP and the UTC 2018 LTIP, the UTC Compensation Committee had discretion to amend the terms of participants' Awards when UTC spun-off a subsidiary.

185.    The UTC LTIP and the UTC 2018 LTIP are contracts governed by Delaware law. Under Delaware law, contracts have an implied covenant of good faith and fair dealing which prohibit parties from using its discretion in a way that is impliedly proscribed by the contract's

express terms.  As set forth above, the Compensation Committee was obligated to protect the value of participants' Awards and to make equitable adjustments to ensure that the value of participants' Awards did not decrease relative to UTC's common stock if there was a spin-off.  Accordingly, while the Compensation Committee had the discretion on **how** to preserve participants' Awards and could, for example, offer participants shares of stock or cash payments, the Compensation Committee could **not** use its discretion in a way that decreased the value of the Awards like was done through the EMA.

186.    The EMA used formulae to value participants' Awards that were inequitable, arbitrary and had no basis under the UTC LTIP or the UTC 2018 LTIP's terms.  Both plans measured the value of participants' Awards by the Fair Market Value of UTC common stock on the New York Stock Exchange on the day of the valuation.  There is no good-faith basis for measuring the pre-Transaction value of participants' Awards on April 2, 2020, and the post-Transaction value days later, using a completely different methodology.

187.    The formulae used contradicted the UTC LTIP's stated purpose to "align shareowner and management interests through stock and performance-based awards linked to shareowner value . . . ."  UTC LTIP at § 1.  The formulae also contracted the UTC 2018 LTIP's purpose to "correlate[] compensation opportunities with shareowners value . . . ."  UTC 2018 LTIP at § 1.  As a result of the application of the EMA's formulae, the interests of UTC LTIP and UTC 2018 LTIP participants were not aligned or correlated with those of UTC common stock and option owners.  While UTC common stock and option owners substantially benefitted from the post-Transaction rise in the share prices of RTX, Carrier and Otis, these increases caused participants to receive **fewer** Stock Options, SARs, PSUs and RSUs and **higher** Strike Prices for their options.

39

188.    After the Transaction, RTX admitted that the formulae in the EMA were unfair and inequitable when it amended the EMA in order to treat certain participants in the UTC Group "*fairly in the conversion process* . . . ."

189.    By employing in the EMA the flawed formulae that the Compensation Committee developed, the UTC LTIP, the UTC 2018 LTIP and UTC (now RTX), breached its obligation of good faith and fair dealing.

190.    Carrier and the Carrier LTIP, having accepted and assumed the liabilities for the compensation and employee benefits owed to members of the Carrier Group, including the compensation owed under the UTC LTIP and the 2018 UTC LTIP, is liable for the UTC LTIP, the 2018 UTC LTIP and UTC's breach of good faith and fair dealing.

191.    Otis and the Otis LTIP, having accepted and assumed the liabilities the compensation and employee benefits owed to members of the Otis Group, including the compensation owed under the UTC LTIP and the 2018 UTC LTIP, is liable for the UTC LTIP, 2018 UTC LTIP and UTC's breach of good faith and fair dealing.

192.    Plaintiffs and the Class suffered damages as a result of Defendants' breaches.

**THIRD CAUSE OF ACTION AGAINST RTX, THE UTC DIRECTOR DEFENDANTS
AND THE COMMITTEE DEFENDANTS
(Breach of Fiduciary Duty Concerning the UTC LTIP and the UTC 2018 LTIP)**

193.    Plaintiffs repeat their allegations in paragraphs 1 to 192 above.

194.    The Compensation Committee is a fiduciary because it was the administrator of the UTC LTIP and the UTC 2018 LTIP. The Compensation Committee had and exercised discretion regarding Plan matters. Plaintiffs and Class Members placed special trust and reliance on the Committee Defendants to protect their interests in these Plans.

195.    UTC and the UTC Director Defendants were fiduciaries in that they exercised discretion to enter into the EMP and, in particular, to agree to the conversion formula. Plaintiffs placed special trust and reliance on the UTC and the UTC Director Defendants to protect their interests in the UTC LTIP and the UTC 2018 LTIP. The Committee, UTC and the UTC Director Defendants are the "UTC LTIP Fiduciaries."

