## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| Geraud Darnis, David Hess, Michael Maurer, Richard Sanfrey, Dino DePellegrini, Bradley Hardesty, David Carter, Roy Dion, Alan Machuga, Theresa MacKinnon, Christopher Doot and Costas Loukellis, on behalf of themselves and all others similarly situated, | Civil Action No.: 3:20-cv-01171 |
| Plaintiffs, | **AMENDED CLASS ACTION COMPLAINT** |
| vs. | |
| Raytheon Technologies Corporation, Carrier Global Corporation and Otis Worldwide Corporation | SEPTEMBER 13, 2021 |
| Defendants. | |

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

JURISDICTION AND VENUE ........................................................................................ 4

PARTIES .......................................................................................................................... 4

SUBSTANTIVE ALLEGATIONS .................................................................................. 8

    A.    The UTC Plans Before the Transaction ................................................. 8

          1.    The UTC LTIP ............................................................. 8

          2.    The UTC 2018 LTIP ..................................................... 12

    B.    UTC's Businesses Before the Transaction ........................................... 13

    C.    Defendants Affirmed Their Obligations To Preserve Award Value Under the UTC Plans Before the Transaction ....................................... 15

    D.    UTC's Board Announces the Terms of the Spin-Offs ........................... 15

    E.    The Transaction's Effect on the UTC Plans ......................................... 16

          1.    Vested Stock Options and SARs................................... 17

          2.    Unvested Stock Options and SARs............................... 18

          3.    Unvested RSUs ........................................................... 19

          4.    PSUs.......................................................................... 19

    F.    Defendants' Formulae Breached the Terms of the Plans and Was Unnecessary, Inappropriate, Unreasonable, Inequitable and/or Arbitrary. .. 19

    G.    Defendants' Formulae Harmed Plaintiffs ............................................ 28

          1.    Vested Stock Options and SARs................................... 28

          2.    Unvested Stock Options, SARs, PSUs and RSUs .................... 31

    H.    RTX Admitted the Formulae in the EMA Were Unfair and Inequitable to Participants................................................................................... 32

CLASS ACTION ALLEGATIONS ................................................................................. 34

CLAIMS FOR RELIEF .................................................................................................... 36

FIRST CAUSE OF ACTION AGAINST RTX, CARRIER AND OTIS
(Breach of Contract) ................................................................................................ 36

SECOND CAUSE OF ACTION AGAINST RTX, CARRIER AND OTIS
(Breach of Implied Covenant of Good Faith and Fair Dealing) .................................... 37

THIRD CAUSE OF ACTION AGAINST RTX, CARRIER AND OTIS
(Specific Performance) ............................................................................................. 40

PRAYER FOR RELIEF ............................................................................................. 42

JURY DEMAND ....................................................................................................... 42

Plaintiffs Geraud Darnis, David Hess, Michael Maurer, Richard Sanfrey, Dino DePellegrini, Bradley Hardesty, David Carter, Roy Dion, Alan Machuga, Theresa MacKinnon, Christopher Doot and Costas Loukellis, on behalf of themselves and all others similarly situated, based on their personal knowledge regarding their own circumstances and based on information and belief as to all other allegations, allege the following.

## INTRODUCTION

1.     This is a class action stemming from Defendants substantial mistreatment of participants in certain of United Technologies Corporation's ("UTC") compensation plans when UTC spun-off Carrier Global Corporation ("Carrier") and Otis Worldwide Corporation ("Otis") into separate companies and merged with Raytheon Corporation ("Old Raytheon") to form Raytheon Technologies Corporation ("RTX").  The spin-offs and merger are collectively referred to as the "Transaction."

2.     UTC's compensation plans at issue provided participants with Stock Appreciation Rights ("SARs") and other forms of compensation tied to the price of UTC common stock.  UTC provided this compensation to "align shareholder and management interests through stock and performance-based awards **linked to shareholder value**." (emphasis added).  Participants, many of whom received a significant portion of their total compensation as SARs and other awards linked to the price of UTC stock, were promised that their awards would not lose value if UTC merged with another company, spun-off a subsidiary or engaged in a corporate transaction that affected its capital structure. In particular, UTC agreed that it would make "appropriate and equitable adjustments" that were "necessary or appropriate to protect the value of Participants' interests in their Awards" and to "***prevent an increase or decrease in the value of [Awards] relative to [UTC] Common Stock or the dilution or enlargement of the rights of recipients.***" (emphasis added).

1

3.      In breach of these express contractual obligations, when Defendants converted Plaintiffs' and Class Members' stock-based compensation into awards in RTX, Carrier and Otis, they used formulae that were significantly different from, inferior to and inequitable as compared to how UTC common stock and the UTC's directors' "deferred share units" were treated in the Transaction.  While common stock owners and non-employee directors received 1 share of RTX, 1 share of Carrier and .5 shares in Otis in the Transaction for each share of UTC stock they owned, Defendants instead concocted a 4/5 day volume weighted average price formula ("4/5 day VWAP"), which was based on average common stock prices of RTX, Carrier and Otis four and five days after the closing of the Transaction. Under this formula, a share of UTC stock was valued as being equal to .851 shares of RTX and Carrier and only .425 shares of Otis.  This decreased and diluted Plaintiffs' and Class Members' awards by nearly 15%.  To make matters worse, Defendants' formulae increased the price at which Stock Options and SARs could be exercised (also known as the "Strike Price") by 17.5%, which further decreased and diluted Plaintiffs' and Class Members' rights and interests and deprived them of the value received by UTC's common stock owners.

4.      Defendants' formulae directly contradicted both the plans' terms and purpose. In contrast to other UTC equity investors, the formulae significantly harmed Plaintiffs and the Class. Plaintiffs received fewer shares with higher Strike Prices.  Defendants' wrongful conduct deprived Plaintiffs and Class Members of hundreds of millions of dollars of value.

5.      It was unreasonable and/or arbitrary for Defendants to expect that the formulae would comply with the plans' terms that required them to "protect the value" of Plaintiffs' awards and "prevent an . . . decrease in the value of SARs relative to [UTC] Common Stock" or the "dilution" of the awards' value.  In order for the formulae to satisfy these provisions, the combined

2

market prices of RTX, Carrier and Otis four to five days after the Transaction would have to have been *identical* to UTC's share price at the time of the Transaction, a near impossibility. This is particularly true here as UTC's Board acknowledged before the Transaction that "[w]e cannot predict the effect of the [Transaction] on the trading prices of Carrier, Otis or UTC common stock or know with certainty" whether their combined prices would "be less than, equal to or greater than" UTC's share price before the Transaction.

6.      Importantly, RTX already has recognized publicly in a Form 8-K securities filing the impropriety of using the conversion formulae that it and the other Defendants employed. RTX expressly stated that "the increase in the [RTX] stock price in the week following the Separation caused *material discontinuity* between the pre-Separation UTC stock price and the post-Separation [RTX] stock price originally chosen in the Agreement," thereby admitting that the awards were not linked to shareholder value and that Defendants did not "*prevent an increase or decrease in the value of [Awards] relative to [UTC] Common Stock or the dilution or enlargement of the rights of recipients.*" In order to correct the substantial financial harm to those RTX employees with *unvested* equity benefits, RTX changed the formulae that were used to convert its employees' UTC-equity-based compensation after the Transaction to "treat employees and retirees *fairly* in the conversion process," thereby admitting that the formulae were not fair and thus not "appropriate and equitable adjustments." RTX similarly changed the formula for its ERISA Plans that had used the 4/5 VWAP.

7.      RTX also attempted to change the formulae for Plaintiffs and Class Members with *vested* benefits so that they too would be treated "fairly," but such a change required the agreement of Carrier and Otis. According to RTX's 8-K, Carrier and Otis refused to agree, thereby perpetuating the harm to Plaintiffs and the Class.

3

8.      Plaintiffs bring this case on behalf of themselves and the thousands of participants in UTC's compensation plans who had their plan benefits substantially diluted in the Transaction.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1332(d)(2), because this a class action, the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest or costs, and there is diversity of citizenship between some Class Members and some Defendants.

10.     This Court has personal jurisdiction over each of the Defendants because at the relevant times they are or were headquartered and transacted business in, or resided in, and/or still have significant contacts with this District.

11.     Venue is proper in this District because some or all of the relevant actions occurred in this District and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because each of the Defendants does business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred in Farmington, Connecticut, which is in this District.

## PARTIES

### Plaintiffs

12.     Plaintiff Geraud Darnis is an individual residing of the State of Florida.  Darnis was a participant in the United Technologies Corporation Long-Term Incentive Plan ("UTC LTIP") before the Transaction. Pursuant to the Transaction, he remained in the UTC LTIP (now under the name RTX) and became a participant in the Carrier Global Corporation 2020 Long Term-Term Incentive Plan ("Carrier LTIP") and the Otis Worldwide Long-Term Incentive Plan ("Otis LTIP").

