## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| GERAUD DARNIS, et al., Plaintiffs, v. RAYTHEON TECHNOLOGIES CORPORATION, CARRIER GLOBAL CORPORATION, and OTIS WORLDWIDE CORPORATION, Defendants. | No. 3:20-cv-1171 (SRU) |

## <u>RULING ON DEFENDANTS' MOTIONS TO DISMISS</u>

This putative class action arises out of the alleged mistreatment of former United

Technologies Corporation ("UTC") executives, management, or other key employees

("Plaintiffs") in connection with their long-term incentive compensation plans when UTC spun-

off Carrier Global Corporation ("Carrier") and Otis Worldwide Corporation ("Otis") into

separate companies and merged with Raytheon Corporation ("Old Raytheon") to form Raytheon

Technologies Corporation ("RTX").[1]  Plaintiffs principally allege that Defendants— when

converting the employees' stock-based compensation into interests in RTX, Carrier, and Otis—

breached obligations arising under the incentive compensation plans by using formulae that

treated employees in a manner that was "inferior and inequitable" relative to UTC common stock

and option owners.  In their pared-down amended complaint, Plaintiffs assert three contract

claims: breach of contract, breach of the implied covenant of good faith and fair dealing, and

specific performance.  RTX, Otis, and Carrier move to dismiss the amended complaint on Rule

---

[1] I refer to the spin-offs and merger as the "Transaction."

12(b)(6) grounds.  For the reasons that follow, I conclude that the claims in the amended

complaint are not colorable.  Therefore, I **grant** the motions to dismiss.

## I.     Background[2]

### A.   Factual Allegations

UTC issued various compensation plans— including the UTC Long Term Incentive Plan

("LTIP") and the UTC 2018 LTIP—that provided participants with Stock Appreciation Rights

("SARs")[3] and other forms of compensation (collectively, "Incentive Compensation") tied to the

price of UTC common stock.  Am. Compl., Doc. No. 104-1, at 4 ¶ 2.  UTC sponsored those

plans, which were administered by the UTC Compensation Committee ("the Committee"), for its

executives, management, and other key employees "to align shareowner and management

interests through stock and performance-based awards linked to shareowner value and to give

UTC a competitive advantage in attracting and retaining key employees and directors."  *Id*. at 4 ¶

2, 10 ¶ 32, 11 ¶¶ 33-34, 15 ¶ 49.  Each plan is discussed below.

#### 1.   *The Contracts*

##### a.   UTC LTIP

The UTC LTIP provided participants with "awards" of Incentive Compensation in the

form of stock options and SARs for UTC common stock, performance share units ("PSUs")

based on UTC's attainment of performance goals, and restricted stock units ("RSUs") of UTC

common stock.  *Id*. at 11 ¶ 34.  The purpose of the UTC LTIP was to "align shareholder and

---

[2] The allegations are principally derived from the Plaintiffs' amended complaint.  Where specified, I have
supplemented the pleadings with documents attached to the complaint, documents incorporated by reference therein,
documents relied on in bringing the action which were in the plaintiff's possession or of which the plaintiff had
knowledge, and matters of which judicial notice may be taken.  *See Chambers v. Time Warner, Inc.*, 282 F.3d 147,
152–53 (2d Cir. 2002).
[3] An SAR "provides the recipient with the right to the appreciation in the Common Stock of UTC measured from the
date of grant to the date of exercise" and may be exercised up to ten years after the Grant Date.  *Id*. at 12 ¶ 36.

management interests through stock and performance-based awards linked to shareholder value. . . ." *Id.*

The stock options entitled participants to purchase shares of UTC common stock at a strike price at any point between three years after the date that the options were awarded, the awards' vesting date ("Vesting Date"), and a future date (the "Exercise Date"). *Id.* at 11 ¶ 35. The strike price was the closing price for UTC common stock on the New York Stock Exchange ("NYSE") on the date the options were awarded (the "Grant Date"). *Id.* If the price of UTC common stock exceeded the strike price between the Vesting Date and the Exercise Date, participants could purchase UTC common stock at a discount relative to the price on the NYSE. *Id.* The SARs entitled participants to the appreciated value between the strike price and the price of UTC common stock on the NYSE in "shares of Common Stock" or as a "cash payment" from UTC. *Id.* at 11 ¶ 36. Participants could exercise their SARs up to ten years after the Grant Date. *Id.*

In addition, participants who held PSUs received shares of UTC common stock if UTC met certain performance goals. *Id.* at 12 ¶ 37. Participants who held RSUs owned shares of UTC common stock subject to a specified vesting period and UTC's attainment of performance targets. *Id.* at 12 ¶ 38. Each PSU and RSU was "equal in value to one share of common stock of [UTC]." *Id.* 12 ¶¶ 37-38.

The value of awards under the UTC LTIP were measured by the "Fair Market Value" of UTC common stock, defined, "in reference to the grant of an Award," as follows:

> [Fair Market Value] means the closing price for [UTC] Common Stock on the Exchange on the Grant Date. In reference to the exercise, vesting, settlement or payout of an Award, Fair Market Value may mean the average of the high and low per share trading prices, or the closing price, or the real time trading price, for [UTC] Common Stock on the Exchange during regular session trading on the relevant date, as specified in the

>Award Agreement.  If there is no reported price on the relevant date, Fair
>Market Value will be determined for the next following day for which
>there is a reported price for [UTC] Common Stock.

*Id*. at 13 ¶ 39.

The UTC LTIP provided that, if UTC entered into a "Corporate Transaction," including a "merger, consolidation, [or] spin-off," the Compensation Committee could make "appropriate and equitable" adjustments to the number of participants' Awards and the applicable strike prices of those Awards.  *Id*. at 13 ¶ 41 (emphasis omitted).  Such adjustments could include, but were not limited to, "cancellation of outstanding Awards in exchange for payments of cash, property or a combination thereof having an aggregate value equal to the value of such Awards, as determined by the Committee or the Board in its sole discretion to be necessary or appropriate to protect the value of Participants' interests in their Awards."  *Id*.  Sections 12(c) and 12(d) of the UTC LTIP further provided that no amendment shall be made without the Participant's consent if such amendment "materially impairs the rights of any Participant with respect to an award."  *Id*. at 13 ¶ 42 (emphasis omitted).  Further, pursuant to Section 12(d), "[n]o amendment to any Award shall reduce the exercise price of any Option or Stock Appreciation Right except to the extent necessary to preserve the value of the Award," including "in the event of . . . a 'Corporate Transaction' as described in Section 10(b)."  UTC LTIP, Doc. No. 107-3, at 11 § 12(d).

Section 3(c) of the UTC LTIP stated that the Compensation Committee had "sole discretion" to make determinations "with respect to any Award . . . unless in contravention of any express term of the [UTC LTIP]."  Am. Compl., Doc. No. 104-1, at 14 ¶ 43 (emphasis omitted); UTC LTIP, Doc. No. 107-3, at 4 § 3(c).  Similarly, the Committee or Board could "amend, alter or discontinue the [UTC LTIP], but no amendment, alteration or discontinuation shall be made which would materially impair the rights of a Participant with respect to a previously granted Award. . . ."  Am. Compl., Doc. No. 104-1, at 14 ¶ 43 (quoting § 12(c)).

b.   UTC 2018 LTIP

UTC created the UTC 2018 LTIP to provide participants with stock options, SARs, PSUs, and RSUs between April 30, 2018 and April 30, 2028 that were previously awarded under the UTC LTIP.  *Id*. at 15 ¶ 48.  Awards issued under the UTC LTIP "remained in full force and effect under the [UTC LTIP] according to their respective terms" when the UTC 2018 LTIP was created.  *Id*.  The purpose of the UTC 2018 LTIP was to "implement a compensation program that correlates compensation opportunities with shareholder value." *Id*. at 15 ¶ 49.

Under the UTC 2018 LTIP, if UTC spun-off a subsidiary, the Committee could "make such substitutions or adjustments as it deems appropriate and equitable to" the number of participants' awards and the strike prices for those awards.  *Id*. at 15 ¶ 50 (emphasis omitted). Further, the Committee could "unilaterally amend the terms of any Award thereto granted, but no such amendment shall, without the Participant's consent, materially impair the rights of any Participant with respect to an Award."  *Id*. at 15 ¶ 51 (emphasis omitted).

c.   The Schedules of Terms

The "material features" of each type of award were set forth in a "Schedule of Terms" that UTC disseminated annually to participants.  *Id*. at 14 ¶ 44.

Each Schedule of Terms provided that "Awards granted pursuant to the LTIP shall be interpreted and administered by the Committee," and that the Committee "shall establish such procedures as it deems necessary and appropriate to administer Awards in a manner that is consistent with the terms of the LTIP."  SOT, Doc. No. 107-2, at 7.

Each Schedule of Terms indicated that, if UTC spun-off a subsidiary, "equitable adjustments shall be made . . . to prevent an increase or decrease in the value of [Awards]

relative to [UTC] Common Stock or the dilution or enlargement of rights of recipients."  Am. Compl., Doc. No. 104-1, at 14 ¶ 47.

2.  *The Transaction*

Prior to the Transaction, UTC supplied technology products and services to building systems and aerospace industries.  *Id*. at 16 ¶ 52.   Its operations were divided into four business segments:  Otis, Carrier, Pratt & Whitney, and Collins Aerospace Systems ("Collins").  *Id*.  Each segment consisted of groups of similar operating companies.  *Id*.

On June 9, 2019, UTC entered into a merger agreement with Old Raytheon, authorizing an all-stock merger of equals transaction between the aerospace portions of UTC and Old Raytheon, with UTC as the surviving entity.  *Id*. at 16 ¶ 53.  Pursuant to the agreement, each share of Old Raytheon common stock was converted into the right to receive 2.3348 shares of UTC common stock.  *Id*.  Upon the closing, UTC changed its name to "Raytheon Technologies Corporation," or "RTX."  *Id*. at 4 ¶¶ 1, 16 ¶ 53.

In connection with the merger, UTC would separate into three independent companies. *Id*. at 16 ¶ 54.  The Collins and Pratt & Whitney business segments would remain part of UTC and, therefore, merge into Old Raytheon.  *Id*.  The Otis and Carrier business segments would spin off into separate and independent companies.  *Id*.

UTC expected that the Transaction would increase shareholder value, an expectation shared by UTC shareholders and market investors.  *See id*. at 17-18 ¶¶ 55-59.  In November 2018, UTC Chairman and CEO Gregory Hayes remarked that the spin-off of Carrier and Otis would "maximize value."  *Id*. at 17 ¶ 58.  In addition, in a document sent to plan participants entitled "How the Spinoffs and Merger Affect My LTIP Awards," UTC and the Compensation Committee asserted that the LTIP Conversion would "have a neutral financial impact on

employees—meaning that the Intrinsic Value of outstanding equity awards before and after the Spinoffs will be equivalent." *Id.* at 18 ¶ 61.