196.    The UTC LTIP Fiduciaries owed Plaintiffs a duty of prudence and care that required them to to act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims and keep themselves reasonably informed when making decisions that affected Plaintiffs' interests in the UTC LTIP. The UTC LTIP Fiduciaries owed Plaintiffs a duty of loyalty that required them to act in good faith and in a manner that they believed served the best interests of Plaintiffs and Class Members.

197.    UTC LTIP Fiduciaries violated these duties when, in contradiction of their obligations to act prudently, loyally and equitably and preserve the value of Plaintiffs' benefits, they employed the 4/5 VWAP methodology that harmed the Plaintiffs and the Class.  The UTC LTIP Fiduciaries violated their duties by using formulae to convert Plaintiffs' interests in the UTC Plans, the Carrier Plans and Otis Plans that violated the terms of those plans and used unfair, inequitable, and arbitrary dates and methodologies.

198.    In *not* protecting the value of participants' benefits and *not* making "equitable adjustments" to participants' benefits relative to UTC's common stock and in impairing participants' rights to their Awards as alleged above, Plaintiffs and the Class were denied substantial value. In particular, Plaintiffs and Class Members were deprived of substantial value

because the EMA valued their benefits in the Transaction on terms that were significantly less favorable than those that applied to UTC's shareowners and option holders.

199.    Any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed on fiduciaries is personally liable to make good on any losses he or she causes from each such breach.

200.    The Court should order equitable relief to Plaintiffs and the Class, including but not limited to:

        (a)        an accounting;

        (b)        a surcharge;

        (c)        correction of the transactions and re-adjudication of claims;

        (d)        disgorgement of profits;

        (e)        an equitable lien;

        (f)        a constructive trust;

        (g)        restitution;

        (h)        an injunction against further violations; and/or

        (i)        any other remedy the Court deems proper.

201.    Carrier and Otis, having accepted and assumed the liabilities for the UTC LTIP Fiduciaries relating to the compensation and employee benefits owed to members of the Carrier and Otis Groups, including the compensation owed under the UTC LTIP, are liable for the breaches of fiduciary duty of the UTC LTIP Fiduciaries.

**FOURTH CAUSE OF ACTION AGAINST THE UTC ERISA PLANS,**
**THE CARRIER ERISA PLANS AND THE OTIS ERISA PLANS**
**(Claim to Enforce Rights and Recover Benefits under**
**ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B))**

202.    Plaintiffs repeat their allegations in paragraphs 1 to 201 above.

203.    The UTC ERISA Plans, the Carrier ERISA Plans, and the Otis ERISA Plans are each employee benefit plans subject to the terms of ERISA.

204.    Under the UTC ERISA Plans, the value of the UTC stock in participants' accounts is equal to the share price of UTC common stock on the New York Stock Exchange.  *See* UTC SRP at § 6.3, UTC PSU Deferral Plan at § 7.1, UTC DC Plan at § 5.3, UTC CACEP at § 6.3.

205.    UTC common stock stopped trading on the New York Stock Exchange on April 2, 2020 when it became RTX and it distributed shares of Carrier and Otis common stock to its shareholders on April 3, 2020 at 12:01 a.m.

206.    As alleged above, in contradiction of their stated valuation methodology, the UTC ERISA Plans did not measure the value of participants' accounts using the price of UTC's common stock at the time of the Transaction.  Instead, the plans used the 4/5 VWAP methodology, which materially deprived Plaintiff and the Class of their benefits under the plans. In *not* protecting the value of participants' Awards and *not* making "equitable adjustments" to participants' Awards relative to UTC's common stock and impairing participants' rights to their Awards as alleged above, UTC ERISA Plan participants were denied substantial benefits. In particular, participants were deprived of substantial value because the EMA valued their benefits in the Transaction on terms that were significantly less favorable than those that applied to UTC's shareowners and option holders.

207.    ERISA § 502(a)(1)(B) provides that a participant or beneficiary may bring an action to recover benefits or to enforce rights under the terms of the plan.

208.    The UTC ERISA Plans have violated this provision as alleged above.

209.    The Carrier ERISA Plans, having accepted and assumed the liabilities for the compensation and employee benefits owed to members of the Carrier Group, including the compensation owed under the UTC ERISA Plans, are liable for UTC ERISA Plans violations.

210.    The Otis ERISA Plans, having accepted and assumed the liabilities the compensation and employee benefits owed to members of the Otis Group, including the compensation owed under the UTC LTIP, are liable for UTC's and the UTC ERISA Plans' violations.