13.     Plaintiff David Hess is an individual residing in the State of Connecticut.  Hess was a participant in the UTC LTIP before the Transaction. Pursuant to the Transaction, he remained a participant in that plan (now under the name RTX) and became a participant in the Carrier LTIP and Otis LTIP.

14.     Plaintiff Michael Maurer is an individual residing in the State of Florida.  Maurer was a participant in the UTC LTIP before the Transaction.  Pursuant to the Transaction, he remained a participant in the UTC LTIP (now under the name RTX) and became a participant in the Carrier LTIP and the Otis LTIP.

15.     Plaintiff Richard Sanfrey is an individual residing in the State of Florida.  Sanfrey was a participant in the UTC LTIP before the Transaction. Pursuant to the Transaction, he remained a participant in the UTC LTIP (now under the name RTX) and became a participant in the Carrier LTIP and the Otis LTIP.

16.     Plaintiff Dino DePellegrini is an individual residing in the State of Connecticut. DePellegrini was a participant in the UTC LTIP before the Transaction.  Pursuant to the Transaction, he remained a participant in the UTC LTIP (now under the name RTX) and became a participant in the Carrier LTIP and the Otis LTIP.

17.     Plaintiff Bradley Hardesty is an individual residing in the State of Indiana. Hardesty was a participant in the UTC LTIP before the Transaction.  Pursuant to the Transaction, he has remained a participant in that plan (now under the name RTX) and became a participant in the Carrier LTIP and the Otis LTIP.

18.     Plaintiff Christopher Doot is an individual residing in the State of Maryland.  Doot was a participant in the UTC LTIP before the Transaction.  Pursuant to the Transaction, he

remained a participant in the UTC LTIP (now under the name RTX) and became a participant in the Carrier LTIP and the Otis LTIP.

19.      Plaintiff David Carter is an individual residing in the Commonwealth of Massachusetts.  Carter was a participant in the UTC LTIP before the Transaction.  Pursuant to the Transaction, he remained a participant in that plan (now under the name RTX) and becamse a participant in the Carrier LTIP and the Otis LTIP.

20.      Plaintiff Roy Dion is an individual residing in the State of Florida.  Dion was a participant in the UTC LTIP before the Transaction.  Pursuant to the Transaction,  he remained a participant in that plan  (now under the name RTX) and became a participant in the Carrier LTIP and the Otis LTIP.

21.      Plaintiff Alan Machuga is an individual residing in the State of Florida.  Machuga was a participant in the UTC LTIP and the United Technologies Corporation 2018 Long-Term Incentive Plan (the "UTC 2018 LTIP") before the Transaction.  Pursuant to the Transaction, he remained a participant in those plans (now under the name RTX) and became a participant in the Carrier LTIP and the Otis LTIP.

22.      Plaintiff Theresa MacKinnon is an individual residing in the State of Connecticut.  MacKinnon was a participant in the UTC LTIP before the Transaction.   Pursuant to the Transaction, she remained a participant in that plan (now under the name RTX) and became a participant in the Carrier LTIP and the Otis LTIP.

23.      Plaintiff Costas Loukellis is an individual residing in the State of Connecticut.  Loukellis was a participant in the UTC LTIP before the Transaction.  Pursuant to the Transaction, he remained a participant in that plan (now under the name RTX) and became a participant in the Carrier LTIP and the Otis LTIP.

6

**Defendants and Plans**

24.     Defendant RTX is a Delaware corporation with its principal place of business is in Waltham, Massachusetts. RTX was formerly named UTC, a Delaware corporation with a principal place of business in Farmington, Connecticut, before the Transaction.

25.     Defendant Otis is a Delaware corporation with its principal place of business in Farmington, Connecticut.

26.     Defendant Carrier is a Delaware corporation with its principal place of business in Palm Beach Gardens, Florida.

27.     The UTC LTIP is a non-qualified, non-ERISA plan of incentive compensation sponsored by RTX.  Before the Transaction, UTC sponsored the UTC LTIP and it is now sponsored by RTX.

28.     The UTC 2018 LTIP is a non-qualified, non-ERISA plan of incentive compensation sponsored by RTX.  Before the Transaction, UTC sponsored the UTC 2018 LTIP and it is now sponsored by RTX.

29.     The UTC LTIP and the UTC 2018 LTIP are referred to as the "UTC Plans."

30.     The Carrier LTIP is a non-qualified, non-ERISA plan of incentive compensation sponsored by Carrier.

31.     The Otis LTIP is a non-qualified, non-ERISA plan of incentive compensation sponsored by Otis.

32.     The United Technologies Corporation Compensation Committee (the "Compensation Committee"), while not a named defendant, was an unincorporated association under Connecticut law that administered the UTC Plans before the Transaction.  Each member of

the Compensation Committee was a "Non-Employee Director," *i.e.*, a member of UTC's Board that was not employed by UTC.

## SUBSTANTIVE ALLEGATIONS

### A.     The UTC Plans Before the Transaction

33.     UTC sponsored the UTC Plans to provide its executives, management and other key employees with incentive compensation "through stock and performance-based awards." UTC LTIP at § 1.  UTC believed that this incentive compensation gave it "a competitive advantage in attracting and retaining" these employees and "reinforce[d] its key objectives of driving long-term shareowner value, aligning executive and shareowner interests and paying for performance." *Id. see also* UTC's Notice of 2019 Annual Meeting of Shareowners and Proxy Statement ("2019 Proxy") at 51 and 54 ("Retirement and deferred compensation plans help UTC attract and retain talented executives.").

#### 1.     The UTC LTIP

34.     The UTC LTIP provided participants with "Awards" of incentive compensation in the form of Stock Options and Stock Appreciation Rights (SARs) for UTC common stock, performance share units ("PSUs") based on UTC's attainment of performance goals, and restricted stock units ("RSUs") of UTC common stock.  The UTC LTIP's purpose was to "align shareholder and management interests through stock and performance-based awards ***linked to shareowner value . . . .*"  *See* UTC LTIP at § 1 (emphasis added).

35.     Participants who received Stock Options were entitled to buy shares of UTC common stock at a Strike Price at any time between the award's vesting date ("Vesting Date") and a future date (the "Exercise Date").  UTC LTIP at § 5(a); Stock Options Schedule of Terms at 2. The Strike Price was the closing price for UTC common stock on the New York Stock Exchange

when the options were awarded (the "Grant Date").  The Vesting Date was three years after the Grant Date.  The Exercise Date was ten years after the Grant Date.   If the price of UTC common stock exceeded the Strike Price during the seven years between the Vesting Date and the Exercise Date, participants could purchase UTC common stock at a discount compared to its price on the New York Stock Exchange.

36.     "A Stock Appreciation Right (a 'SAR') provides the recipient with the right to the appreciation in the Common Stock of [UTC] measured from the date of grant to the date of exercise." SAR Schedule of Terms at 2.  Participants who received SARs have the right to the appreciated value between the Strike Price and the price of UTC common stock on the New York Stock Exchange in "shares of Common Stock" or as a "cash payment" from UTC.  UTC LTIP at § 5(b); SAR Schedule of Terms at 2.  Participants could exercise their SARs up to ten years after the Grant Date, a time period that "[t]he Committee believe[d] . . . incentivizes long-term shareowner creation."  2019 Proxy at 46.

37.     Participants who held PSUs received shares of UTC common stock if UTC met certain performance goals, such as a specified earnings per share or revenue growth.  UTC LTIP at §§ 7(a), 2(v); PSU Schedule of Terms at 2, 3.  Each PSU was "equal in value to one share of common stock of [UTC]."  PSU Schedule of Terms at 1.

38.     Participants who held RSUs owned shares of UTC common stock subject to a specified vesting period and UTC's attainment of performance targets.  UTC LTIP at §§ 6(a), 8. Each RSU was "equal in value to one share of common stock of [UTC]."  RSU Schedule of Terms at 1.  While participants could not sell, assign, transfer or pledge their RSUs before they vested, participants otherwise had "all of the rights of a shareowner of [UTC]," including "the right to

receive cash dividends at the same time as the dividends are paid to [UTC's] other shareowners."

UTC LTIP at § 6(b)(ii).

39.     The value of all awards under the UTC LTIP were measured by the "Fair Market

Value" of UTC common stock, a term defined as:

> in reference to the grant of an Award, means the closing price for [UTC] Common
> Stock on the Exchange on the Grant Date. In reference to the exercise, vesting,
> settlement or payout of an Award, Fair Market Value may mean the average of the
> high and low per share trading prices, or the closing price, or the real time trading
> price, for [UTC] Common Stock on the Exchange during regular session trading on
> the relevant date, as specified in the Award Agreement. If there is no reported price
> on the relevant date, Fair Market Value will be determined for the next following
> day for which there is a reported price for [UTC] Common Stock.[1]

UTC LTIP at § 2(r); *see also* SAR Schedule of Terms at 2.