To execute the spin-offs, on March 11, 2020, UTC's Board declared a *pro rata* dividend for UTC shareholders in the form of Carrier common stock and Otis common stock. *Id.* at 18 ¶ 62. Each UTC shareowner of record as of March 19, 2020 at 5 p.m. would receive one share of Carrier common stock and one-half share of Otis common stock for each share of UTC common stock they owned, with the distribution taking place when the Transaction closed on April 3, 2020. *Id.* at 18 ¶ 62. UTC shareholders received cash in lieu of any fractional shares of Carrier or Otis, and they retained their shares of UTC common stock. *Id.* Publicly traded options of UTC were similarly converted in the spin-off: each UTC option holder received one Carrier option and one-half of an Otis option, and each option holder also retained the UTC option. *Id.* at 19 ¶ 63.

On March 19, 2020, Carrier's and Otis's common stocks began trading on the NYSE on a "when issued" basis, permitting the market to value the post-Transaction prices of Carrier and Otis as well as the company that would become RTX. *Id.* at 19 ¶ 64; *id.* at 25 ¶ 86.

a.   The Employee Matters Agreement and the UTC Plans

As part of the Transaction, UTC, Carrier, and Otis entered into an Employee Matters Agreement (the "EMA") to allocate liabilities among RTX, Carrier, and Otis once the Transaction was executed. *See id.* at 19 ¶ 65.

Under Section 2.01(a) of the EMA, Carrier accepted and assumed liabilities for incentive compensation, equity compensation, and any other compensation or benefits payable to the current and former employees in the Carrier business segment (the "Carrier Group") that was spun off. *Id.*

Under Section 2.01(b), Otis similarly accepted and assumed the liabilities for incentive compensation, equity compensation, and any other compensation or benefits payable to current or former employees in the Otis business segment (the "Otis Group") that was spun-off. *Id*.

Under Section 2.01(c), UTC retained the liabilities for incentive compensation, equity compensation, and any other compensation or benefits payable to current and former employees in the Pratt & Whitney and Collins Aerospace business segments. *Id*.

Carrier and Otis defined the Carrier LTIP and Otis LTIP, respectively, as "assumed . . . in connection with the Spin-Off." *Id*. at 20 ¶ 66. Carrier created the Carrier LTIP for the members of the Carrier Group, and Otis established the Otis LTIP for the members of the Otis Group to mirror the UTC Plans, and to directly assume, as successors in interest, UTC's liabilities associated with the participants in their respective groups. *Id*. at 20 ¶ 67.

The EMA set forth the formulae that would be used to convert participants' interests in UTC common stock in the UTC Plans in the Transaction, as detailed below. *Id*. at 20 ¶ 68.

### i. Vested Stock Options and SARs

Vested stock options and SARs were awards that already had passed the date after which they could be exercised by the holder. Pursuant to the EMA, vested stock options and SARs were converted to options and SARs for RTX, Carrier, and Otis, which changed the number of stock options and SARs that participants held as well as the applicable strike prices. *Id*. at 20 ¶ 69. The EMA provided the following conversion formula by which publicly-traded shares of UTC common stock and options were converted in the Transaction: one share of UTC stock became one share of RTX, one share of Carrier, and one-half of a share of Otis. *Id*. at 20 ¶ 70. Instead of that formula, Defendants' formula calculated the number of stock options and SARs that participants would have in RTX, Carrier, and Otis, by dividing the closing price of UTC's

stock on the day before the Transaction, *i.e.*, April 2, 2020, by the sum of the volume-weighted average prices on the fourth and fifth trading day after the Transaction ("4/5 VWAP") of the common stocks of RTX and Carrier and Otis, with Otis's figure multiplied by 0.5 to reflect Otis's reverse share split. *Id*. at 21 ¶ 71. Defendants calculated a new strike price for Plaintiffs' stock options and SARs by dividing the company's 4/5 VWAP by UTC's share price on April 2, 2020, multiplied by the strike price that applied to UTC's stock options and SARs before the Transaction. *Id.* at 21 ¶ 72.

ii. Unvested Stock Options and SARs

Unvested stock options and SARs were those awards that had not yet passed the date after which they could be exercised by the holder. Defendants used a different formula for participants' unvested Stock Options and SARs; under the EMA, unvested Stock Options and SARs were converted entirely into options and SARs for the stock of the company "group" that the participants were in. *Id*. at 21 ¶ 73. Accordingly, members of the UTC Group only received options or SARs for RTX, members of the Carrier Group only received options or SARs for Carrier, and members of the Otis Group only received options or SARs for Otis. *Id*. Defendants calculated the number of options and SARs that participants would receive by dividing the UTC's share price on April 2, 2020 by the applicable 4/5 VWAP. *Id*. at 21 ¶ 74. To calculate the new strike prices, Defendants divided the company's 4/5 VWAP by UTC's share price on April 2, 2020, and then multiplied that number by the original strike price for UTC common stock. *Id*.

### iii. Unvested RSUs

Participants' unvested RSUs were converted into RSUs of either RTX, Carrier, or Otis based on the participant's company group. *Id*. at 22 ¶ 75. Defendants divided UTC's stock price on April 2, 2020 by the company's 4/5 VWAP to determine the number of RSUs. *Id*.

### iv. PSUs

Under the UTC Plans, participants received shares of UTC stock if UTC achieved certain performance goals within a specified amount of time. *Id*. at 22 ¶ 76. Defendants adjusted the number of PSUs to account for UTC's fulfilment of those goals before the Transaction, then converted participants' PSUs into PSUs of either RTX, Carrier, or Otis using the same method as used to convert participants' unvested RSUs. *Id*.

### b. Plans Not Subject to the EMA

Not all awards were calculated in accordance with the EMA. Participants in UTC's 401(k) plan whose plan accounts held shares of UTC common stock were treated "[j]ust like any other shareholder of UTC stock. . . ." *Id*. at 24 ¶ 83. In addition, each member of the Compensation Committee received Deferred Director Stock Units ("DDSUs"), converted using the same formula employed for common stockholders. *Id*. at 24 ¶ 84.

### c. Vested Stock Options and SARs

The closing price of UTC common stock on the last trading day before the Transaction, April 2, 2020, was $86.01; that same day, the "when issued" price per share of RTX was $50.73, of Carrier was $13.28, and of Otis was $44.00. *Id*. at 31 ¶ 110. Each company's opening prices per share on April 3, 2020, the first day of trading after the transaction closed at 12:01 a.m., were similar to their closing prices the day prior. *Id*. Specifically, shares of RTX opened on April 3,

2020, at $51.00 a share; Carrier opened at $13.75; and Otis opened at $43.75. *Id*. The days following the Transaction, the share prices of RTX, Carrier, and Otis increased: Raytheon's share price increased to a 4/5 VWAP of $63.90, Carrier's share price increased to a 4/5 VWAP of $14.37, and Otis's share price increased to a 4/5 VWAP of $22.76, amounting to a total of $101.04. *Id*. at 31 ¶ 111. Those prices reflected an increase of $15.03 per share, or 17.04%, from UTC's closing price on April 2, 2020. *Id*.

The 4/5 VWAP formula affected the value of participants' vested stock options and SARs in two ways. *Id*. at 32 ¶ 112. First, the formula decreased the number of options and SARs that participants received. *Id*. Because Defendants' formula calculated the new number of options and SARs by dividing UTC's pre-separation stock price by the companies' combined 4/5 VWAP, the increase in the aggregate share prices of Raytheon, Carrier, and Otis in the days following the Transaction decreased the number of stock options or SARs that participants would have after the Transaction. *Id*. As a result, participants with 1,000 vested stock options or SARs prior to the Transaction received 851 stock options or SARs for RTX, 851 stock options or SARs for Carrier, and 425 stock options or SARs for Otis. *Id*. By contrast, if Defendants had used the same formula for participants as they did for UTC's common stockholders, then the participants with 1,000 stock options before the UTC transaction would have received 1,000 stock options or SARs in RTX; 1,000 stock options or SARs in Carrier; and 500 stock options or SARs in Otis. *Id*.

Second, Defendants' formula increased the strike prices for the stock options and SARs. *Id*. at 32 ¶ 113. Stock options and SARs are only valuable if the stock's price is higher than the strike price at the time of exercise; all else equal, the value of a stock option or SAR is reduced when the strike price is higher because the difference between the strike price and the exercise

price decreases as a result. *Id*. Because the 4/5 VWAP methodology caused strike prices to increase, participants lost appreciation value for each option they received since 2011. *Id*. at 32 ¶ 114.

      d.   Unvested Stock Options, SARs, PSUs, and RSUs

The formula that Defendants applied to unvested stock options, SARs, PSUs, and RSUs in the Transaction also resulted in participants receiving fewer stock options, SARs, PSUs, and RSUs relative to what they would have received had Defendants treated them like public option holders, as well as a lower amount of dividends on their RSUs. *Id*. at 35 ¶ 120. The strike prices for the Options and SARs also increased. *Id*. at 35 ¶ 121.

      e.   May 29, 2020 Form 8-K

In a Form 8-K securities filing filed on May 29, 2020, RTX— the new UTC— informed shareholders that it had amended the EMA to change the formulae used to convert unvested equity awards and, in particular, that it had eliminated use of the 4/5 VWAP. *Id*. at 35 ¶ 122. Under RTX's amendment, "the post-Separation Company stock price used in the applicable conversion ratio for [unvested equity awards] held by employees and former employees shall be the opening price on the date of the Separation, instead of the [4/5 VWAP]." *Id*. RTX explained that the impetus behind the amendment was the "increase in the [RTX] stock price in the week following the Separation," which RTX stated had "caused material discontinuity between the pre-Separation UTC stock price and the post-Separation [RTX] stock price originally chosen in the Agreement." *Id*. at 36 ¶ 123. RTX also remarked in its Form 8-K that the amendment to the EMA "preserves the Company's ability to continue to treat employees and retirees fairly in the conversion process. . . . " *Id*. at 36 ¶ 124.

RTX further noted that it believed it should "choose a different post-Separation stock price" for any other "legacy UTC equity award," but that it asked Carrier and Otis for their consent as required to make that adjustment and both companies refused. *Id*. at 36 ¶ 125. Meanwhile, Carrier and Otis twice extended the "Blackout Period" during which participants were unable to exercise their awards after the Transaction because "of the market conditions resulting from the COVID-19 pandemic." *Id*. In addition, Carrier claimed it did not want to change the formula after it was "disclosed to . . . investors in Form 10 SEC filings," but Carrier had withdrawn the financial projections provided in those filings.