211.    Under 29 U.S.C. § 1132(a)(1)(B), ERISA § 502(a)(1)(B), Plaintiffs bring this cause of action to recover benefits and enforce their rights under the UTC ERISA Plans, the Carrier ERISA Plans and the Otis ERISA Plans.

**FIFTH CAUSE OF ACTION AGAINST RTX, THE COMMITTEE DEFENDANTS, AND THE UTC DIRECTOR DEFENDANTS**
**(Declaratory and Equitable Relief**
**under ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1) and**
**§ 502(a)(3), 29 U.S.C. § 1132(a)(3))**

212.    Plaintiffs repeat their allegations in paragraphs 1 to 211 above.

213.    ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

214.    The UTC Compensation Committee was the Plan Administrator of each of the UTC ERISA Plans and, therefore is the named fiduciary of those plans. UTC SRP § 10.1; UTC PSU Deferral Plan § 9.1; UTC DC Plan § 9.1; UTC CACEP § 10.1.  As the individual members of the Compensation Committee, the Committee Defendants owed fiduciary duties to the UTC ERISA Plans and their participants.

215.    ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). This is a functional test. Neither "named fiduciary" status nor formal delegation is required for a finding of fiduciary status, and contractual agreements cannot override finding fiduciary status when the statutory test is met.

216.    UTC and the UTC Directors exercised discretionary authority or control respecting management of such plan or exercised any authority or control respecting management or disposition of its assets in that they negotiated and agreed to the EMP and, in particular, the 4/5 VWAP methodology.

217.    UTC, the UTC Compensation Committee, the Committee Defendants and the UTC Director Defendants are collectively the "UTC ERISA Fiduciaries."

218.    ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), further provides that a fiduciary shall discharge its duties with respect to a plan (1) solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the plan ("loyalty") and (2) with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a

like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims ("prudence").

219.    The UTC ERISA Fiduciaries breached their fiduciary duties to the UTC ERISA Plans and their participants and beneficiaries in that , as alleged above, the UTC ERISA Fiduciaries caused the UTC ERISA Plans, in contradiction of their stated valuation methodology, to use the 4/5 VWAP methodology which harmed the UTC ERISA Plans, the Plaintiffs and the Class. In *not* protecting the value of participants' benefits and *not* making "equitable adjustments" to participants' benefits relative to UTC's common stock and by impairing participants' rights to their Awards as alleged above, UTC ERISA Plans and participants and beneficiaries were denied substantial value. In particular, the UTC ERISA Plans and their participants were deprived of substantial value because the EMA valued their benefits in the Transaction on terms that were significantly less favorable than those that applied to UTC's shareowners and option holders.

220.    ERISA § 409, 29 U.S.C. § 1109, provides, *inter alia*, that any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such breach and to restore to the plan any profits the fiduciary made through use of the plan's assets. ERISA § 409 further provides that such fiduciaries are subject to such other equitable or remedial relief as a court may deem appropriate.

221.    Plaintiffs and the class are entitled to have restored to their UTC ERISA Plan accounts the amounts of which they have been deprived.

222.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title

or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

223.    Pursuant to this provision, 28 U.S.C. §§ 2201 and 2202 and Federal Rule of Civil Procedure 57, Plaintiffs seek declaratory relief, determining that the methodologies that were used to calculate the value of participants' accounts in the UTC ERISA Plans, the Carrier ERISA Plans and the Otis ERISA Plans violated the terms of the plans and deprived participants of part of their vested benefits under the terms of those plans.

224.    Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Court should order equitable relief to Plaintiffs and the Class, including but not limited to:

(a)  an accounting;

(b)  a surcharge;

(c)  correction of the transactions and re-adjudication of claims;

(d)  disgorgement of profits;

(e)  an equitable lien;

(f)  a constructive trust;

(g)  restitution;

(h)  an injunction against further violations; and/or

(i)  any other remedy the Court deems proper.

225.    Carrier, having accepted and assumed the liabilities for the compensation and employee benefits owed to members of the Carrier Group, including the compensation owed under the UTC ERISA Plans, is liable for UTC ERISA Fiduciaries' violations.

226.    Otis, having accepted and assumed the liabilities the compensation and employee benefits owed to members of the Otis Group, including the compensation owed under the UTC ERISA Plans, is liable for UTC ERISA Fiduciaries' ERISA violations.