40.     The Compensation Committee administered the UTC LTIP.  UTC LTIP at § 2(i).

41.     If UTC entered into "Corporate Transaction," including a "merger, consolidation,

[or] spin-off," the Compensation Committee or UTC's Board could make "***appropriate and***

***equitable***" adjustments to the number of participants' awards and the applicable Strike Prices of

those awards.  UTC LTIP at § 10(b).  Adjustments could "include, without limitation, the

cancellation of outstanding Awards in exchange for payments of cash, property or a combination

thereof ***having an aggregate value equal to the value of such Awards***, as determined by the

[Compensation] Committee or the Board in its sole discretion ***to be necessary or appropriate to***

***protect the value of Participants' interests in their Awards***."  *Id*. (emphasis added).

42.     The UTC LTIP further limited UTC's ability to amend the plan.  Section 12(d),

titled "Amendment of Awards," provides that no "***amendment shall be made without the***

---

[1]      The term "Exchange" means the New York Stock Exchange.  UTC LTIP at § 2(p).

***Participant's consent if such amendment materially impairs the rights of any Participant with
respect to an award***."  (emphasis added).

43.     Section 3(c) of the UTC LTIP further provides that the Compensation Committee
had discretion to make determinations "with respect to any Award. . . . ***unless in contravention of
any express term of the [UTC LTIP]***."  (emphasis added).  Likewise, UTC's Board could "amend,
alter or discontinue the [UTC LTIP], ***but no amendment, alteration or discontinuation shall be
made which would materially impair the rights of a Participant with respect to a previously
granted Award without such Participant's consent*** . . . ."  *Id*. at § 12(c). (emphasis added).

44.     UTC described the "material features" of each type of award in a "Schedule of
Terms" that it sent to participants each year and attached as an exhibit to its annual report filed
with the SEC on Form 10-K.

45.     The "Schedule of Terms" provided that "[t]he Award is subject to this Schedule
of Terms and the terms, definitions, and provisions of the LTIP  "  SAR Schedule of Terms at 1.

46.     The Schedule of Terms for each type of award also provided that "[t]he recipient
must affirmatively acknowledge and accept the terms and conditions of the SAR Award or the
Award will be forfeited."  *Id*. at 2.

47.     In the event of a merger or spin-off, the Schedules of Terms provided that
"equitable adjustments shall be made in the terms of of outstanding awards, as the Committee
determines to be necessary or appropriate ***to prevent an increase or decrease in the value of
[Awards] relative to [UTC] Common Stock*** or the ***dilution or enlargement*** of rights of recipients."
*See, e.g.,* SAR Schedule of Terms at 4 (emphasis added); RSU Schedule of Terms at 3-4; Stock
Options Schedule of Terms at 4; and PSU Schedule of Terms at 4.  Accordingly, the only
"equitable adjustments" that could be made were those that prevented participants from having the

11

value of their awards increased or decreased compared to UTC common stock and that prevented the dilution or enlargement of the participants' rights in their previously granted awards.

### 2. The UTC 2018 LTIP

48.      UTC established the UTC 2018 LTIP to provide participants with Stock Options, SARs, PSUs and RSUs between April 30, 2018 and April 30, 2028 that in previous years were awarded under the UTC LTIP.  *See* UTC's Notice of 2018 Annual Meeting of Shareowners and Proxy Statement ("2018 Proxy Statement") at 68.  Awards issued under the UTC LTIP "remained in full force and effect under the [UTC LTIP] according to their respective terms" when the UTC 2018 LTIP was established.  UTC 2018 LTIP at § 3(b).

49.      The UTC 2018 LTIP's purpose was "to implement a compensation program that correlates compensation opportunities with shareowner value . . . ."  UTC 2018 LTIP at § 1; *see also* 2018 Proxy Statement at 68 ("The Board believes that the [UTC 2018 LTIP] will serve its intended purpose of: ***Aligning shareowner and management interests*** . . . ." (emphasis in original).

50.      The Compensation Committee administered the UTC 2018 LTIP.  UTC 2018 LTIP at § 2(a).  The Plan provided that if UTC spun-off a subsidiary, the Compensation Committee could "make such substitutions or adjustments as it deems ***appropriate and equitable*** to" the number of participants' awards and the Strike Prices for those awards.  UTC 2018 LTIP at § 3(e). (emphasis added).

51.      Under the UTC 2018 LTIP, the Compensation Committee could "unilaterally amend the terms of any Award theretofore granted, ***but no such amendment shall, without the Participant's consent, materially impair the rights of any Participant with respect to an Award*** . . . ."  UTC 2018 LTIP at § 12(d). (emphasis added).

**B.      UTC's Businesses Before the Transaction**

52.      Before the Transaction, UTC provided technology products and services to the building systems and aerospace industries. Its operations were classified into four business segments: Otis, Carrier, Pratt & Whitney, and Collins Aerospace Systems. Each segment was comprised of groups of similar operating companies. Otis was the world's largest elevator and escalator manufacturing, installation and service company. Carrier was a leading global provider of heating, ventilating, air conditioning (HVAC), refrigeration, fire and security solutions for residential, commercial and industrial and applications. Pratt & Whitney was a leading supplier of aircraft engines for the commercial, military, business jet and general aviation markets. Collins Aerospace Systems was a leading provider of technologically advanced aerospace products and aftermarket service solutions for aircraft manufacturers, airlines, regional, business and general aviation markets, and military and space operations.

53.      On June 9, 2019, UTC entered into a merger agreement with Old Raytheon providing for an all-stock merger of equals transaction between the aerospace portions of UTC and Old Raytheon, with UTC being the surviving entity.  Under the terms of the merger, each share of Old Raytheon common stock was converted into the right to receive 2.3348 shares of UTC common stock. Upon the closing, UTC changed its name to "Raytheon Technologies Corporation," and its stock began trading under the ticker symbol "RTX."

54.      In conjunction with the merger, and as disclosed in November 2018, UTC would separate into three independent companies.  The Collins Aerospace Systems and Pratt & Whitney business segments would remain part of UTC (and thus merge into the Old Raytheon). The Otis and Carrier business segments would be spun-off into separate, independent companies and not be part of the new merged company.

13

55.     UTC expected that the spin-offs and merger would increase shareholder value. In November, 2018, UTC Chairman and CEO Gregory Hayes stated about the spin-off of Carrier and Otis: "Our decision to separate United Technologies is a pivotal moment in our history and will best position each independent company to drive sustained growth, lead its industry in innovation and customer focus, and *maximize value creation*."[2] *See also* 2019 Proxy at 35.

56.     Hayes further stated about UTC's merger with Old Raytheon and spin-off of Otis and Carrier: "I'm confident that each company will continue our proud history of performance, excellence and innovation while building an even brighter future."[3]

57.     "Besides hopes of unlocking value, splitting up a conglomerate is also sold as a way to improve the management of each business unit." During the firm's second-quarter earnings conference call, for example, CEO Greg Hayes told analysts, "What we have heard is that people prefer focus. Breaking up United Technologies is management's attempt to give investors what they want on the theory that separately run companies will be more focused and thus effective at driving long-term revenue and cash flow growth."

58.     Hayes described the Transaction as an "important step in the transformation of UTC and the establishment of two independent companies that are leaders in their respective industries with attractive investment profiles.  As standalone public companies, Carrier and Otis are each well-positioned to drive sustained growth and innovation, with more focused business strategies that will enable them to *maximize value* for their customers and shareowners."[4]

---

[2]     https://www.floridatrend.com/article/25917/united-technologies-announces-intention-to-separate-into-three-independent-companies (emphasis added)

[3]     https://www.cnn.com/2018/11/27/business/united-technologies-breakup-conglomerate/index.html

[4]     https://www.prnewswire.com/news-releases/united-technologies-board-of-directors-approves-separation-of-carrier-and-otis-and-declares-spin-off-distribution-of-carrier-and-otis-shares-301021893.html (emphasis added)

14

59.     UTC shareholders and market investors agreed.  Activist investors Dan Loeb of Third Point and William Ackman of Pershing Square Capital Management had been pushing for UTC to break up into three companies. "The company has been more hampered by its model than it's been helped," said Jim Corridore, an analyst at CFRA Research, told CNN. "It makes a lot of sense for United Technologies to break itself up."[5]

## C.     Defendants Affirmed Their Obligations To Preserve Award Value Under the UTC Plans Before the Transaction

60.     In the months before the Transaction, UTC, Carrier, Otis and the Compensation Committee affirmed their obligation to preserve the value of participants' awards in accordance with the UTC Plans' terms.