B. <u>Procedural History</u>

1. *The Original Complaint and Motions to Dismiss*

The instant case was originally filed on August 12, 2020. *See generally* Compl., Doc. No. 1.

Plaintiffs advanced six causes of action against various defendants: (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; (3) breach of fiduciary duty; (4) a claim to enforce rights and recover benefits under Section 502(a)(1)(b) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B); (5) declaratory and equitable relief under Sections 404(a)(1) and 502(a)(3) of ERISA, 29 U.S.C. §§ 1104(a)(1) and § 1132(a)(3); and (6) breach of fiduciary duty against defendants affiliated with Carrier and Otis. *See generally id*. The claims principally arose out of Defendants' use of the 4/5 VWAP methodology as set forth in the EMA.

On November 20, 2020, the Raytheon Defendants,[4] Carrier Defendants,[5] and Otis Defendants[6] each filed separate motions to dismiss the complaint in its entirety for failure to state a claim under Rule 12(b)(6).  *See* Docs. No. 49, 50, 51.  Plaintiffs submitted an omnibus memorandum in opposition on January 15, 2021, doc. no. 82, and each set of defendants filed a separate reply on February 19, 2021, docs. no. 88, 89, 90.

On March 19, 2021, the parties filed a stipulation of partial dismissal, in which the parties agreed to dismiss with prejudice the third and sixth causes of action and all claims against certain defendants.[7]  Stipulation of Dismissal, Doc. No. 95

On April 1, 2021, I held a hearing on the motions to dismiss the remaining claims and took the motions under advisement.  Doc. No. 96.  At the hearing, I recommended that the parties stay the proceedings pending exhaustion of ERISA remedies and/or mediation.  Doc. No. 97, at 73:2-7.  The parties agreed; soon after, they requested and I granted a stay for the pendency of mediation.  Docs. No. 101, 103.

On September 13, 2021, the plaintiffs filed an amended complaint (the "Amended Complaint" or the "instant complaint").  Am. Compl., Doc. No. 104-1.  On September 16, 2021,

---

[4] The Raytheon Defendants were:  Raytheon, Lloyd J. Austin III, Diane M. Bryant, Gregory J. Hayes, Ellen J. Kullman, Marshall O. Larsen, Robert K. Ortberg, Margaret L. O'Sullivan, Denise L. Ramos, Frederic G. Reynolds, Brian C. Rogers, United Technologies Corporation Long-Term Incentive Plan, United Technologies Corporation 2018 Long-Term Incentive Compensation Plan, United Technologies Corporation Savings Restoration Plan, United Technologies Corporation Performance Share Unit Deferral Plan, United Technologies Corporation Deferred Compensation Plan, and United Technologies Corporation Company Automatic Contribution Excess Plan.

[5] The Carrier Defendants were:  Carrier, the Carrier 2020 LTIP, the Carrier Global Corporation Savings Restoration Plan, the Carrier Global Corporation LTIP Performance Share Unit Deferral Plan, the Carrier Global Corporation Deferred Compensation Plan, the Carrier CACEP, John V. Faraci, Jean-Pierre Garnier, David Gitlin, John J. Greisch, Charles M. Holley Jr., Michael M. McNamara, Michael A. Todman, and Virginia M. Wilson.

[6] The Otis Defendants were:  Otis, Otis LTIP, Otis SRP, Otis PSU Deferral Plan, Otis DC Plan, Otis Worldwide Corporation Automatic Contribution Excess Plan (Otis "CACEP"), Jeffrey H. Black, Kathy Hopinkah Hannan, Shailesh G. Jejurikar, Christopher J. Kearney, Judith F. Marks, Harold McGraw III, Margaret M. Preston, Shelley Stewart Jr., and John H. Walker.

[7] Specifically, claims against the following defendants were dismissed with prejudice: Jeffrey H. Black, Kathy Hopinkah Hannan, Shailesh G. Jejurikar, Judith F. Marks, Margaret M. Preston, Shelley Stewart Jr., and John H. Walker (the "Otis Director Defendants"); and David Gitlin, John J. Greisch, Charles M. Holley, Jr., Michael M. McNamara, Michael A. Todman, and Virginia M. Wilson (the "Carrier Director Defendants").

in light of the filing of an amended complaint, I denied the pending motions to dismiss as moot. Doc. No. 106 (denying Docs. No. 49, 50, 51).

### 2. *The Amended Complaint and Motions to Dismiss*

The named plaintiffs in the Amended Complaint are Geraud Darnis, David Hess, Michael Maurer, Richard Sanfrey, Dino DePellegrini, Bradley Hardesty, David Carter, Roy Dion, Alan Machuga, Theresa MacKinnon, Christopher Doot, and Costas Loukellis ("Plaintiffs"). Am. Compl., Doc. No. 104-1, at 4. Plaintiffs are former participants of either the UTC LTIP or the UTC 2018 LTIP and are current participants of the UTC LTIP (now under the name and sponsorship of RTX), Carrier Global Corporation 2020 Long Term-Term Incentive Plan ("Carrier LTIP"), the Otis Worldwide Long-Term Incentive Plan ("Otis LTIP"). *Id.* at 7 ¶ 12 – 9 ¶ 23.

The named defendants are RTX, Carrier, and Otis (collectively, "Defendants"). *Id.* at 10 ¶¶ 24-26.

Plaintiffs advance three causes of action: (1) breach of contract against RTX, Carrier, and Otis; (2) breach of implied covenant of good faith and fair dealing against RTX, Carrier, and Otis; and (3) specific performance. *See* Am. Compl., Doc. No. 104-1, at 39-44. The claims in the instant complaint again principally arise out of Defendants' use of the 4/5 VWAP methodology as set forth in the EMA.

On October 13, 2021, RTX, individually, and Carrier and Otis, jointly, moved to dismiss the Amended Complaint in its entirety for failure to state a claim under Rule 12(b)(6). Docs. No. 107, 108. Plaintiffs submitted an omnibus memorandum in opposition on November 12, 2021. Doc. No. 112. Each set of defendants filed a separate reply on December 3, 2021. Docs. No. 113, 114. After full briefing, I held oral argument on July 14, 2022. Doc. No. 119.

## II.     Standard of Review

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) is designed "merely to assess the legal feasibility of a complaint, not to assay the weight of evidence which might be offered in support thereof."  *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774, 779 (2d Cir. 1984) (quoting *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980)).

When deciding a motion to dismiss pursuant to Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true, draw all reasonable inferences in favor of the plaintiffs, and decide whether it is plausible that plaintiffs have a valid claim for relief.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007); *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996).

Under *Twombly*, "[f]actual allegations must be enough to raise a right to relief above the speculative level," and assert a cause of action with enough heft to show entitlement to relief and "enough facts to state a claim to relief that is plausible on its face."  550 U.S. at 555, 570; *see also Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").  The plausibility standard set forth in *Twombly* and *Iqbal* obligates the plaintiff to "provide the grounds of his entitlement to relief" through more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (quotation marks omitted).  Plausibility at the pleading stage is nonetheless distinct from probability, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the claims] is improbable, and . . . recovery is very remote and unlikely."  *Id.* at 556 (quotation marks omitted).

"[W]hen matters outside the pleadings are presented in response to a 12(b)(6) motion," a district court must either "exclude the additional material and decide the motion on the complaint

16

alone" or "convert the motion to one for summary judgment under Fed. R. Civ. P. 56 and afford

all parties the opportunity to present supporting material." *Fonte v. Board of Managers of*

*Continental Towers Condominium*, 848 F.2d 24, 25 (2d Cir. 1988).  However, a district court

may consider certain materials without converting a motion to dismiss into one for summary

judgment.  Those materials include matters of which judicial notice may be taken, *Brass v. Am.*

*Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); any written instrument attached to the

complaint as an exhibit or any statements or documents incorporated in the complaint by

reference, *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (citations omitted);

or any document that is not attached or incorporated by reference "where the complaint relies

heavily upon its terms and effect, which renders the document integral to the complaint," *id*. at

153 (citation and internal quotation marks omitted).

## III.   Discussion

Plaintiffs bring three claims sounding in contract: breach of contract, breach of the

implied covenant of good faith and fair dealing, and a claim for specific performance.  It is

undisputed that the contracts in question are governed by Delaware law, under which contract

interpretation is a question of law, and the Court must endeavor to determine and give effect to

the parties' mutual intent at the time of contracting; evaluate contracts objectively; and, absent

ambiguity, interpret contractual provisions in a manner consistent with the plain meaning of their

terms.  *Exelon Generation Acquisitions, LLC v. Deere & Co.*, 176 A.3d 1262, 1266-67 (Del.

2017); *see also Lillis v. AT&T Corp.*, 2007 WL 2110587, at *12 (Del. Ch. July 20, 2007),

judgment entered, (Del. Ch. 2007) ("[O]ption grant agreements are no more or less than

contracts that must be construed in accordance with normal rules of contract interpretation.").  Of

note, neither the UTC LTIP nor the 2018 UTC LTIP is subject to the Employee Retirement

Income Security Act of 1974, 29 U.S.C. § 1001 *et seq*.  Am. Compl., Doc. No. 104-1, at 10 ¶¶ 27-28.

Plaintiffs claim that Defendants breached numerous contractual provisions limiting the manner in which Defendants could exercise their discretion and by exercising their discretion in an unreasonable or arbitrary manner; or, in the alternative, Plaintiffs assert that Defendants breached the implied covenant of good faith and fair dealing in the manner in which Defendants exercised their discretion.  *See* Opp'n, Doc. No. 112, at 8-11.  Defendants emphasize that the contracts expressly conferred "sole discretion" to them.  *See* Doc. No. 107-1, at 19.  The parties' arguments and this ruling turn on the scope of Defendants' discretion to alter Incentive Compensation when certain corporate events occur, as provided by the contracts.