### SIXTH CAUSE OF ACTION AGAINST THE CARRIER DIRECTOR DEFENDANTS AND OTIS DIRECTOR DEFENDANTS
### (Breach of Fiduciary Duty)

227.    Plaintiffs repeat their allegations in paragraphs 1 to 226 above.

228.    Plaintiffs and Class Members who obtained equity awards in Carrier and Otis placed special trust and reliance on the Carrier Director Defendants and Otis Director Defendants to protect their interests in the Carrier Plans and the Otis Plans.   The Carrier Director Defendants and Otis Director Defendants exercised discretion over the Carrier Plans and Otis Plans and were fiduciaries.

229.    The Carrier Director Defendants and Otis Director Defendants had the ability to amend the EMA, like RTX did for certain participants in the UTC Plans, to eliminate the unfair and inequitable treatment of participants in the Carrier Plans and the Otis Plans. Given this authority, and the duties the Carrier Director Defendants and Otis Director Defendants owed to their equity holders, Plaintiffs placed special trust and reliance on the Carrier Director Defendants and Otis Director Defendants.

230.    The Carrier Director Defendants and Otis Director Defendants owed Plaintiffs a duty of care that required them to keep themselves reasonably informed when making decisions that affected Plaintiffs' interests in the Carrier Plans and the Otis Plans.  The Carrier Director Defendants and Otis Director Defendants also owed Plaintiffs a duty of loyalty that required them to act in good faith and in a manner that they believed served the best interests of Plaintiffs and Class Members. The Carrier Director Defendants and the Otis Director Defendants also owed

48

Plaintiffs a duty of prudence to act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

231.     The Carrier Director Defendants and Otis Director Defendants violated both duties and acted arbitrarily, unfairly and inequitably by refusing the amend the EMA to eliminate the use of the unfair and inequitable 4/5 WVAP when requested to do so by RTX.  By refusing to amend the EMA, the Carrier Director Defendants and Otis Director Defendants breached their fiduciary duties to those Plaintiffs and Class Members who obtained equity awards in Carrier and Otis through the Transaction.

232.     Any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed on fiduciaries is personally liable to make good on any losses he or she causes from each such breach.

233.     The Court should order equitable relief to Plaintiffs and the Class, including but not limited to:

        (a)  an accounting;

        (b)  a surcharge;

        (c)  correction of the transactions and re-adjudication of claims;

        (d)  disgorgement of profits;

        (e)  an equitable lien;

        (f)  a constructive trust;

        (g)  restitution;

        (h)  an injunction against further violations; and/or

        (i)  any other remedy the Court deems proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that judgment be entered on all claims and requests that the Court award the following relief:

A.      Certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding the Plaintiffs money damages for the contractual breaches of UTC;

C.      Awarding the Plaintiffs money damages for the breaches of fiduciary duty committed by the Committee Defendants, the UTC Director Defendants, the Carrier Director Defendants, and the Otis Director Defendants;

D.      An Order enforcing the terms of the UTC ERISA Plans, the Carrier ERISA Plans, and the Otis ERISA Plans;

E.      An Order declaring that the methodology used to value participants' accounts in the Transaction violated the terms of the UTC ERISA Plans, the Carrier ERISA Plans, and the Otis ERISA Plans;

F.      Declaring that the Defendants failed to properly calculate benefits in violation of ERISA;

G.      Awarding to Plaintiff's counsel attorneys' fees and expenses as provided by the common fund doctrine, ERISA § 502(g), 29 U.S.C. § 1132(g), and/or other applicable doctrine;

H.      Interest, and

I.      Any other relief the Court determines is just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: August 12, 2020                    Respectfully submitted,


                                          */s/ Craig A. Raabe*_____
                                          **IZARD, KINDALL & RAABE LLP**
                                          Craig A. Raabe (ct04116)
                                          Robert A. Izard (ct01601)
                                          Mark P. Kindall (ct13797)
                                          Douglas P. Needham (ct29433)
                                          29 South Main Street, Suite 305
                                          West Hartford, CT 06107
                                          Tel: (860) 493-6292
                                          Fax: (860) 493-6290
                                          Email: craabe@ikrlaw.com
                                          Email: rizard@ikrlaw.com
                                          Email: mkindall@ikrlaw.com
                                          Email: dneedham@ikrlaw.com