61.     In a document sent to plan participants entitled "How the Spinoffs and Merger Affect My LTIP Awards," UTC and the Compensation Committee stated that the LTIP Conversion would "have a **neutral financial impact** on employees—meaning that the Intrinsic Value of outstanding equity awards before and after the Spinoffs will be equivalent." (emphasis in original)

## D.     UTC's Board Announces the Terms of the Spin-Offs

62.     To carry out the spin-offs, on March 11, 2020, UTC's Board declared a *pro rata* dividend for UTC shareowners in the form of Carrier common stock and Otis common stock.  Each UTC shareowner of record as of March 19, 2020 at 5:00 p.m. EDT would receive one share of Carrier common stock and one-half share of Otis common stock for each share of UTC common stock they owned, with the distribution occurring when the Transaction closed on April 3, 2020 at 12:01 a.m. EDT.  No fractional shares of Carrier or Otis were issued in the distribution, and instead

---

[5]     https://www.cfo.com/strategy-budgeting-planning/2018/11/united-technologies-ditches-conglomerate-model

UTC shareowners received cash in lieu of any fractional shares. UTC shareowners retained their shares of UTC common stock.

63.     Publicly traded options of UTC stock were similarly converted in the spin-off. Each UTC option holder received one Carrier option and one-half of an Otis option.  Each option holder also retained the UTC option.

64.     On March 19, 2020, two weeks before the closing of the Transaction, the common stocks of Carrier and Otis began trading on the New York Stock Exchange on a "when issued" basis, allowing the market to value Carrier and Otis and the combined company that would become RTX before the Transaction closed.

**E.     The Transaction's Effect on the UTC Plans**

65.     As part of the Transaction, UTC, Carrier and Otis entered into a Employee Matters Agreement (the "EMA") on April 2, 2020 to, among other things, allocate the liabilities among RTX, Carrier and Otis after the Transaction for employee benefits.  Under Section 2.01(a) of the EMA, Carrier accepted and assumed the liabilities for, among other things, incentive compensation, equity compensation and any other compensation or benefits payable to current and former employees in the Carrier business segment (the "Carrier Group") that was spun-off.  Under Section 2.01(b) of the EMA, Otis accepted and assumed the liabilities for, among other things, incentive compensation, equity compensation and any other compensation or benefits payable to current employees and former employees in the Otis business segment (the "Otis Group") that was spun-off.  UTC retained the liabilities, for, among other things, incentive compensation, equity compensation and any other compensation or benefits payable to current and former employees in the Pratt & Whitney and Collins Aerospace business segments (the "UTC Group").

66.     Carrier and Otis specifically acknowledged their successor liability for the outstanding awards issued under the UTC Plans that were converted to awards under the Carrier LTIP and the Otis LTIP, respectively.   For instance, the Otis LTIP defined "Assumed Spin-Off Awards" as awards that had been granted under the UTC Plans that were "assumed by [Otis] and converted into an Award in connection with the Spin-Off."  Otis LTIP at § 1(c).  The Carrier LTIP defined the term as an award that Carrier had "assumed . . . in connection with the Spin-Off."  Carrier LTIP at § 1(c).

67.     Accordingly, Carrier established the Carrier LTIP for the members of the Carrier Group and Otis established the Otis LTIP for the members of Otis Group to mirror the UTC Plans and to directly assume as successors in interest UTC's liabilities associated with the participants in their respective groups.

68.     The EMA set forth the multiple formulae that would be used to convert participants' interests in UTC common stock in the UTC Plans in the Transaction.

**1.     Vested Stock Options and SARs**

69.     Vested Stock Options and SARs for UTC were converted to options and SARs for RTX, Carrier and Otis under the EMA.  The conversion changed the number of Stock Options and SARs that participants held and the applicable Strike Prices.

70.     Defendants did not use the conversion formula by which publicly-traded shares of UTC common stock and options were converted in the Transaction: one share of UTC stock became one share of RTX, one share of Carrier and one-half of a share of Otis.  Instead, Defendants gave Plaintiffs and Class Members fewer shares pursuant to a flawed formula that did ***not*** preserve, and in fact diluted, the value of participants' Stock Options and SARs.

17

71.     Defendants' formula calculated the number of Stock Options and SARs that participants would have in RTX, Carrier and Otis by dividing the closing price of UTC's stock on the day before the Transaction, *i.e.*, April 2, 2020, by the sum of volume-weighted average prices on the fourth and fifth trading days after the Transaction (4/5 VWAP) of the common stocks of RTX and Carrier and Otis, with Otis's figure multiplied by .5 to reflect Otis's reverse share split.

72.     Moreover, Defendants further diluted the value of the Stock Options and SARs by calculating a new Strike Price for Plaintiffs' Stock Options and SARs by dividing the respective company's 4/5 WVAP by UTC's share price on April 2, and then multiplying that number by the Strike Price that applied to UTC's Stock Options and SARs before the Transaction.  EMA at § 4.02(c).

**2.      Unvested Stock Options and SARs.**

73.     Defendants used a different formula for participants' unvested Stock Options and SARs.  Under the EMA, unvested Stock Options and SARs were converted entirely into options and SARs for the stock of the company "group" that the participants were in: members of the UTC Group only received options or SARs for RTX, members of the Carrier Group only received options or SARs for Carrier, and members of the Otis Group only received options or SARS for Otis.  EMA at §§ 4.02(b) and (d).

74.     Defendants again calculated the number of Stock Options/SARs that participants would receive by dividing the UTC's share price on April 2, 2020 by the applicable 4/5 VWAP. To calculate the new Strike Prices, Defendants divided the company's 4/5 VWAP by UTC's share price on April 2, 2020, and then multiplied that number by the original Strike Price for UTC common stock.

### 3.    Unvested RSUs

75.    Participants' unvested RSUs were converted into RSUs of either RTX, Carrier or Otis based the participant's company group. EMA at § 4.02(e).  To determine the number of RSUs, Defendants divided UTC's stock price on April 2, 2020 by the company's 4/5 VWAP.

### 4.    PSUs

76.    Under the UTC Plans, participants received shares of UTC stock if UTC met specified performance goals over several years.  After adjusting the number of PSUs to account for UTC's achievement of those goals before the Transaction, Defendants converted participants' PSUs into RSUs of either RTX, Carrier or Otis using the same method was used to convert participants' unvested RSUs.

## F.    Defendants' Formulae Breached the Terms of the Plans and Was Unnecessary, Inappropriate, Unreasonable, Inequitable and/or Arbitrary.

77.    The 4/5 VWAP that the Compensation Committee chose to adjust participants' awards in the Transaction violated the terms of the UTC Plans.  The  adjustments made were not: (a) equitable; (b) "necessary or appropriate" "to protect the value of Participants' interests in their Awards;" (c) "necessary or appropriate" to "prevent an increase or decrease in the value of [Awards] relative to [UTC] Common Stock or the dilution or enlargement of the rights of recipients;" and they (d) "materially impair[ed] the rights [of Plaintiffs] with respect to an Award."

78.    The Compensation Committee could not have reasonably expected that the 4/5 VWAP would satisfy the UTC Plans' requirements.  To do so, the combined prices of RTX, Carrier and Otis under the the 4/5 VWAP would have to be identical to the closing price of UTC on April 2, 2020.  This is a near impossibility for a single stock, let alone for the combined prices of three stocks.

19

79.     The 4/5 VWAP obviously and inevitably entailed significantly greater risk that there would be a deviation between the value of participants' awards before and after the Transaction and the value of the common stock than if Defendants had used the same conversion methodology that was used for UTC shareholders or the opening prices of the three companies' stocks immediately after the Transaction closed.  By using a formula with a multi-day lag, Defendants substantially increased the risk that the pre- and post-Transaction values of participants' awards would be different.

80.     Indeed, the companies acknowledged in public filings before the Transaction that there was a risk that market fluctuations would cause the values of participants' awards to deviate from the value of the UTC common stock.  On February 7, 2020, Otis and Carrier each filed Form 10s with the SEC to register their securities that would begin trading the "regular way" on the New York Stock Exchange when the Transaction closed.  In their filings, Otis and Carrier (which were UTC subsidiaries at the time) stated that UTC's Board concluded that:

> We **cannot predict** the effect of the [Transaction] on the trading prices of Carrier, Otis or UTC common stock or know with certainty whether the combined market value of one share of Carrier common stock, the number of shares of Otis common stock to be distributed per share of UTC common stock in the Otis distribution and one share of UTC common stock **will be less than, equal to or greater than the market value of one share of UTC common stock prior to the distributions**.