Under Delaware law, when a contract grants one party discretion and specifies the scope of that discretion, "there is no gap in the contract as to the scope of the discretion" and a court's inquiry is limited to the express terms of the contract.  *Policemen's Annuity & Benefit Fund of Chicago v. DV Realty Advisors LLC*, 2012 WL 3548206, at *12 (Del. Ch. Aug. 16, 2012), *aff'd sub nom. DV Realty Advisors LLC v. Policemen's Annuity & Ben. Fund of Chicago*, 75 A.3d 101 (Del. 2013) (internal quotation marks omitted).  In such circumstances, the express terms of the contract control, and there is no need to employ a default rule like the implied covenant of good faith and fair dealing to elucidate how the party granted discretion may exercise it.  *Id.* n.95 (collecting cases).  On the other hand, "even the most carefully drafted agreement will harbor residual nooks and crannies."  *Gerber v. Enter. Prod. Holdings, LLC*, 67 A.3d 400, 419 (Del. 2013), *overruled on other grounds by Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808 (Del. 2013). Where a contract leaves a gap with respect to the scope of discretion, then the implied covenant of good faith and fair dealing fills the "nooks and crannies" by requiring that the discretion be

18

exercised "reasonably" and "in good faith," and by mandating that the party with discretion "refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of its bargain." *Id.*

In this case, the contracts granted substantial discretion to Defendants. Indeed, Defendants had "sole discretion" to make "[a]ny determination . . . with respect to any Award. . . ." UTC LTIP, Doc. No. 107-3, at 4 § 3(c); UTC 2018 LTIP, Doc. No. 107-4, at 4 § 2(c). The Committee's exercise of discretion was "final, binding, and conclusive on all persons." UTC LTIP, Doc. No. 107-3, at 4 § 3(c); UTC 2018 LTIP, Doc. No. 107-4, at 4 § 2(c). In the case of a spin-off or merger, the Committee "may in its discretion make such substitutions or adjustments as it deems appropriate and equitable to," *inter alia*, "the number and kind of Shares or other securities subject to outstanding Awards" and "the exercise price of outstanding Options and Stock Appreciation Rights." UTC LTIP, Doc. No. 107-3, at 8 § 10(b); UTC 2018 LTIP, Doc. No. 107-4, at 5 § 3(e)(i). I therefore agree with Defendants' characterization that the Plans endowed them with a "broad grant of discretion." *E.g.*, RTX's Mem. of Law, Doc. No. 107-1, at 18.

The phrase "sole discretion" may be sufficiently specific to supplant statutory and common law default rules, precluding an implied covenant claim. *See, e.g.*, *Wireless Props., LLC v. CC Fin. LLC*, 10 A.3d 613, 616–17 (Del. 2010) (affirming dismissal of a claim alleging that a lender was required to increase an initial loan commitment when the contract provided that the decision to increase the loan commitment was subject to the lender's "sole discretion"). However, Defendants' broad discretion does not end the inquiry, because the Committee's discretion was not absolute. The Plans proscribed exercising discretion in a manner "in contravention of any express term of the Plan." *See* UTC LTIP, Doc. No. 107-3, at 4 § 3(c);

UTC 2018 LTIP, Doc. No. 107-4, at 4 § 2(c).  Thus, this is not a case where Defendants' only express promise was to "exercise [their] discretion."  *See* RTX's Mem. of Law, Doc. No. 107-1, at 18 (analogizing to and quoting from *In re K-Sea Transp. Partners L.P. Unitholders Litig.*, 2012 WL 1142351, at *6-7 (Del. Ch. Apr. 4, 2012), for the proposition that "'[u]nder Delaware law, where a contract grants discretion to a party, the only express promise is for the party to 'exercise its discretion'").  Defendants were bound to comply with the terms of the Plans.

Accordingly, the Court's role on these motions is as follows.  First, with respect to Plaintiffs' claim for breach of contract, I must evaluate the limits on Defendants' discretion set by the Plans and determine whether any limit was contravened.  Second, in connection with Plaintiffs' claim for breach of the implied covenant, I must determine whether the limits on Defendants' discretion are so well-defined that the contracts preclude Plaintiffs' implied covenant claim.  If not, I must identify the "gaps" to be filled by the implied covenant and determine whether Defendants' conduct breached the covenant's obligations.

For the reasons that follow, I conclude that Plaintiffs do not plausibly plead that Defendants breached any express contract term nor, to the extent that the Plan terms left "gaps," that Defendants breached the implied covenant.  Accordingly, I conclude that Plaintiffs do not state a colorable claim.

A. Identifying and Interpreting the Controlling Contractual Provisions

1. *The Plans did not impose restrictive limits on Defendants' discretion.*

The Committee could breach the contracts by exercising its discretion in a manner "in contravention of any express term of the Plan."  *See* UTC LTIP, Doc. No. 107-3, at 4 § 3(c); UTC 2018 LTIP, Doc. No. 107-4, at 4 § 2(c).  In addition, the Committee could breach the implied covenant of good faith and fair dealing by failing to refrain from acting in an "arbitrary"

or "unreasonable" manner, in connection with the parties' "original contractual expectations."
*Gerber*, 67 A.3d at 419.  To evaluate both claims, I must identify and interpret the controlling
contract terms and any gaps therein.

*First*, I look to the purpose of Incentive Compensation.  *See* Restatement (Second) of
Contracts § 202(1) (Am. L. Inst. 1981) ("[I]f the principal purpose of the parties is ascertainable
it is given great weight.").  The plain text of the purpose statements set forth in Section 1 of the
Plan demonstrate that Incentive Compensation was intended to incentivize employees to work at
UTC, to remain at UTC, and to do their best work for UTC.  Specifically, the UTC LTIP seeks to
"align shareowner and management interests" and "give UTC a competitive advantage in
attracting and retaining key employees and directors."  UTC LTIP, Doc. No. 107-3, at 2 § 1.
Likewise, the UTC 2018 LTIP seeks to "focus[] Management on long-term, sustainable
performance," and to "provide[] [UTC] with a competitive advantage in attracting, retaining and
motivating officers, employees and directors."  *See* UTC 2018 LTIP, Doc. No. 107-4, at 2 § 1.
To achieve the Incentive Compensation scheme's goals, then, UTC tied key employees'
compensation to the company's performance in the market by providing "awards linked to
shareowner value" and by "correlat[ing] compensation opportunities with shareowner value."
UTC LTIP, Doc. No. 107-3, at 2 § 1 ("link"); UTC 2018 LTIP, Doc. No. 107-4, at 2 § 1
("correlat[e]").

Even though the purpose statements limited the Committee's exercise of discretion by
requiring that Incentive Compensation bear some relationship to the company's market
performance, the Plans left a gap by failing to define the relationship with specificity.  Neither
Plan defines "link" or "correlate[]."  Nevertheless, the plain meaning of both terms suggests that
the Committee could achieve its goals in a variety of ways, from exercising its discretion to

guarantee lockstep performance between Incentive Compensation and common stock to exercising its discretion to merely facilitate that Incentive Compensation and market performance trend in the same direction.  *See Link*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/link (defining "link" as "to couple or connect by or as if by a link"); *Correlate*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/correlate ("to bear reciprocal or mutual relations").  Said differently, the purpose statements did not impose a restrictive limit on the Committee's discretion, *e.g.*, by requiring that the formulae cause employee awards to track the exchange ratio applicable to shares of common stock.  *See* RTX's Mem. of Law, Doc. No. 107-1, at 26-27.  Rather, the terms "link" and "correlate" are broader than that.

   *Second*, I look to the limits imposed by the Plans in the case of an amendment or alteration to a Plan.  In such circumstances, the Committee was not allowed to make any non-consensual amendment or alteration that would "materially impair the rights of a Participant" with respect to "a previously granted award" or an award "thereto granted."  UTC LTIP, Doc. No. 107-3, at 10 § 12(c)-(d); *see also* UTIC 2018 LTIP, Doc. No. 107-4, at 10 § 12(c)-(d) (setting forth a nearly-identical rule).  The Plans, however, left a gap by failing to define the term "materially impair."  In addition, subject to Section 10, the Committee could not "reduce the exercise price of any Option or Stock Appreciation Right, except to the extent necessary to preserve the value of the Award" in the event of, *inter alia*, a corporate event like the Transaction.  UTC LTIP, Doc. No. 107-3, at 11 § 12(d).[8]

   *Third,* I look to the limits in the case of a corporate event.  In a merger or spinoff like the Transaction, the Committee "may in its discretion make such substitutions or adjustments as it

---

[8] This provision is not mirrored in the UTC 2018 LTIP.  *See* Doc. No. 107-4, at 10 § 12(d).

deems appropriate and equitable" to awards, including to "the aggregate number and kind of Shares or other securities reserved for issuance and delivery" under the Plan; to "the number and kind of Shares or other securities subject to outstanding Awards;" and to "the exercise price of outstanding" stock options and SARs.  UTC LTIP, Doc. No. 107-3, at 8 § 10(b); UTC 2018 LTIP, Doc. No. 107-4, at 5 § 3(e)(i).  Of note, the Section 12(d) obligation not to reduce the exercise price of an award is "[s]ubject to" Section 10.

Accordingly, under the express terms of the UTC LTIP and the UTC 2018 LTIP, the Committee, in its discretion, could make adjustments in a manner that generally maintained a relationship between Incentive Compensation and common stock.  Although I do not conclude that *any* relationship would necessarily satisfy the required nexus, I do not conclude that the Committee was required to exercise its discretion to guarantee parity between Incentive Compensation and common stock.  *See* Opp'n, Doc. No. 112, at 26.  No contract term constrained the Committee's discretion by dictating the tightness of the nexus between Incentive Compensation and common stock, and no contract term defined a specific economic outcome for plan participants such as Plaintiffs.

## 2. *Plaintiffs rely on inapposite contractual provisions.*

Plaintiffs attempt to limit the Committee's discretion by relying on inapposite contractual provisions.  In this section, I identify those provisions and explain why I reject them.

Plaintiffs allege that "UTC agreed that it would make 'appropriate and equitable adjustments' that were 'necessary or appropriate to protect the value of Participants' interests in their Awards' and to 'prevent an increase or decrease in the value of [Awards] relative to [UTC] Common Stock or the dilution or enlargement of the rights of recipients.'"  Am. Compl., Doc.

No. 104-1, at 4 ¶ 2 (quoting SAR SOT, Doc. No. 107-2, at 5).  The allegation relies on several inapposite contract terms.

For one, the Committee's obligation to preserve the value of Plaintiffs' awards was subject to their discretion to adjust awards in an event like the Transaction.  *See*, *e.g.*, SAC, Doc. No. 104-1, at 20 ¶ 70, 34 ¶ 117.  Section 12(d) provides that the Committee could not "reduce the exercise price of any Option or Stock Appreciation Right, except to the extent necessary to preserve the value of the Award."  UTC LTIP, Doc. No. 107-3, at 11 § 12(d).  However, Section 12(d) is "subject to" Section 10(b), which authorizes the Committee to make "substitutions or adjustments [to awards] as [it] deems appropriate and equitable," including to the number and exercise price of awards, in the event of a Corporate Transaction.  Therefore, notwithstanding the language of Section 12(d) regarding "preserving value," the Committee retained discretion to alter the number and exercise prices of awards in the Transaction.