Carrier Form 10 at Exhibit 99.1 at 19 (emphasis added); Otis Form 10 at Exhibit 99 at 18-19.

81.     In other words, UTC's Board, which included each member of the Compensation Committee, had no idea whether the combined prices of the three companies' share prices under the the 4/5 VWAP would be the same as UTC's share price before the Transaction.

82.     The 4/5 VWAP formulae that the Compensation Committee used for the UTC Plans was also materially different than the one UTC used for its other compensation plans.  For example,

Defendants used a different formula for the participants in UTC's 401(k) plan ("UTC Savings Plan") whose plan accounts held shares of UTC common stock.

83.     Unlike the participants in the UTC Plans, participants in the UTC Savings Plan were treated "[j]ust like any other shareholder of UTC stock . . . ." *See* UTC Savings Plan ESOP and UTC Common Stock Fund Treatment at 1.  Each share of UTC stock in participants' 401(k) accounts was converted to one share of Raytheon stock, one share of Carrier stock, and 1/2 share of Otis stock.  UTC easily could used the same formula to convert  participants' UTC LTIP Awards. Accordingly, the 4/5 WVAP was clearly not "necessary."

84.     The 4/5 VWAP formulae was not even used for the Compensation Committee's own stock-based compensation. For their service as non-employee member of the UTC's Board, each member of the Compensation Committee received Deferred Director Stock Units ("DDSUs"), which provided compensation based on the price of UTC common stock.  To convert the DDSUs in the Transaction, Defendants did not use the 4/5 VWAP. Instead, they used the same formula that was used for common stockholders. Each DDSU was converted to one share of Raytheon stock, one share of Carrier stock and ½ share of Otis stock.  Thus, the Compenation Committee used a different formula for the participants in the UTC LTIP Plans than was used to convert their own stock-based compensation.  Tellingly, in an apparent attempt to correct this self-dealing, immediately *after* Plaintiffs filed their first complaint in this action, numerous non-employee directors filed documents with the SEC to indicate that their DDSU's had been reduced by 15%—the same percentage by which the the flawed VWAP decreased and diluted Plaintiffs' awards.

85.     There was no need to use a 4/5 VWAP formula to "smooth out" any market adjustment relating to valuing UTC, Otis and Carrier as separate companies because the market

began valuing each as a separate company through pre-Transaction markets that opened on March 19, 2020.

86.    Carrier and Otis each began trading on a "when-issued" basis on March 19, 2020, two weeks before the Transaction.

87.    The purpose of the "when issued" market is to account for the idiosyncratic volatility associated with the Transaction before the closing. It also mitigates potential initial order imbalances after the closing.  This is important because it implies that the price movements on the first few days after the Transaction were changes in the fundamental value of the common stock after the Transaction stemming from changes in information, risk, and market risk-tolerance that occurred after the Transaction. Plaintiffs and the Class, who were to be treated like common stockholders, were entitled to that value, and Defendants knew or should have known that they would not receive that value as a result of use of the 4/5 day VWAP.

88.    "When-issued" trading allows investors to buy or sell the stocks of the companies that will be spun-off, *i.e*., Carrier and Otis, in the two weeks before the spin-off. On the same day, in addition to trading the "regular way" on the New York Stock Exchange, UTC began trading on an "ex-distribution" basis, *i.e.*, UTC without Carrier and Otis.  These markets indicate post-Transaction price and demand for the stocks before they begin trading the "regular way" after the Transaction occurs.  It helps ensure that UTC common stockholders who elected to retain their shares would receive market value at the time of the closing and those who elected not to participate in the Transaction could sell beforehand.  In other words, trading on a "when issued" and "ex-distribution" bases enabled the market to price and account for the post-Transaction idiosyncratic risks unique to each company before the Transaction closed.

89.     Upon information and belief, the Compensation Committee decided to use a VWAP-based formula in December, 2019, several months before the outbreak of the COVID-19 pandemic caused substantial volatility in the market as a whole and for UTC and old Raytheon specifically.  Indeed, in its Form 10-K for the year ending December 31, 2019, UTC used an expected volatility between 18.8% and 19.7% to measure the fair value of unexercised awards under the UTC Plans.  This volatility range was consistent with the assumptions that UTC had used in previous few years. For example, UTC used an expected volatility assumption of 20% for the same measurement at the end of 2016, as contrasted to a range between 30% and 42% at the end of the 2009 during the financial crisis

90.     Upon information and belief, the UTC Board approved the VWAP-based formula in January or early February, 2020 in a period of market calm.  The Form 10s that Carrier and Otis filed on February 7, 2020 (while UTC subsidiaries) attached a Form of the Employee Matters Agreement, which included the 4/5 VWAP formula for the first time.

91.     In UTC's Form 10-K for the year ending December 31, 2019 that it filed on February 12, 2020, UTC mentioned "pandemic health issues" as a risk that could affect its future results, the first time it had ever done so.

92.     In mid-February 2020, the spread of COVID-19 began to impact the stock market and the entire world economy.  After the S&P 500 closed at an all-time record high on February 19, 2020, the stock market saw its largest single-week decline since the 2008 financial crisis for the week ending February 28, 2020.[6]  On February 28, 2020, the chair of the Federal Reserve

---

[6]     https://fraser.stlouisfed.org/timeline/covid-19-pandemic

issued a statement which said that COVID-19 "poses evolving risks to economic activity" and it was "closely monitoring developments and their implications for the economic outlook."[7]

93.     COVID-19's effects on UTC's share price were consistent with those felt by the entire U.S. economy.  UTC's share price began to fluctuate wildly during the last week of February and continued to do so during the entire month of March, 2020.

94.     UTC's share price varied significantly over multi-day periods before the Transaction.  For example, its price swung by more than 10% in four of the five weeks before the Transaction.[8]  These wide fluctuations in the price of UTC's common stock increased its volatility. At the time of the Transaction, UTC's volatility was more than twice than what it had been when the Compensation Committee decided to use a VWAP-based formula that the Board approved.

95.     The U.S. stock market also had measurable volatility increases beginning in late February, 2020.  The Chicago Board Options Exchange's Volatility Index (VIX) is a common measure of the stock market's volatility.  VIX is known as Wall Street's "fear index" because it represents the market's expectations for how the prices of publicly traded stocks will change in the next 30 days.  A higher VIX indicates an expectation of larger price moves up or down.  A "normal" VIX, which indicates that stock prices are likely to remain stable, is below 20.  A VIX of "over 30 suggests prices might dramatically swing over the next month."[9]

96.     The VIX ranged between 12.5 and 15.86 in December, 2019 and remained stable until mid-February, 2020.  It was 15.47 when Carrier and Otis filed their Form 10s on February 7

---

[7]     https://fraser.stlouisfed.org/archival-collection/board-governors-federal-reserve-system-6116/statement-federal-reserve-chair-jerome-h-powell-589383

[8]     UTC's price declined by 13.81% in the week of February 24-28, decreased by 3.15% in the week of March 2-6, decreased by 16.67% during the week of March 9-13, decreased by 21.70% in the week of March 16-20 and increased by 17.71% in the week of March 23-27.

[9]     https://finance.yahoo.com/news/investors-cboe-volatility-index-164052633.html

and 13.74 when UTC filed its Form 10-K on February 12.  By March 3, 2020, thirty days before the Transaction, the VIX had skyrocketed to 36.82, indicating investors' expectation that stock prices would "dramatically swing over the next month."  On March 16, 2020, the VIX reached an all-time high of 82.69, exceeding its previous high of 80 during the Great Recession.[10]

97.     The Wall Street Journal stated on March 23, 2020 that "[m]arkets have never unraveled as quickly as they did in the past month," as increased volatility was "upending bets on more placid trading from earlier in the year."[11] According to a Goldman Sachs analyst, "[t]hings are not only quite bad, I would say they're likely worse than anything we've ever seen."[12]

98.     Because UTC, Carrier and Otis could not predict the prices of their stocks under normal market conditions, the Compensation Committee and the UTC Board could not have reasonably expected that they could do so over a four to five day period during the extreme market volatility and unrest which existed at the time of the Transaction.

99.     The COVID-19 pandemic affected all aspects of the U.S. economy, including executive compensation plans like the UTC Plans.  Industry leaders warned compensation committees to be aware of how this market volatility affected their obligations when issuing or pricing stock-based compensation. For example, Semler Brossy Consulting Group advised on March 27, 2020 that it was "critical that the focus on pay and performance is responsive to the environment."  Others advised that compensation committees "must adjust to the new reality" during the pandemic and that "what made sense in January is no longer appropriate" because of the "market turmoil."