In addition, Plaintiffs' reliance on a provision of the Schedule of Terms setting forth that "in the event of material changes in the capital structure of the Corporation" arising from "the spin-off of a subsidiary," like the Transaction, the Committee "shall" make "equitable adjustments . . . in the terms of outstanding Awards, as the Committee determines to be necessary or appropriate to prevent an increase or decrease in the value of SARs relative to Common Stock or the dilution or enlargement of the rights of recipients" (the "Adjustments Provision") is unavailing.  SAR SOT, Doc. No. 107-2, at 5.  The Adjustments Provision does not cabin the Committee's discretion as Plaintiffs allege.  There is a conflict between the Plans' permissive language and the Schedule of Terms's mandatory language.  Specifically, pursuant to Sections 10(b) of the UTC LTIP and Section 3(e) of the UTC 2018 LTIP, the Plans provide that the Committee "*may* in its discretion make such . . . adjustments as it deems . . . equitable;" in

24

contrast, the Schedule of Terms uses mandatory language requiring that the Committee "*shall . . .* make equitable adjustments . . . as the Committee determines to be necessary or appro-priate [sic]. . . ." *Compare* UTC LTIP, Doc. No. 107-3, at 8 § 10(b) *and* UTC 2018 LTIP, Doc. No. 107-4, at 5 § 3(e), *with* SAR SOT, Doc. No. 107-2, at 5. The conflict resolves in favor of the Plans' permissive language, because the Schedule of Terms is "subject in all respects to the terms of the LTIP" and, "[i]n the event that any provision of this Schedule of Terms . . . is inconsistent with the terms of the LTIP, the terms of the LTIP shall govern." SAR SOT, Doc. No. 107-2, at 7. Therefore, the Committee retained discretion to choose to make (or not make) adjustments, and Defendants could not plausibly breach the Schedule of Terms by allegedly failing to do so.

The Amended Complaint further alleges that "the only 'equitable adjustments' that could be made were those that prevented participants from having the value of their awards increased or decreased compared to UTC common stock and that prevented the dilution or enlargement of the participants' rights in their previously granted awards." Doc. No. 104-1, at 14 ¶ 47. For this proposition, Plaintiffs invoke language from the second sentence of Section 10(b) of the UTC LTIP and Section 3(e)(iii) of the UTC 2018 LTIP, which provide that "[a]djustments may include, without limitation, the cancellation of outstanding Awards in exchange for payments of cash, property or a combination thereof having an aggregate value equal to the value of such Awards. . . ." *Id.* at 13 ¶ 41 (quoting UTC LTIP, Doc. No. 107-3, at 8 § 10(b); UTC 2018 LTIP, Doc. No. 107-4, at 5 § 3(e)(iii)). But this provision is inapposite.

Plaintiffs assert for the first time in their Opposition brief that the Committee "cancelled" and "exchanged" Plaintiffs' awards, thereby obligating Defendants to provide "equal" value and "protect the value" of participants' interests in the awards within the meaning of Sections 10(b)

and (e)(iii).  *See* Opp'n, Doc. No. 112, at 19.  But Plaintiffs' reliance on Sections 10(b) and

3(e)(iii) is misplaced, because Plaintiffs never allege in the Amended Complaint that the awards

were cancelled.  *See Schulz v. Medtronic, Inc.*, 2022 WL 503960, at *2 (D. Conn. Feb. 18, 2022)

(declining to consider allegations stated in an opposition brief that were not in the complaint).

Instead, Plaintiffs consistently allege that the awards were "converted."  *See, e.g.,* Am. Compl.,

Doc. No. 104-1, at 5 ¶ 3, 16 ¶ 53, 19 ¶ 63, 20 ¶ 70.  This is a distinction with a difference,

because to "cancel" means to "bring to nothingness" whereas to "convert" means "to exchange

for an equivalent."  *Cancel*, MERRIAM-WEBSTER.COM, https://www.merriam-

webster.com/dictionary/cancel; *Convert*, MERRIAM-WEBSTER.COM, https://www.merriam-

webster.com/dictionary/convert.

       In the Amended Complaint, Plaintiffs do not allege that Defendants eliminated the

awards— they allege that Defendants substituted Plaintiffs' awards for other, allegedly inferior

awards.  Because Plaintiffs do not allege that Defendants cancelled Plaintiffs' awards, Plaintiffs

do not plausibly plead that Defendants incurred a contractual obligation arising from cancelling

awards.  Rather, the conversion was subject to Defendants' "discretion [to] make such

substitutions or adjustments as [the Committee] deems appropriate and equitable" in the context

of a Corporate Transaction.  UTC LTIP, Doc. No. 107-3, at 8 § 10(b); UTC 2018 LTIP, Doc. No.

107-4, at 5 § 3(e)(i)).  Thus, I cannot conclude that Defendants' discretion was limited by an

inapposite responsibility to provide "equal" value and "protect the value" of participants'

interests in cancelled awards.

       Plaintiffs continue their implausible cancellation argument by citing to a provision of the

LTIP requiring the use of "Fair Market Value," defined as "the closing price for [UTC] Common

Stock on the Exchange on the Grant Date," in the event of a "settlement" or "payout."  Am.

Compl., Doc. No. 104-1, at 13 ¶ 39 (citing UTC LTIP, Doc. No. 107-3, at 3 § 2(r), for the proposition that "[t]he value of all awards under the UTC LTIP were measured by the 'Fair Market Value' of UTC common stock"); Opp'n, Doc. No. 112, at 7 ("[T]he Plans expressly provide that any "settlement" or "payout" of the awards had to be at fair market value."). In Plaintiffs' view, the "cancellation" constituted a "payout," and Defendants breached the Fair Market Value term by using an "intrinsic value" measurement and formula with a "built-in delay" rather than "Fair Market Value" defined on the "Grant Date." Opp'n, Doc. No. 112, at 19. This argument must fail for the same reason as the last one: Plaintiffs do not allege in the Amended Complaint that the awards were cancelled.

Plaintiffs' Fair Market Value argument further fails because, although the Plans expressly use the term "Fair Market Value," the relied-on provisions of the Plans instead refer to the term "value." *E.g.*, UTC LTIP, Doc. No. 107-3, at 8 § 10(b) ("In the event of a . . . 'Corporate Transaction' . . . the Committee . . . may in its discretion make such substitutions or adjustments as it deems appropriate and equitable. . . . Adjustments may include, without limitation, the cancellation of outstanding Awards in exchange for payments of cash, property or a combination thereof having an aggregate *value* equal to the *value* of such Awards. . . .") (emphasis added). Unlike the expressly defined Fair Market Value term, the Plans do not likewise define "value" so as to constrain Defendants' discretion with respect to a valuation method. *See* Reply, Doc. No. 113, at 6. I must presume that the parties, "[h]aving chosen not to use the defined term[] . . . intended, instead, to use the ordinary plain meaning" of the term "value." *Giesecke+Devrient Mobile Sec. Am., Inc. v. Nxt-ID, Inc.*, 2021 WL 982597, at *10, *judgment entered sub nom. Giesecke+Devrient Mobile Sec. Am., Inc. v. NXT-ID, Inc.* (Del. Ch. 2021). Accordingly, I conclude that the Committee was not constrained by the definition of "Fair Market Value" when

making adjustments and could reasonably exercise its discretion to select a different valuation method.

Furthermore, in their Opposition brief, Plaintiffs rely on a section of the Schedule of Terms providing that "in the event of a capital adjustment [] 'the number of SARs (and, if applicable, the exercise price) will be adjusted in the same manner and to the same extent as all other shares of Common Stock of the Corporation.'"  Opp'n, Doc. No. 112, at 10 (quoting SAR SOT, Doc. No. 107-2, at 5).  Setting aside that this allegation is not in the Amended Complaint and considering it in light of the fact that the Schedule of Terms is incorporated by reference, I observe that the provision continues by distinguishing a "capital adjustment" affecting common stock, such as a subdivision or consolidation of shares (*e.g.*, a stock split), from events constituting "material changes in the capital structure of the corporation," which clearly describes the Transaction.[9]  SAR SOT, Doc. No. 107-2, at 5.  Accordingly, a natural reading of the Adjustments Provision on which Plaintiffs rely indicates that the requirement to "adjust[]" the "number of SARS (and, if applicable, the exercise price)" "in the same manner and to the same extent as all other shares of Common Stock" applies to capital adjustments but not to capital structure changes, such as the Transaction.  SOT, Doc. No. 107-2, at 5.  Consequently, I cannot conclude that Defendants' discretion was limited by an inapplicable responsibility to

---

[9] The provision, in full, reads as follows:

"If the Corporation effects a subdivision or consolidation of shares of Common Stock or other capital adjustment, the number of SARs (and, if applicable, the exercise price) will be adjusted in the same manner and to the same extent as all other shares of Common Stock of the Corporation. In the event of material changes in the capital structure of the Corporation resulting from: the payment of a special dividend (other than regular quarterly dividends) or other distributions to shareowners without receiving consideration therefore; the spin-off of a subsidiary; the sale of a substantial portion of the Corporation's assets; in the event of a merger or consolidation in which the Corporation is not the surviving entity; or other extraordinary non-recurring events affecting the Corporation's capital structure and the value of Common Stock, equitable adjustments shall be made in the terms of outstanding Awards, as the Committee determines to be necessary or appro-priate [sic] to prevent an increase or decrease in the value of SARs relative to Common Stock or the dilution or enlargement of the rights of recipients."

SAR SOT, Doc. No. 107-2, at 5.

adjust the number of SARs and the exercise price in the same manner and to the same extent as all other shares of common stock.

### B. Count I (Breach of Contract)

Having identified the controlling contractual provisions, I now assess whether Defendants contravened any of them. To state a claim for breach of contract under Delaware law, a plaintiff must allege: (1) "the existence of the contract, whether express or implied;" (2) "the breach of an obligation imposed by that contract;" and (3) resulting damage. *See VLIW Tech., LLC v. Hewlett-Packard Co*., 840 A.2d 606, 612 (Del. 2003). I conclude that Plaintiffs do not plausibly plead that Defendants breached a controlling contract term.

In the first cause of action, Plaintiffs aver that Defendants' conversion formulae breached the UTC LTIP and UTC 2018 LTIP. Specifically, the adjustments made allegedly were not:

> (a) equitable; (b) "necessary or appropriate" "to protect the value of Participants' interests in their Awards;" (c) "necessary or appropriate" to "prevent an increase or decrease in the value of [Awards] relative to [UTC] Common Stock or the dilution or enlargement of the rights of recipients;" and they (d) "materially impair[ed] the rights [of Plaintiffs] with respect to an Award."

Doc. No. 104-1, at 22 ¶ 77. Defendants move to dismiss the claim, primarily arguing that Plaintiffs have not pled any facts suggesting that Defendants acted beyond the scope of their contractual discretion. *See generally* RTX's Mem. of Law, Doc. No. 107-1, at 17-24; Carrier and Otis's Mem. of Law, Doc. No. 108-1, at 7 (adopting RTX's arguments). Carrier and Otis advance additional arguments that they were not parties to the UTC LTIP or UTC 2018 LTIP, that the EMA precludes Plaintiffs from asserting a claim against Carrier or Otis based on assumption of liabilities in the EMA, and that Carrier and Otis are not liable under a theory of successor liability. *See* Doc. No. 108-1, at 7-13. Defendants' meritorious arguments warrant dismissal of the breach of contract claim.