---

[10]     https://www.cnbc.com/2020/03/16/wall-streets-fear-gauge-hits-highest-level-ever.html
[11]     https://www.wsj.com/articles/stock-market-meltdowns-historic-velocity-bruises-investors-11584955800
[12]     https://www.nytimes.com/2020/03/16/business/stock-market-coronavirus-federal-reserve.html

100.     As UTC, Carrier and Otis each recognized before the Transaction, markets are not static, and it was virtually guaranteed that the value of the awards would "increase or decrease . . .. relative to Common Stock" over the 4/5-day period built into the formulae, and that this valuation delay would result in a "dilution or enlargement of the rights of recipients."  In fact, Defendants understood and predicted that the delayed formulae would separate the value of the awards from UTC's common stock as the stock prices of RTX, Carrier and Otis would necessarily change after the Transaction closed.  Each company acknowledged in SEC filings that its stock price could "fluctuate significantly" after the Transaction.

101.     Given the large swings in the market prices of stocks and the high volatility that existed just before the Transaction, using a delayed measurement like the 4/5 VWAP was particularly unreasonable because it increased the risk that the pre- and post-Transaction values of Plaintiffs' awards would be different than they were immediately before the Transaction.  The multi-day lag in the 4/5 VWAP formula provided substantially more time for macroeconomic factors like COVID-19 to affect the prices of RTX, Carrier and Otis and to deviate from their combined values when they were UTC before the Transaction.  Thus, the Committee could not have reasonably expected the 4/5 VWAP "to be necessary or appropriate to *prevent* an increase or decrease in the value of SARs relative to Common Stock . . . ."  Instead, the 4/5 VWAP *increased* the likelihood that the values would be different.

102.     Defendants did not modify the 4/5 VWAP formula despite conditions that had dramatically changed since it had been chosen, which virtually guaranteed that the value of participants' awards would "increase or decrease" relative to the value of UTC common stock and that their rights would be "dilute[ed] or enlarge[d]" in violation of the UTC Plans.

103.    To make matters worse, Defendants knew or should have known that RTX and Carrier were going to amend their prior financial projections at the time of the Transaction, which would cause further deviation from the value common stockholders received.  On January 28, 2020, UTC filed a Form 8-K with the SEC, which provided financial projections for the Pratt & Whitney and Collins Aerospace business segments in 2020 that would continue to be part of RTX after the Transaction closed.  Similarly, Carrier provided investors with a "2020 Outlook" on February 10, 2020 that projected the company's financial outlook for that year.

104.    On April 3, 2020, however, just hours *after* the Transaction closed, RTX and Carrier both withdrew their financial projections for 2020.  RTX's Form 8-K stated:

> The financial impact of the COVID-19 pandemic cannot be reasonably estimated at this time but may materially affect RTC's business, financial condition, results of operations and cash flows.  As a result, [RTX] is withdrawing the Collins Aerospace and Pratt & Whitney financial outlooks for 2020 provided in the press release furnished as Exhibit 99.1 to its Current Report on Form 8-K filed on January 28, 2020.

105.    Carrier stated in its Form 8-K:

> Due to the global economic slowdown, social distancing efforts and shelter-in-place directives, and the uncertainty associated with when the coronavirus restrictions will be lifted, the Company is withdrawing its 2020 Outlook. The Company expects to provide an update regarding the impact of COVID-19 on its business as well as the Company's mitigation plan during its first quarter earnings call.

106.    Undoubtedly, these public filings were prepared *before* the Transaction closed and the members UTC's Board and and the Compensation Committee knew about them.  Each knew or should have known that the submission of these filings just hours after the Transaction would affect the market prices of RTX and Carrier, respectively, further reducing the already minimal likelihood that the combined prices of RTX, Carrier and Otis four and five days after the Transaction would be the same as the price of UTC on April 2, 2020.

107.    Under these circumstances, it was unreasonable and/or arbitrary for the Compensation Committee to conclude that (a) the awards would not "increase or decrease . . . relative to Common Stock" in the several days after the Transaction, (b) the delayed formulae would not "dilute[e] or enlarge[e] the rights of recipients" in their awards and (c) the 4/5 VWAP would not "materially impair the rights [of Plaintiffs] with respect to an Award."

108.    Defendants gambled with the Plaintiffs' hard-earned compensation and lost big. Based on what Defendants knew or should have known in the month before and at the time of the Transaction, and what they disclosed in public filings, this risky gamble was unnecessary, inappropriate, unreasonable, inequitable and/or arbitrary.

## G.    Defendants' Formulae Harmed Plaintiffs

### 1.    Vested Stock Options and SARs

109.    Defendants' formulae compared the value of participants' awards on April 2, 2020 to their values days later, on April 8 and 9, 2020, using the 4/5 VWAP method.

110.    The closing price of UTC common stock on the last trading day before the Transaction, April 2, 2020, was $86.01. This was consistent with the combined prices of Carrier ($13.28) and Otis ($44.00) on a "when issued" basis and RTX ($50.21) on an "ex-distribution" basis. Each company's opening prices per share on April 3, 2020, the first day of trading after the transaction closed at 12:01 a.m., were consistent with the closing prices from the previous day and UTC's closing price. Shares of RTX opened on April 3, 2020, hours after the Transaction closed, at $51.00 a share, Carrier opened at $13.75 and Otis opened at $43.75. Accordingly, the "when issued" trading market largely priced in the Transaction.

111.    In the days following the Transaction, the share prices of RTX, Carrier and Otis increased substantially. Raytheon's share price increased to a 4/5 VWAP of $63.90, Carrier's share

price increased to a 4/5 VWAP of $14.38 and Otis's share price increased to a 4/5 WVAP of $22.76 ($45.52 x .5), for a total of $101.04, an increase of $15.03 per share or 17.47%, from UTC's closing price on April 2, 2020 of $86.01.

112.     Using the 4/5 WVAP formula materially reduced the value of participants' Stock Options and SARs in two ways.  First, it decreased the number of options and SARs that participants received.  Because Defendants' formula calculated the new number of options and SARs by dividing UTC's Pre-Separation stock price by the companies' combined 4/5 WVAP, under Defendants' flawed formula, ***an increase*** in the aggregate share prices of Raytheon, Carrier and Otis in the days following the Transaction reduced the number of Stock Options or SARs that participants would hold after the Transaction.  Accordingly, participants with 1,000 vested Stock Options or SARs before the Transaction only received 851 Stock Options or SARs for RTX, 851 Stock Options or SARs for Carrier and 425 Stock Options or SARs for Otis—a decrease and dilution of approximately 15%.  If Defendants had used the same formula for plan participants as UTC's common stockowners, participants with 1,000 Stock Options or SARs before the Transaction in UTC would have received 1,000 Stock Options or SARs in RTX, 1,000 Stock Options or SARs in Carrier and 500 Stock Options or SARs in Otis.

113.     Second, Defendants' formula increased the Strike Prices for the Stock Options and SARs.  Stock Options and SARs are only valuable if the stock's price is higher than the Strike Price at the time of exercise.  All other things being equal, the value of a Stock Option or SAR declines when a higher Strike Price is used because the difference between the Strike Price and the stock price is reduced.

114.     By measuring the value of participants' Stock Options and SARs days after the Transaction closed when the share prices of RTX, Carrier and Otis had substantially increased,

Defendants caused the Strike Prices to increase and thereby substantially depriving Plaintiffs and Class Members of the appreciation value of those benefits.  Defendants' 4/5 WVAP methodology caused Strike Prices to increase by 17.5% in each year, as shown below, causing participants to lose appreciation value for each option they received since 2011:

| Award Year | Pre-Transaction Strike Price | Combined Post-Transaction Strike Prices | Percent Increase | Value Lost Per Option |
|---|---|---|---|---|
| 2011 | $78.99 | $92.81 | 17.5% | $13.82 |
| 2012 | $74.66 | $87.72 | 17.5% | $13.06 |
| 2013 | $84.00 | $98.68 | 17.5% | $14.68 |
| 2014 | $112.49 | $132.16 | 17.5% | $19.67 |
| 2015 | $115.04 | $135.15 | 17.5% | $20.11 |
| 2016 | $95.57 | $112.28 | 17.5% | $16.71 |
| 2017 | $110.83 | $130.21 | 17.5% | $19.38 |
| 2018 | $128.16 | $150.57 | 17.5% | $22.41 |
| 2019 | $120.77 | $141.88 | 17.5% | $21.11 |

115.    Plaintiff Darnis' harm is illustrative.  Darnis held 54,500 SARs with a Strike Price of $74.66 from the year 2012.  At a share price of $86.01, Darnis' SARs had a value of $618,575 (($86.01 – $74.66) x 54,500).  Under Defendants' formula, Darnis' SARs were converted to 46,394 options for RTX with a Strike Price of $55.47, 46,394 options for Carrier with a Strike Price of $12.48 and 23,197 options for Otis with a Strike Price of $39.51.  At a combined share price of $86.01 – the price used to value participants' options before the Transaction, the value of Darnis' options is $141,244, a ***decrease of $477,331***.