To define the relevant limits on the Committee's discretion, I begin by laying out the goals of the Incentive Compensation scheme then look to the Plans' regulation of alterations of Incentive Compensation in the context of a corporate event like the Transaction.  Taken together, I conclude that the contracts required the Committee to exercise its discretion in a manner that generally or approximately maintained awards' value relative to common stock.  Under that general mandate, Plaintiffs' breach of contract claim does not survive scrutiny.

1. *The Amended Complaint fails to state a valid claim for breach of contract.*

Defendants exercised their discretion to issue awards tied to the common stocks of RTX, Otis, and Carrier.  To plausibly allege that Defendants acted outside the bounds of their discretion, Plaintiffs must allege that Defendants acted in a manner contrary to one or more express terms of the Plan at the time Defendants developed the conversion formulae.  But Plaintiffs do not plausibly allege that Defendants acted in a manner contrary to any express term of the Plan at the time they developed the formulae.

First, I cannot conclude that Plaintiffs plausibly allege that Defendants breached their requirement to "link[] [awards] to shareowner value" or to "correlate[] compensation opportunities with shareowner value" by adopting the formulae.  UTC LTIP, Doc. No. 107-3, at 2 § 1; UTC 2018 LTIP, Doc. No. 107-4, at 2 § 1.  As explained, the contracts require a link or correlation between Incentive Compensation and common stock, but the contracts do not cabin the Committee's discretion by mandating a specific valuation method nor a specific economic outcome, such as "equal value."  Here, Plaintiffs' allegations indicate that the formulae maintained a link or correlation.  The formulae "mathematically adjust[ed] the number of [] outstanding SARs, Stock Options, RSUs and PSUs (and the grant prices for SARs and Stock Options) to reflect the post-Spinoff stock prices of UTC, Carrier and Otis relative to UTC's pre-

30

Spinoff stock price." LTIP Conversion Brochure, Doc. No. 107-5, at 4.[10]  Accordingly,

Plaintiffs do not plausibly plead a breach of Section 1.

Second, Plaintiffs seem to construe the Adjustments Provision to require that Defendants'

formulae prevent any increase or decrease in the value of awards relative to common stock, and

any dilution or enlargement of the rights of awards recipients relative to common stockholders.

*See* Am. Compl., Doc. No. 104-1, at 14 ¶ 47 ("[T]he only 'equitable adjustments' that could be

made were those that prevented participants from having the value of their awards increased or

decreased compared to UTC common stock and that prevented the dilution or enlargement of the

participants' rights in their previously granted awards.") (quoting SAR SOT, Doc. No. 107-2, at

5). The plain implication of Plaintiffs' construction is that the Schedule of Terms entirely

constrained the Committee's discretion, requiring identical conversion formulae for Incentive

Compensation and common stock such that the identical formulae maintained exact parity

between Incentive Compensation and common stock. *E.g.*, Opp'n, Doc. No. 112, at 6 ("UTC's

long-term incentive plans required that participants' awards be aligned with shareholder

interests, and that any adjustments to the awards had to provide 'equal value' and 'protect the

value' of Plaintiffs' interests in those awards to prevent their value from decreasing relative to

UTC common stock."); *id.* at 18 (asserting that "all 'equitable adjustments' must provide

participants with the same value that UTC shareholders receive when UTC merges or spins-off a

subsidiary"). But, for the reasons set forth in the last section, the Adjustments Provision is

subject to the UTC LTIP and UTC 2018 LTIP (and their permissive grant of discretion), and

Plaintiffs' construction of the Adjustments Provision is inconsistent with the provision's plain

text.

---

[10] I may consider the document for purposes of the motion to dismiss because it is incorporated by reference into the
complaint.  *See* Doc. No. 104-1, at 18 ¶ 61; *DiFolco v. MSNBC Cable L.L.C.,* 622 F.3d 104, 111 (2d Cir. 2010).

To further illustrate why Plaintiffs' claim must fail, I turn to *Lillis v. AT&T Corp.*, 2007 WL 2110587, at *16-18 (Del. Ch. July 20, 2007) (hereinafter "*Lillis I*"), and *AT&T Corp. v. Lillis,* 970 A.2d 166 (Del. 2009) (hereinafter "*Lillis II*"), on which Plaintiffs rely, as a relevant counterfactual.  There, participants of a stock option plan alleged that they were deprived of the full economic value of their options, in violation of the plan, when their underwater stock options were cancelled for no consideration following a merger.  *Lillis II*, 970 A.2d at 168.  The relevant provision stated:

> In the event there is any change in the Common Stock by reason of any consolidation, combination, liquidation, reorganization . . . or other like change in the capital structure of [MediaOne], the number or kind of shares or interests subject to an Award and the per share price or value thereof shall be appropriately adjusted by the Committee at the time of such event, provided that each Participant's economic position with respect to the Award shall not, as a result of such adjustment, be worse than it had been immediately prior to such event. . . .

*Lillis I,* 2007 WL 2110587, at *16-18.  The Chancery Court concluded that cancelling underwater stock options for no consideration failed to provide the full economic value of the options.  *Id.* at *18.  On appeal, the Delaware Supreme Court upheld the Chancery Court's conclusion that "economic position" was defined as the "full economic value of the options, including their 'intrinsic value' and their 'time value.'"[11]  *Lillis II,* 970 A.2d at 169.  But the *Lillis* cases are distinguishable.

The *Lillis* plaintiffs established at trial that stock options played an "unusually large role" in their overall compensation scheme, representing 50% to 70% of certain employees' overall

---

[11] The Chancery Court defined the difference between the intrinsic value and the time value as follows:
> Options have two components of value: time value and intrinsic value. The time value is the chance that the underlying security will appreciate before the option expires such that the market price is more than the strike price. The intrinsic value is the difference between the strike price and the market price now.

*Lillis I*, 2007 WL 2110587, at *3 n.7.

compensation.  *Lillis I*, 2007 WL 2110587 at *6.  The *Lillis* options were not a form of incentive compensation for a select group of employees, as here, but were a "material portion of compensation for all employees."  *Id.* at *17.  Accordingly, in light of the employees' "exceptionally large interest" in the value of their options, the parties had bargained for plan terms "uniquely protective of the[ir] rights."  *Id.*  Here, Plaintiffs' claim arises in connection with an incentive compensation scheme for a select group of "key" employees that is not, for the reasons I have explained, especially protective of their rights.

Furthermore, the *Lillis* plan provided that the committee "*shall . . .* appropriately adjust[]," as applicable, "the number or kind of shares or interests . . . and the per share price or value thereof."  *Id.* at *14.  The Chancery Court construed the plan's "highly protective" language to require, upon a triggering event, that the "the plaintiffs' options [] be adjusted to maintain their economic position."  *Id.*  The Chancery Court distinguished this "mandatory adjustment provision" from other option agreements, like Plaintiffs' agreement, that "le[ave] the adjustment to the discretion of the committee by using the term 'may' rather than the term 'shall.'"  *Id.* at *14-*15.  Here, Plaintiffs' Plans use permissive language, providing that the Committee "*may* in its discretion make such substitutions or adjustments as it deems appropriate and equitable."  UTC LTIP, Doc. No. 107-3, at 8 § 10(b); UTC 2018 LTIP, Doc. No. 107-4, at 5 § 3(e)(i).  Therefore, the Committee was not analogously required to act.

In addition, the *Lillis* plan distinguishably guaranteed a particular outcome: that each participant's "economic position . . . shall not, as a result, be worse than it had been immediately prior to [the merger]," which the Court of Chancery construed as requiring that any adjustment "completely preserve the economic position of the options."  *Lillis I*, 2007 WL 2110587, at *14.  Here, there is no squarely analogous contractual language; the Plans merely endow the

Committee with discretion to provide "equitable adjustments," deemed "necessary or appropriate" within the Committee's discretion, to maintain the link or correlation required by the UTC LTIP and UTC 2018 LTIP.  The parties at bar could have included contractual language requiring a specific outcome, as the parties in *Lillis* had done.  They did not.  Because "[i]t is not the role of this court to second-guess the parties and read into their agreement what they have omitted," I will not read language into the contract that the parties could have included.  *Golden Rule Fin. Corp. v. S'holder Representative Servs. LLC*, 2021 WL 305741, at *11 (Del. Ch. Jan. 29, 2021), *aff'd*, 267 A.3d 382 (Del. 2021).

Third, Plaintiffs do not allege that Defendants made any "amendment [or] alteration" to a Plan that would "materially impair" Plaintiffs' rights in an SAR or other award.  *See* UTC LTIP, Doc. No. 107-3, at 10 ¶ 12(c); UTIC 2018 LTIP, Doc. No. 107-4, at 10 ¶ 12(c).  Plaintiffs allege that their rights in their awards were materially impaired because they received fewer stock options and their SARs had higher strike prices "than they should have."  Am. Compl., Doc. No. 104-1, at 40 ¶ 144.  But the Committee expressly had discretion in circumstances such as the Transaction to "make such substitutions or adjustments as it deem[ed] appropriate and equitable" to "the aggregate number and kind of Shares or other securities reserved for issuance and delivery;" to "the number and kind of Shares or other securities subject to outstanding Awards;" and to "the exercise price of outstanding" awards, including stock options and stock appreciation rights.  UTC LTIP, Doc. No. 107-3, at 8 § 10(b); UTC 2018 LTIP, Doc. No. 107-4, at 5 § 3(e)(i).  Accordingly, the allegation that Plaintiffs received fewer stock options and SARs, and that their awards had higher strike prices, cannot constitute a sufficient showing that Defendants impermissibly "materially impaired" Plaintiffs' rights in their awards.

34

Taken together, Plaintiffs' grievances reveal that they challenge the end result of the conversion formulae rather than the formulae themselves. *E.g.,* Am. Compl., Doc. No. 104-1, at 5 ¶ 4 ("Defendants' wrongful conduct deprived Plaintiffs and Class Members of hundreds of millions of dollars of value."); *id.* at 34 ¶ 117 ("In substance, Defendants caused participants to sell their Stock Options and SARs when UTC's share price was $86.01 and then re-purchase those Stock Options and SARs . . . when the share prices . . . w[ere] $101.04."); *id.* at 40 ¶ 144 (alleging that Plaintiffs' rights in their awards were materially impaired because Plaintiffs received fewer Stock Options and their SARs had higher strike prices); *see also* Opp'n, Doc. No. 112, at 14 (arguing that Plaintiffs' claim is supported by allegations that "the 4/5 VWAP materially reduced the value of participants' Stock Options and SARs" by "decreas[ing] the number of options and SARs that participants received by roughly 15%" and "increas[ing] the Strike Price for the Stock Options and SARS").  Indeed, Plaintiffs do not dispute that they challenge the end result.  *See* Hrg. Trans., Doc. No. 121, at 52:4-5 ("We don't dispute that if the market had gone the other way, you know, there would not be someone claiming damages."). Fatally to Plaintiffs' claim, however, neither the UTC LTIP, the UTC 2018 LTIP, nor the Schedule of Terms guarantee a particular economic outcome for Plaintiffs following a merger or spinoff.