116.    In short, participants with vested Stock Options and SARs experienced two forms of harm: they got substantially fewer Stock Options and SARs with a substantially higher Strike Price compared to those who purchased options in the market. There was no equitable justification for short-changing UTC LTIP participants, especially when the UTC LTIP's stated purpose was to "align shareowner and management interests . . . ."  UTC LTIP at §1.  Through its formula, Defendants *un*aligned participants' interests from UTC's shareowners' interests:  participants did much worse when the share prices of RTX, Carrier and Otis increased.

117.    In substance, Defendants caused participants to sell their Stock Options and SARs when UTC's share price was $86.01 and then re-purchase those Stock Options and SARs days later, when the share prices of the companies that comprised UTC days earlier was $101.04.  This methodology was inequitable and did *not* preserve the value of participants' Stock Options and SARs as the UTC LTIP required.

**2.     Unvested Stock Options, SARs, PSUs and RSUs**

118.    The formulae that Defendants applied to unvested Stock Options, SARs, PSUs and RSUs in the Transaction also harmed participants in two significant ways.  First, Defendants determined the number of options or units that participants would have by dividing UTC's Pre-Transaction share price of $86.01 by the respective company's 4/5 WVAP, the result of which is called a "Post-Transaction Multiplier."

119.    The consequence of Defendants' formulae was that participants' interests were not aligned with the interests of public stock and options owners.  An increase in each company's 4/5 WVAP caused the Post-Transaction Multiplier to decline, meaning that the *participant received fewer options when the company's stock price increased*.  In other words, if the Transaction

"maximize[d] value creation" like UTC's CEO had previously predicted, participants in the UTC Plans would be *worse off*.

120.     Because the share prices of RTX, Carrier and Otis each increased after the Transaction, participants received fewer Stock Options, SARs, PSUs and RSUs compared to what they would have received if Defendants had treated them like public option holders and a lower amount of dividends on their RSUs because they owned fewer shares than they should have.

|  | Pre-Transaction Multiplier | Post-Transaction Multiplier (4/5 VWAP) | Percent Decrease |
|---|---|---|---|
| **Raytheon Group** | 1.695 | 1.346 | 20.6% |
| **Carrier Group** | 6.476 | 5.982 | 7.6% |
| **Otis Group** | 1.954 | 1.889 | 3.3% |

121.     Defendants exacerbated the harm by increasing the Strike Prices for the Options and SARs because the new Strike Price was based on the company's 4/5 WVAP.  Accordingly, any increase in the company's share price between April 2, 2020 and April 8 and 9, 2020, increased the new Strike Price.

## H.     RTX Admitted the Formulae in the EMA Were Unfair and Inequitable to Participants

122.     RTX acknowledged after the Transaction that the formulae in the EMA did *not* treat participants in the UTC Plans fairly in the Transaction.  In a Form 8-K filed on May 29, 2020, RTX (*i.e.*, the new UTC) informed shareholders that it had amended the Employee Matters Agreement to change the formulae used to convert unvested equity awards for RTX employees and that it had eliminated use of the 4/5 WVAP.  RTX's amendment provided that "the post-Separation Company stock price used in the applicable conversion ratio for [unvested equity

32

awards] held by employees and former employees shall be the ***opening price*** on the date of the Separation, instead of the [4/5 WVAP]." (emphasis added).

123.    RTX stated that the reason for the amendment was that "the increase in the [RTX] stock price in the week following the Separation caused ***material discontinuity*** between the pre-Separation UTC stock price and the post-Separation [RTX] stock price originally chosen in the Agreement." (emphasis added). In other words, the holders of unvested Stock Options and SARs, unvested PSUs, unvested RSUs were denied the value appreciation enjoyed by owners of UTC's common stock.

124.    RTX further stated in its 8-K that the amendment to the EMA "preserves the Company's ability to continue to treat employees and retirees ***fairly in the conversion process*** . . . ." In other words, absent this change, RTX did not treat employees and retirees appropriately or equitably in the conversion process.  Necessarily, RTX admitted that it acted unfairly and, therefore, inequitably, towards participants with vested benefits in the UTC Plans when it ***did not*** similarly revise the conversion formulae to eliminate the 4/5 WVAP for those participants.

125.    Indeed, RTX believed it should "choose a different post-Separation stock price" for any other "legacy UTC equity awards" and asked Carrier and Otis for their required consent to make such a fair and equitable adjustment, but both companies refused.  Carrier and Otis did so even though they twice extended the "Blackout Period" during which participants were unable to exercise their awards after the Transaction because "of the market conditions resulting from the COVID-19 pandemic."  Moreover, Carrier claimed it did not want to change the formula because it had been "disclosed to . . . investors in Form 10 SEC filings," even though it had withdrawn the financial projections it provided investors in those same filings.

33

126.    RTX similarly amended the formula for many of its other ERISA plans to use the opening price immediately after the closing of the Transaction, rather than the 4/5 WVAP.

127.    All Defendants knew or should have known that the award conversion formulae were inconsistent with the terms of the benefit plans and the treatment of common stock and option holders, particularly at the time they were employed and afterward, and that those formulae would likely result is substantial financial harm to Plaintiffs and Class Members and unalign Plaintiff and Class Members' interests from those of common stock and public option holders..

## CLASS ACTION ALLEGATIONS

128.    Plaintiffs bring this case as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the class (the "Class") defined below:

> All participants in UTC Plans whose compensation benefits were converted in the Transaction using the formulae in the Employee Matters Agreement. Excluded from the Class are the Defendants, the judge to whom this case is assigned and any member of the judge's immediate family and any individuals who are subsequently determined to have been fiduciaries to participants in the UTC Plans at the time of the Transaction.

129.    The members of the Class are so numerous that joinder of all members is impractical.  Upon information and belief, the Class includes thousands of people.  The members of the Class are all former employees of UTC, many of whom are now current employees of RTX, Carrier or Otis.  Members of the Class live in, among other states, Connecticut, Florida, Indiana, and Massachusetts, the states where UTC formerly operated and the states where Raytheon, Carrier and Otis now operate.

130.    Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs' claims, and those of all Class members, arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class are similarly affected by Defendants' wrongful conduct.

131.     There are common questions of law and fact common to the Class and these questions predominate over questions affectingly only individual Class members.  Common legal and factual questions include, but are not limited to:

        A.     Whether Defendants breached the UTC LTIP and the UTC 2018 LTIP;

        B.     Whether Defendants preserved the value of participants' Stock Options, SARs, PSUs, RSUs and UTC Stock Units in the Transaction; and

        C.     Whether Defendants impaired the rights of participants who held Stock Options, SARs, PSUs and RSUs in the Transaction.

132.     Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of class actions involving breach of contract, employee benefits and fiduciary duty litigation.  Plaintiffs have no interests antagonistic to those of other members of the Class.  Plaintiffs are committed to the vigorous prosecution of this action, and do not anticipate any difficulty in the management of this case as a class action.

133.     This action may be properly certified under either subsection of Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendant. Class action status also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

134.     In the alternative, certification under Rule 23(b)(2) is warranted because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby

making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

135.    In the alternative, certification under Rule 23(b)(3) is also appropriate. A class action is superior to other available methods for the fair and efficient adjudication of the controversy within the meaning of Rule 23(b) and in consideration of the matters set forth in Rule 23(b)(3)(A)-(D). Because of the amount of the individual Class members' claims relative to the complexity of the litigation and the financial resources of the Defendants, few, if any, members of the Class would seek legal redress individually for the wrongs complained of herein. The maintenance of separate actions would place a substantial and unnecessary burden on the courts, and could result in inconsistent adjudications, while a single class action can determine, with judicial economy, the rights of all Class members. Absent a class action, Class members will continue to suffer damages, and Defendants' misconduct will proceed without remedy.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION AGAINST RTX, CARRIER AND OTIS
### (Breach of Contract)

136.    Plaintiffs repeat the allegations in paragraphs 1 through 135 above.

137.    The UTC LTIP and the UTC 2018 LTIP are contracts that provided Plaintiffs with compensation in exchange for the work they performed for UTC.

138.    Plaintiffs performed all their obligations under the UTC LTIP and the UTC 2018 LTIP.

139.    Under the UTC LTIP, the UTC Defendants could only make adjustments in the event of a merger or spin-off that were "appropriate or equitable," were "necessary or appropriate" under two specified, and limited, circumstances:  (1) "to protect the value of Participants' interests

in their Awards" and (2) to "prevent an increase or decrease in the value of [Awards] relative to [UTC] Common Stock or the dilution or enlargement of the rights of recipients."