The implausibility of Plaintiffs' claim is further evinced by their reliance on *Hilton Hotels Corp. v. Dunnet*, 275 F. Supp. 2d 954, 964 (W.D. Tenn. 2002), another distinguishable case.  *Dunnet* concerned a merger between Hilton and Doubletree Corporation's successor, Promus.  *Id.* at 956.  Pursuant to the merger agreement, Hilton required that Promus cash out or cancel its outstanding options and assume any attendant liabilities.  *Id.* at 957.  Promus exchanged certain employees' in-the-money options for the difference between the exercise price

and the $38.50 merger consideration, but the executives' out-of-the-money options were rendered worthless. *Id.* at 957-58. Hilton brought a declaratory judgment action, seeking a declaration that it could cancel the executives' underwater options without providing compensation for them. *Id.* at 956. The Western District of Tennessee, construing Delaware law, denied Hilton's motion for summary judgment. *Id*. at 966.

There, in the event of a "Corporate Transaction," the executive compensation committee had "discretion" to act "appropriate[ly] in order to prevent dilution or enlargement of the benefits or potential benefits intended to be made available under the Plan. . . ." *Id*. at 962. The court concluded that the plans did not authorize the Board of Directors "an unfettered right to cancel outstanding options without appropriate compensation," because the plan implied that awards would be "exchanged for value" including cash, securities or other property. *Id*. at 964. The court further observed that cancellation would deny participants the time value of the awards due to the likelihood that underwater options might move into the money over time. *Id*. at 963 n.4. Moreover, it determined that cancellation without compensation would impermissibly "alter or impair" the rights of participants in violation of express plan terms. *Id*. at 964. Finally, the court considered that it was "unlikely that business executives" would have agreed that their options "could be taken away from them without payment or their consent" in the event of a corporate transaction. *Id*.

In *Dunnet*, the court concluded that the plans did not authorize the compensation committee "an unfettered right to *cancel* outstanding options without appropriate compensation." *Id.* at 964 (emphasis mine). Here, Plaintiffs allege that Defendants "converted," not cancelled, their awards. In addition, Plaintiffs do not allege that they were not compensated. There, the compensation committee had an obligation to replace cancelled awards "for an amount of cash

36

equal to the amount that could have been attained upon the exercise of such Award . . . or the replacement of such award with other rights or property." *Id.* at 964. Here, Defendants had discretion to adjust awards in connection with a merger and to determine how to do so, with no commensurate responsibility to guarantee Plaintiffs a specific economic outcome when awards were not cancelled.

For the foregoing reasons, I conclude that Plaintiffs' breach of contract claim is implausible and must be dismissed.

> 2. *Carrier and Otis are not liable for breaches of the UTC LTIP or UTC 2018 LTIP because Plaintiffs have not plausibly pled a breach of contract.*

Carrier and Otis further argue that Count One should be dismissed on the ground that they were not parties to the UTC LTIP or UTC 2018 LTIP, that the EMA precludes Plaintiffs from asserting a claim against Carrier or Otis based on assumption of liabilities in the EMA, and that Carrier and Otis are not liable under a theory of successor liability. *See* Doc. No. 108-1, at 7-13. Because I conclude that Defendants did not breach any contract, I need not reach whether Carrier and Otis are liable for UTC's alleged breach of contract.

For the foregoing reasons, I **dismiss** Count One.

C. Count II (Breach of Implied Covenant of Good Faith and Fair Dealing)

Defendants next move to dismiss Count Two, arguing that the Amended Complaint does not adequately plead a breach of the implied covenant of good faith and fair dealing. *See generally* RTX's Mem. of Law, Doc. No. 107-1, at 24-31; Carrier and Otis's Mem. of Law, Doc. No. 108-1, at 7 (adopting RTX's arguments). I agree.

Invoking the implied covenant of good faith and fair dealing is a "rare" and "fact-intensive" exercise, *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005), and a

"cautious enterprise," *Nemec v. Shrader*, 991 A.2d 1120, 1125 (Del. 2010).  Although express contractual provisions "always supersede" the implied covenant, a contract may "harbor residual nooks and crannies for the implied covenant to fill."  *Gerber v. Enter. Prod. Holdings, LLC*, 67 A.3d 400, 419 (Del. 2013), *overruled on other grounds by Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808 (Del. 2013).  In those situations, the implied covenant fills the gaps by "implying only those terms that the parties would have agreed to during their original negotiations if they had thought to address them."  *Id.* at 418; *see also Nemec*, 991 A.2d at 1126 ("[t]he implied covenant only applies to developments that could not be anticipated, not developments that the parties simply failed to consider").  Through an implied covenant analysis, the court must endeavor to assess "whether it is clear from what was expressly agreed upon that the parties who negotiated the express terms of the contract would have agreed to proscribe the act later complained of as a breach of the implied covenant of good faith—had [the originally contracting parties] thought to negotiate with respect to that matter."  *Gerber*, 67 A.3d at 418 (cleaned up); *accord Nemec*, 991 A.2d at 1126.  "[W]hat is 'arbitrary' or 'unreasonable'—or conversely 'reasonable'—depends on the parties' original contractual expectations, not a 'free-floating' duty applied at the time of the wrong."  *Gerber*, 67 A.3d at 419 (cleaned up).  In addition, the court may not rewrite a contract to "appease a party who later wishes to rewrite a contract he now believes to have been a bad deal."  *Nemec*, 991 A.2d at 1126.

    1.   *The Amended Complaint fails to state a valid implied covenant claim.*

      With those principles in mind, I conclude that the Amended Complaint does not plausibly plead that Defendants violated the implied covenant of good faith and fair dealing.  Plaintiffs allege that Defendants violated the implied covenant by using formulae to value participants' awards that were unnecessary, inequitable, and/or arbitrary.  *See* Am. Compl., Doc. No. 104-1, at

41 ¶ 148.  Plaintiffs assert that "the Compensation Committee could not exercise discretion in a

way that decreased the value of the awards" because the parties' "original contracting intent was

to keep the award recipients in the same financial position with respect to their previously

granted awards. . . ."  *Id*. at 41 ¶ 147.  But the Amended Complaint sets forth no factual

allegations suggesting that Defendants exercised their discretion unreasonably, inappropriately,

arbitrarily, or in bad faith at the time the formulae were selected.

To begin, because an implied covenant claim cannot supersede express contract terms,

several of Plaintiffs' claims fail.  For example, the Amended Complaint asserts that the

Committee "had the discretion on how to preserve participants' awards," but "could not exercise

discretion in a way that decreased the value of the awards."  Am. Compl., Doc. No. 104-1, at 41

¶ 147.  But the Plans expressly stated that the Committee could, within its discretion, adjust "the

number and kind of Shares or other securities subject to outstanding Awards" and alter "the

exercise price of outstanding" options and SARs in the event of a merger or spin-off.  UTC

LTIP, Doc. No. 107-3, at 8 § 10(b); UTC 2018 LTIP, Doc. No. 107-4, at 5 § 3(e)(i).  For that

reason, and because there is no evidence of any express contract term analogous to the *Lillis*

provisions requiring a specific economic outcome, I cannot agree with Plaintiffs that the Plans

indicate that the parties' original contracting intent was to narrowly "keep . . . recipients in the

same financial position with respect to their previously granted awards. . . ."  *Id*. at 41 ¶ 147; *id.*

at 42 ¶ 152.

Moreover, as previously-explained, Defendants did not act arbitrarily by employing

formulae that had "no realistic chance of providing 'an aggregate value equal to the value of such

Awards' or of protecting the value of any award like § 10(b) of the UTC LTIP required," Opp'n,

Doc. No. 112, at 24, because the obligation to exchange awards for substitutes "having an

aggregate value equal to the value of such Awards" expressly arises when awards are cancelled (rather than converted).  UTC LTIP, Doc. No. 107-3, at 8 § 10(b); UTC 2018 LTIP, Doc. No. 107-3, at 5 § 3(e)(iii).

Plaintiffs also assert that Defendants acted unreasonably because they knew that the 4/5 VWAP would fail at the formulae's inception.  Opp'n, Doc. No. 112, at 31-33.  For that proposition, Plaintiffs allege that using UTC's pre-closing price and a lag price for Carrier, Otis, and RTX "obviously and inevitably" effected a "price 'discontinuity.'"  *Id.* at 32.  Plaintiffs claim that Defendants could only have satisfied their contractual obligations, including but not limited to preventing an "increase or decrease" in Awards' value, if "the combined prices of RTX, Carrier and Otis" under the 4/5 VWAP formulae were "identical to the closing price of UTC on April 2, 2020," which was "a near impossibility for a single stock, let alone for the combined prices of three stocks."  Am. Compl., Doc. No. 104-1, at 22 ¶ 78.  Setting aside that the claim rests on inapposite contractual provisions, Plaintiffs' argument fails because it defies common sense.  It is impossible to know how a stock will perform in the future, a fact that Plaintiffs themselves seem to acknowledge.  *See id*.  Therefore, Plaintiffs do not— and cannot— allege that Defendants knew or could have known before the Transaction closed that the VWAP formulae would yield a less favorable outcome for Plaintiffs than another valuation method.

Relatedly, Plaintiffs have not pled any facts to establish that "had the parties to the [Plans] specifically addressed the issue at the time of contract, they would have agreed to preclude" the defendants from landing on the 4/5 VWAP formula.  *See Nemec*, 991 A.2d at 1127.  To the contrary, the Amended Complaint acknowledges, the parties' contracts expressly contemplated the scope of Defendants' discretion in the case of a corporate event like the Transaction, providing in such circumstances that "the Committee . . . *may in its discretion* make

such substitutions or adjustments as it deems appropriate and equitable" to awards.  UTC LTIP,
Doc. No. 107-3, at 8 § 10(b) (emphasis added); UTC 2018 LTIP, Doc. No. 107-4, at 5 § 3(e)
(emphasis added).