140.    Under the 2018 UTC LTIP, the UTC Defendants could not make adjustments that would "materially impair the rights [Plaintiffs] with respect to an Award."

141.    Defendants exercised their discretion unreasonably and/or arbitrarily when adjusting the LTIP awards and breached these and other contractual obligations as alleged above.

142.    Carrier, having accepted and assumed the liabilities for the compensation and employee benefits owed to members of the Carrier Group, including the compensation owed under the UTC LTIP and 2018 UTC LTIP, is liable for UTC's breach of contract.

143.    Otis, having accepted and assumed the liabilities the compensation and employee benefits owed to members of the Otis Group, including the compensation owed under the UTC LTIP and 2018 LTIP, is liable for UTC's breach of contract.

144.    Plaintiffs and the Class have been injured because of Defendants' contractual breaches.  They received fewer Stock Options, SARs, PSUs and RSUs and their Stock Options and SARs had higher Strike Prices than they should have based on the formula applied to UTC share and option owners.  Plaintiffs' rights in their awards was materially impaired because they received fewer Stock Options and SARs that had higher Strike Prices.

### SECOND CAUSE OF ACTION AGAINST RTX, CARRIER AND OTIS
### (Breach of Implied Covenant of Good Faith and Fair Dealing)

145.    Plaintiffs repeat the allegations in paragraphs 1 through 144 above.

146.    Under the UTC LTIP and the UTC 2018 LTIP, the UTC Compensation Committee had discretion to amend the terms of participants' awards when UTC spun-off a subsidiary or merged.

147.     The UTC LTIP and the UTC 2018 LTIP are contracts governed by Delaware law. Under Delaware law, contracts have an implied covenant of good faith and fair dealing which prohibit parties from using its discretion in a way that is impliedly proscribed by the contract's express terms.  As set forth above, the Compensation Committee was obligated to protect the value of participants' awards, make equitable adjustments to ensure that the value of participants' awards did not decrease relative to UTC's common stock and was not diluted if there was a merger or spin-off and ensure that any adjustments did not "materially impair the rights [Plaintiffs] with respect to an Award."   Accordingly, while the Compensation Committee had the discretion on *how* to preserve participants' awards and could, for example, offer participants shares of stock or cash payments, the Compensation Committee could *not* exercise discretion in a way that decreased the value of the awards.  The parties' original contracting intent was to keep the award recipients in the same financial position with respect to their previously granted awards in the event of a merger or spin-off as compared to common stockholders.

148.     The Compensation Committee developed and used formulae to adjust participants' awards that were unreasonable, inequitable and/or arbitrary and which had no basis under the UTC LTIP or the UTC 2018 LTIP's terms.  Both plans measured the value of participants' awards by the Fair Market Value of UTC common stock on the New York Stock Exchange on the day of the valuation.  There is no good-faith basis for measuring the pre-Transaction value of participants' awards on April 2, 2020, and the post-Transaction value days later, using a completely different methodology in a period of extraordinary market volatility.  It was nearly certain that the formulae would fail to comply with the requirement that the Compensation Committee's exercise of discretion "prevent an increase or decrease in the value of [the Awards] relative to Common Stock or the dilution or enlargement of the rights of the recipients."  SAR Schedule of Terms at 4.

Moreover, when implemented, the formulae had a high likelihood that it would not "protect the value of participants' Awards" and would "materially impair the rights [Plaintiffs] with respect to an Award."

149.     UTC's failure to act in good faith is evidenced by both the different formulae that it used to convert 401(k) holdings of employees and the DDSUs of non-employee directors and by their gamble with Plaintiffs' hard-earned compensation that was virtually guaranteed to be a losing bet.  Further, the non-employee directors' reduction of their DDSUs by 15% *after* Plaintiffs filed this action is a recognition of disparate treatment and self-dealing.

150.     The formulae also contradicted the UTC LTIP's stated purpose to "align shareowner and management interests through stock and performance-based awards linked to shareowner value . . . ."  UTC LTIP at § 1.  The formulae also contradicted the UTC 2018 LTIP's purpose to "correlate[] compensation opportunities with shareowners value . . . ."  UTC 2018 LTIP at § 1.  As a result of the application of the EMA's formulae, the interests of UTC LTIP and UTC 2018 LTIP participants were not aligned or correlated with those of UTC common stock and option owners.  While UTC common stock and option owners substantially benefitted from the post-Transaction rise in the share prices of RTX, Carrier and Otis, these increases caused participants to receive *fewer* Stock Options, SARs, PSUs and RSUs and *higher* Strike Prices for their options.

151.     After the Transaction, RTX admitted that the formulae in the EMA were unfair and inequitable when it amended the EMA in order to treat certain participants in the UTC Group "*fairly in the conversion process* . . . ."

152.     By employing the flawed formulae that the Compensation Committee developed, UTC (now RTX), breached its obligation of good faith and fair dealing and frustrated the original

contracting intent of the parties to keep the recipients in the same financial position with respect to their previously granted awards.

153.    Carrier, having accepted and assumed the liabilities for the compensation and employee benefits owed to members of the Carrier Group, including the compensation owed under the UTC LTIP and the 2018 UTC LTIP, is liable for UTC's breach of the implied covenant of good faith and fair dealing.

154.    Otis, having accepted and assumed the liabilities the compensation and employee benefits owed to members of the Otis Group, including the compensation owed under the UTC LTIP and the 2018 UTC LTIP, is liable for UTC's breach of the implied covenant of good faith and fair dealing.

155.    Plaintiffs and the Class have been injured as a result of Defendants' contractual breaches.

### THIRD CAUSE OF ACTION AGAINST RTX, CARRIER AND OTIS
### (Specific Performance)

156.    Plaintiffs repeat the allegations in paragraphs 1 through 155 above.

157.    The UTC Plans are valid contracts,

158.    As alleged above, Defendants breached the UTC Plans and Plaintiffs suffered harm as a result.  The 4/5 VWAP decreased the value of Plaintiffs' SARs relative to UTC common stock and diluted Plaintiffs' rights.  Plaintiffs received 15% fewer SARs and the new SARs had Strike Prices that were 17.5% higher than the formula that was used for UTC shareowners in the Transacation.

159.    The Court should order the Defendants to specifically perform their obligations under the UTC Plans and adjust the number of SARs and other awards that they provided Plaintiffs

as well as the Strike Prices of those SARs to remedy the decreased value and diluted rights that Plaintiffs suffered.  It would be fair and equitable for the Court to order this relief.

160.   UTC promised Plaintiffs that the SARs would be "linked to shareowner value" and told shareholders three weeks before the Transaction that SARs "incentivizes long-term shareowner value creation" because participants had ten years after the Grant Date to exercise their SARs.  2019 Proxy at 46.  In other words, UTC *benefitted* from this long exercise period because it encouraged participants "to focus on strategies that promote[d] sustainable growth" over the long-term.  UTC's 2016 Notice of Annual Meeting of Shareowners and Proxy Statement at iv.

161.   Assessing money damages may be impractical and fail to do complete justice to remedy Defendants' contractual breaches.  Money damages may also be inadequate because Plaintiffs would be deprived of the long-term nature of the compensation that the UTC Plans were supposed to provide.

162.   It would also be equitable for this Court to order specific performance because Defendants created this problem.  They breached the contracts using formulae that were inconsistent with the UTC Plans' terms and, especially given the existing market conditions, had virtually no chance of complying with them.  Plaintiffs' awards should be adjusted using the same formula that UTC used for common stock shareholders in the Transaction.  This formula was used for the Committee members' stock-based compensation, the DDSUs, and almost identical to the formula that RTX used for participants with unvested awards when it recognized after the Transaction that the 4/5 VWAP did not "treat employees and retirees fairly in the conversion process."

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that judgment be entered on all claims and requests that the Court award the following relief:

A.    Certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.    An order enjoining Defendants to perform their obligations under the UTC Plans, and provide Plaintiffs with awards that have value consistent with what UTC shareowners received;

C.    In the alternative, awarding the Plaintiffs money damages for the harm they suffered because of Defendants' contractual breaches;

D.    Pre and post-judgment interest; and

E.    Any other relief the Court determines is just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.


Respectfully submitted,


 /s/ Craig A. Raabe
**IZARD, KINDALL & RAABE LLP**
Craig A. Raabe (ct04116)
Robert A. Izard (ct01601)
Mark P. Kindall (ct13797)
Douglas P. Needham (ct29433)
29 South Main Street, Suite 305
West Hartford, CT 06107
Tel: (860) 493-6292
Fax: (860) 493-6290
Email:  craabe@ikrlaw.com
Email:  rizard@ikrlaw.com
Email:  mkindall@ikrlaw.com
Email:  dneedham@ikrlaw.com

42