 Nor can I conclude that selecting the VWAP method was arbitrary or inappropriate,
because the formulae appear to have been chosen to reduce the risk of loss for employees.  A
volume-weighted average price is "[t]he average price of a stock traded during a single day
based on both volume and price, calculated by adding up the dollars traded in all transactions in
the stock (price multiplied by volume) during that day divided by the total number of shares of
the stock traded during the day."  Doc. No. 107-5, at 3.  Defendants correctly assert that a
VWAP method "allows for a more accurate reflection of how the market values each company
following the Spinoffs" by "reduc[ing] the effect of short-term volatility in a single day of
trading."  *Id.* at 6.  The Committee appears to have sought to minimize the downside risks for
employees.  Of course, any formula designed to limit downside risk also limits upside risk.
Therefore, by attempting to shield Plaintiffs from a big loss, Defendants perhaps also stymied
Plaintiffs from getting a huge windfall.  Such decision is patently reasonable and well-within the
Committee's broad grant of discretion.

 Moreover, the purpose statements set forth in Section 1 expressly appear to have invited
the Committee to distinguish the Incentive Compensation scheme from the company's short-
term market goals by repeatedly emphasizing the long-term nature of Incentive Compensation.
*E.g.*, UTC LTIP, Doc. No. 107-3, at 2 § 1 ("retention"); UTC 2018 LTIP, Doc. No. 107-4, at 2 §
1 ("long-term, sustainable performance").  Accordingly, I am not persuaded that Defendants
acted in an arbitrary fashion by distinguishing Incentive Compensation from common stock, and
by acting more cautiously with respect to Incentive Compensation than common stock.

Similarly, Plaintiffs assert that Defendants acted arbitrarily by deciding on the formulae during a period of market calm in early 2020— in advance of the "historic" market disruptions effected by COVID-19— and by failing to alter the formula accordingly.  *Id.* at 26 ¶ 89 – 28 ¶ 99; Opp'n, Doc. No. 112, at 7.  I cannot agree.  As explained in the previous paragraph, the VWAP method was designed to smooth market volatility.  Accordingly, Plaintiffs cannot plausibly plead that the formulae were arbitrary for Defendants' failure to account for volatility.

In addition, Plaintiffs seem to allege that Defendants acted arbitrarily by failing to alter the VWAP formula despite knowing in advance that Defendants would affect market conditions by amending RTX and Carrier's financial projections.  *See* Am. Compl., Doc. No. 104-1, at 30 ¶¶ 103-106.  This argument rests on an unsupported assumption that withdrawing the financial projections increased market volatility, which Plaintiffs allege in a conclusory and speculative fashion, and that Defendants knew that the withdrawal would engender that effect.  *See id.*  But even assuming *arguendo* that the withdrawal had its alleged impact, I am not persuaded.  If withdrawing the guidance increased market volatility, a formula designed to account for market volatility such as the VWAP method would have the effect of smoothing such volatility.

Plaintiffs also rely on Raytheon's "admission" in the May 29, 2020 Form 8-K SEC filing that the conversion formulae in the EMA "caused material discontinuity between the pre-Separation UTC stock price and the post-Separation [RTX] stock price originally chosen in the Agreement," which prompted Raytheon to later amend the EMA to change the formulae.  Am. Compl., Doc. No. 104-1, at 6 ¶ 6, 36 ¶ 123.  Plaintiffs suggest that Defendants knew that the discontinuity would "inevitably occur" because Defendants admitted that they "c[ould] not predict the effect of the [Transaction] on the trading prices of Carrier, Otis or UTC common stock or know with certainty whether the combined market value of one share of Carrier

common stock, the number of shares of Otis common stock to be distributed per share of UTC common stock in the Otis distribution and one share of UTC common stock will be less than, equal to or greater than the market value of one share of UTC common stock prior to the distributions." *Id.* at 23 ¶¶ 80-81.  But I perceive two problems with that argument.  For one, that "admission" has no bearing on Plaintiffs' claim, because the statement only addresses what transpired following the Board's decision rather than the decision itself.  Moreover, even if I take the allegation at face value, I am not persuaded.  Plaintiffs' decision to construe Defendants' statement that they could not predict the effect of the Transaction on trading prices as stating that Defendants knew that a certain outcome would occur defies common sense.  Plaintiffs' conclusory allegation of bad faith conduct is an insufficient basis for an implied covenant claim. *Lonergan v. EPE Holdings, LLC*, 5 A.3d 1008, 1022 (Del. Ch. 2010) ("When a party seeks to invoke the implied covenant, [g]eneral allegations of bad faith conduct are not sufficient.") (cleaned up).

Likewise, the statement that the amendment to the EMA "preserves the Company's ability to *continue to* treat employees and retirees fairly in the conversion process," doc. no. 104-1, at 36 ¶ 124, does not shed light on the decision-making process that preceded the Transaction. Instead, those statements were made nearly two months after the Transaction and thus with the benefit of hindsight.  For those reasons, Raytheon's representations do not support the argument that Defendants exercised their discretion in an arbitrary fashion when by selecting the 4/5 VWAP methodology.

The UTC Chairman and CEO's statement expressing optimism that the spin-off of Carrier and Otis would "maximize value creation," *id.* at 17 ¶ 55, does not compel a conclusion to the contrary.  The statement does not raise a plausible inference that Defendants knew that the

stock prices would move higher, and thus would fare poorly for Plaintiffs, four to five days following the Transaction, particularly considering that the Transaction was impacted as the COVID-19 pandemic was emerging and high market volatility ensued.

At bottom, the implied covenant "is not an equitable remedy for rebalancing economic interests after events that could have been anticipated, but were not, [and] that later adversely affected one party to a contract," but rather is a "limited and extraordinary legal remedy." *Nemec*, 991 A.2d at 1128.  For those reasons, and because Plaintiffs proffer no allegations raising a plausible inference that the Committee acted with bad faith, irrationally, or arbitrarily when it developed the adjustment methodology, the claim cannot withstand the motions to dismiss.

> 2. *Carrier and Otis are not liable for breach of the implied covenant of good faith and fair dealing because Plaintiffs have not plausibly pled a breach of the implied covenant.*

Otis and Carrier again argue that Count II fails because they are not parties to the UTC LTIPs, and that Plaintiffs cannot rely on the EMA to hold them liable because Plaintiffs are neither parties to, nor third-party beneficiaries of, the EMA.  *See* Doc. No. 108-1, at 7-8. Because I conclude that Plaintiffs have not plausibly pled that Defendants breach the implied covenant of good faith and fair dealing, I need not reach whether Carrier and Otis are liable for UTC's alleged breach.

For the foregoing reasons, I **dismiss** Count Two.

## D. Count III (Specific Performance)

In Count III, Plaintiffs assert a claim for specific performance, seeking that the Court order Defendants to "adjust the number of SARs and other awards . . . as well as the Strike Prices of those SARs."  Am. Compl., Doc. No. 104-1, at 43 ¶ 156 – 44 ¶ 162.  Defendants argue that

the Court should dismiss the claim for specific performance because specific performance is an equitable remedy for breach of contract, not a separate cause of action, and there has been no breach of contract to remedy.  Doc. No. 107-1, at 31-32; Doc. No. 108-1, at 7.  I agree.

"Although phrased as a claim, specific performance is a form of equitable relief dependent upon an underlying cause of action—in this case: breach of contract." *Boulden v. Albiorix, Inc.*, 2013 WL 396254, at *12, as revised (Del. Ch. Feb. 7, 2013).  A request for specific performance "depend[s] on the viability and outcome of the underlying cause[] of action." *Addy v. Piedmonte*, 2009 WL 707641, at *23 (Del. Ch. Mar. 18, 2009).  Here, "[b]ecause the court has dismissed the breach of contract claim, an independent claim for specific performance cannot stand." *Benihana of Tokyo, Inc. v. Benihana, Inc.,* 828 F. Supp. 2d 720, 727 (D. Del. 2011).

For the foregoing reasons, I **dismiss** Count Three.

E. <u>Leave to Replead</u>

In general, the Court will grant leave to amend a complaint upon granting a motion to dismiss. *Ronzani v. Sanofi S.A.*, 899 F.2d 195, 198 (2d Cir. 1990) (cleaned up).  However, "[a]lthough Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend 'shall be freely given when justice so requires,' it is within the sound discretion of the district court to grant or deny leave to amend." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007) (quoting Fed. R. Civ. P. 15(a)).  The Court may deny leave for a good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party. *Foman v. Davis*, 371 U.S. 178, 182 (1962).  I conclude that dismissal with prejudice is warranted here for two reasons.

One, I have already granted Plaintiffs leave to amend their original complaint.  At that time, Defendants had already moved to dismiss Plaintiff's original complaint, and Plaintiffs were on notice of Defendants' arguments.  Nevertheless, Plaintiffs did not cure the deficiencies in their original complaint upon repleading.  In such circumstances, denying leave to amend is not an abuse of discretion.  *See*, *e.g.*, *Nunes v. Cable News Network, Inc.*, 31 F.4th 135, 147 n.7 (2d Cir. 2022) (denial of leave to replead was proper where, *inter alia*, the plaintiff had "receiv[ed] a preview" of the defendant's motion to dismiss); *Edwards v. Black*, 854 F. App'x 382, 386 (2d Cir. 2021) (summary order) (denial of leave to amend was proper where, *inter alia*, the plaintiff had already been granted an opportunity to amend his complaint and did not cure its deficiencies); *In re American Express Co. Shareholder Litigation*, 39 F.3d 395, 402 (2d Cir. 1994) (affirming dismissal with prejudice because, *inter alia*, plaintiffs had two opportunities to amend their complaint); *Mooney v. Vitolo*, 435 F.2d 838, 839 (2d Cir. 1970) (affirming dismissal with prejudice where plaintiffs had twice amended their complaint before dismissal).

Two, the Second Circuit has advised that when the problem with a cause of action is substantive and better pleading will not cure it, repleading is futile and the Court should not grant the party leave to replead.  *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also IBEW Loc. Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 389 (2d Cir. 2015) ("Proposed amendments are futile if they would fail to cure prior deficiencies or to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  Thus, the standard for denying leave to amend based on futility is the same as the standard for granting a motion to dismiss.") (internal citation and quotation marks omitted).  Plaintiffs' claims sound in contract.  Interpreting and construing an unambiguous contract presents questions of law.  For the reasons set forth in this ruling, the wording of the contracts preclude Plaintiffs'

46

claims.  Therefore, the problems with the Amended Complaint's claims are substantive and they will not be cured by better pleading.  Thus, "granting leave to amend is unlikely to be productive." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993).  Accordingly, I decline to do so.

Because repleading would be futile, dismissal with prejudice is appropriate.

## IV.     Conclusion

For the reasons set forth, I **grant** RTX's Motion to Dismiss, doc. no. [107], and Carrier and Otis's joint Motion to Dismiss, doc. no. [108].  I hereby **dismiss** Counts One, Two, and Three with prejudice.

The Clerk is directed to enter judgment in favor of Defendants and close this case.

So ordered.

Dated at Bridgeport, Connecticut, this 30th day of September 2022.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge